# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

RADIO FREE ASIA,
2500 M Street, NW
Washington, D.C. 20037,

         *Plaintiff,*

v.

THE UNITED STATES OF AMERICA;

UNITED STATES AGENCY FOR GLOBAL
MEDIA,
Wilbur J. Cohen Federal Building
330 Independence Avenue, SW
Washington, D.C. 20237;

KARI LAKE, in her official capacity as
Senior Advisor to the Acting CEO of the
United States Agency for Global Media,
Wilbur J. Cohen Federal Building
330 Independence Avenue, SW
Washington, D.C. 20237;

VICTOR MORALES, in his official capacity
as Acting Chief Executive Officer of the
United States Agency for Global Media,
Wilbur J. Cohen Federal Building
330 Independence Avenue, SW
Washington, D.C. 20237;

OFFICE OF MANAGEMENT AND
BUDGET,
725 17th Street, NW
Washington, D.C. 20503;

RUSSELL VOUGHT, in his official capacity
as Director of United States Office of
Management and Budget
725 17th Street, NW
Washington, D.C. 20503;

Case No. _____

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND PETITION
FOR WRIT OF MANDAMUS

UNITED STATES DEPARTMENT OF
TREASURY,
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220;

and

SCOTT BESSENT, in his official capacity as
United States Secretary of the Treasury,
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220,

*Defendants.*

## **COMPLAINT**

1.      This case challenges a federal agency's unilateral refusal to follow laws duly

enacted by Congress.  Congress appropriated funds directly to Radio Free Asia (RFA) so that it

can provide uncensored reporting in Asian countries that otherwise lack access to free press.

Congress directed that the United States Agency for Global Media (USAGM) provide RFA its

appropriated funds via grant agreements.  USAGM has nevertheless refused to grant or disburse

the appropriated funds on the basis that the grant "no longer effectuates agency priorities."  But

Congress did not give USAGM discretion to unilaterally withhold RFA's congressionally

appropriated funds.  Urgent relief is needed to compel USAGM to follow the law and release

RFA's appropriated funds.

2.      For over eighty years, the federal government has funded independent journalism

abroad as a means of providing accurate news to foreign publics that would otherwise hear only

what their governments want them to hear.  Recognizing that some of the world's most

repressive regimes are in Asia, Congress in the 1990s created Radio Free Asia, a private,

nonprofit organization, to bring independent broadcasting to Asian countries that do not honor freedom of expression.

3.    RFA began broadcasting in 1996 and for almost three decades it has, without interruption and with bipartisan support, dutifully fulfilled its statutory purpose, reaching millions of people in countries across Asia, many of whom are otherwise unable to access objective, independent journalism.  It has offered groundbreaking reporting on a host of developments, including the Uyghur genocide in Xinjiang, the cover-up by the Chinese Communist Party (CCP) of COVID-19 fatalities, and the unfolding crisis in Myanmar since the 2021 coup.  These and other reports provide a more accurate and fuller picture of current events not only to RFA's audiences in China, North Korea, Myanmar, and the greater Asia-Pacific region, but also to the U.S. national security and policymaking community.

4.    Since RFA's inception, Congress has appropriated funding to provide annual grants to the organization.  The executive agency distributing these funds, USAGM, has—until now—always complied with its statutory mandate to "make annual grants for the purpose of carrying out" RFA's critical role.  22 U.S.C. § 6208(a).  RFA depends entirely on these congressionally appropriated funds to sustain its journalistic work.

5.    Despite this statutory mandate and Congress's express appropriation of funds to RFA, USAGM has impounded RFA's congressionally appropriated funds.  First, USAGM refused to grant or disburse RFA's congressionally appropriated funds for the period March 1 through March 14, 2025.  After that, USAGM entirely terminated RFA's grant, confirming that USAGM has made a final decision to impound RFA's appropriated funds from March 1, 2025 through the end of Fiscal Year 2025.  USAGM terminated RFA's grant on the purported basis that funding RFA "no longer effectuates agency priorities," and in response to a March 14

Executive Order directing USAGM to eliminate "all non-statutorily required activities and functions." But that is no justification: Funding RFA is a statutorily required activity and function.

6.     USAGM's abrupt and unlawful decision to impound RFA's funding is, in the words of the Ranking Member of the House Select Committee on China, "a gift to the Chinese Communist Party."[1] As the Republican Chair of the East Asia and Pacific Subcommittee similarly explained, "[g]utting" RFA "counters the principles of freedom our nation was founded on and cedes leverage to the Chinese Communist Party, North Korea and other regimes."[2] These concerns are well founded. For instance, just last year, Chinese state-run media celebrated the closure of RFA's Hong Kong office, describing RFA's investigative journalism as an "attack and smear campaign against China."[3] And upon learning that RFA's grant had been terminated, a journalist from a CCP-controlled publication hailed it as "EXCELLENT NEWS."[4]

7.     USAGM's actions defy Congress's commands and the U.S. Constitution. Without access to its congressionally appropriated funds, RFA's operations have already been effectively shuttered, making it nearly impossible to perform its statutory mission. Its journalists—who often risk their lives to provide reliable and unbiased news in countries that are hostile to a free press—may soon lose RFA's advocacy and protection and, as a result, will face

---

[1] Phelim Kine, *DOGE Targets Radio Free Asia*, Politico (Mar. 13, 2025, 11:00 AM), https://www.politico.eu/newsletter/china-watcher/doge-targets-radio-free-asia/, *archived at* https://perma.cc/B2LC-M8TC (internal quotation marks omitted).

[2] *Id.* (internal quotation marks omitted).

[3] *Netizens Hail Closure of Radio Free Asia in Hong Kong, As End of 'Fake News Creator' Rumor-Mongering Era Beneficial to the City*, Global Times (Mar. 21, 2024, 3:19 PM), https://www.globaltimes.cn/page/202403/1309829.shtml, *archived at* https://perma.cc/VUM4-P7Y4.

[4] Andy Boreham (@AndyBxxx), X/Twitter (Mar. 15, 2025, 3:28 AM), https://x.com/andybxxx/status/1900811337304768903?s=42, *archived at* https://perma.cc/9DMU-3RD6.

an even greater risk of imprisonment and physical harm.  Meanwhile, RFA's reputation—as a reliable news source, a protector of journalists who put themselves in harm's way, and as a business partner to local media outlets—may never recover.  These harms threaten the very existence of RFA and its ability to fulfill Congress's goal of providing reliable, uncensored news in countries where press freedom is weakest.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction pursuant to 28 U.S.C. § 1331, 1346, and 1361.

9.      Venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.  28 U.S.C. § 1391(e).

## PARTIES

10.     Plaintiff RFA is a private, nonprofit 501(c)(3) organization headquartered in Washington, D.C.  RFA's mission is to deliver uncensored, domestic news and information to places in Asia with poor media environments and few, if any, free speech protections.

11.     Defendant the United States of America is sued in its governmental capacity as a proper party defendant for actions seeking relief under the Administrative Procedure Act (APA), 5 U.S.C. § 702.

12.     Defendant United States Agency for Global Media is a federal agency that makes and administers grants supporting the United States' international broadcasting efforts worldwide.

13.     Defendant Victor Morales is Acting Chief Executive Officer of USAGM.  He is sued in his official capacity.  The CEO of USAGM supervises all activities relating to broadcasting, including by making and supervising grants for broadcasting and related activities. *See generally* 22 U.S.C. § 6204(a).

14.     Defendant Kari Lake is Senior Advisor to the Acting Chief Executive Officer of the USAGM.  She is sued in her official capacity.

15.     Defendant the Office of Management and Budget (OMB) is an administrative agency within the Office of the President of the United States.  Defendant OMB apportions congressionally appropriated funding to USAGM to be disbursed to RFA.

16.     Defendant Russell Vought is the Director of OMB.  He is sued in his official capacity.

17.     Defendant United States Department of Treasury is a federal agency headquartered in Washington, D.C., with responsibility for managing federal finances.

18.     Defendant Scott Bessent is the United States Secretary of the Treasury.  He is sued in his official capacity.

## FACTS

### A.  Radio Free Asia

19.     RFA is a private, nonprofit, multimedia news organization that provides award-winning, uncensored local news to countries across Asia that restrict free speech, freedom of the press, and access to reliable information within their borders.  Established in 1996, RFA currently offers content in 10 languages and reaches an audience of nearly 60 million people each week.  *See* Radio Free Asia January 2025 Factsheet.[5]  RFA has been funded by appropriations from the U.S. Congress since its inception.

---

[5] *January 2025 Factsheet*, Radio Free Asia, https://rfa-english.s3.us-east-1.amazonaws.com/docs/RFA+Factsheet+January+2025.pdf (last accessed Mar. 21, 2025), *archived at* https://perma.cc/L8X4-F78A.

20.      RFA was conceived after the 1989 Tiananmen Square massacre prompted calls to create a surrogate news service devoted to local uncensored journalism in China.[6]  Five years later, Congress enacted the United States International Broadcasting Act of 1994, which laid out the framework for RFA's creation as a private, nonprofit media organization.  Pub. L. No. 103-236, Title III, § 309, 108 Stat. 382, 440 (1994).  In that Act, Congress found that it was "the policy of the United States to promote the right of freedom of opinion and expression," and that open communication of ideas "contributes to international peace and stability" and "is in the interests of the United States."  22 U.S.C. § 6201(1), (2).  Congress further found that establishing a new broadcasting service to serve Asian countries that lack adequate sources of free information would promote information and ideas and advance U.S. foreign policy goals. The Act accordingly directed USAGM's predecessor, the Broadcasting Board of Governors, to submit a detailed plan for establishing and operating Radio Free Asia, which would carry out radio broadcasting in Asia.  Pub. L. No. 103-236, § 309(a), (c), 108 Stat. 382, 439–40.  The Act authorized the Broadcasting Board of Governors to make annual grants to Radio Free Asia, so that it could provide accurate and timely information, news, and commentary and be a forum for a variety of opinions and voices from within Asian nations whose people "do not fully enjoy freedom of expression."  *Id.* § 309(a), (b).

21.      RFA was officially incorporated in Washington, D.C. in March 1996 and began broadcasting later that year.  Today, RFA provides independent, uncensored, and accurate local news to audiences who lack access to a free press or live in media environments vulnerable to authoritarian disinformation.[7]  Through its journalism, RFA puts pressure on the ruling CCP and

---

[6] *About*, Radio Free Asia, https://www.rfa.org/english/about/ (last accessed Mar. 22, 2025), *archived at* https://perma.cc/YU3E-CKEK.

[7]  *About*, Radio Free Asia, *supra* note 6.

other malign regimes by covering sensitive issues that would otherwise be censored or ignored by state-controlled media and by dissecting false narratives and misinformation.[8]  For instance, it has offered groundbreaking reporting on the Uyghur genocide in Xinjiang, the CCP's cover-up of COVID-19 fatalities, the unfolding crisis in Myanmar since the 2021 coup, and the journeys of North Korean defectors.  *Id.*  Its reporting has won prestigious awards and been cited by major media outlets and publications.  *Id.*

22.     At the heart of RFA's ability to provide top-quality journalism are its statutory protections for journalistic integrity.  Congress mandated that agency programming meet the "highest professional standards of broadcast journalism," 22 U.S.C. § 6202(a)(5), and that it be "consistently reliable and authoritative, accurate, objective, and comprehensive," *id.* § 6202(b)(1).  To help achieve that vision, Congress adopted a statutory firewall to insulate RFA's journalists and content from any and all political influence, including by or through USAGM.  For instance, the statute directs the USAGM CEO and Secretary of State to "respect the professional independence and integrity" of RFA, and it bars the USAGM CEO and any other full-time federal employee from serving on RFA's board.  22 U.S.C. § 6204(b), (c)(2).

23.     RFA today has expanded beyond radio broadcast to build a robust online presence, amassing 257 million website views in 2024 and 38.1 million followers on social media.[9]

24.     RFA is able to provide quality independent news to people in repressive Asian countries because of its sustained efforts to recruit journalists and staff with the relevant language skills and cultural knowledge.

---

[8] *January 2025 Factsheet*, Radio Free Asia, *supra* note 5.

[9] *January 2025 Factsheet*, Radio Free Asia, *supra* note 5.

25.     RFA employs over 400 employees, in addition to hundreds of journalists, stringers, and contractors, and it has offices overseas in Taipei, Bangkok, Seoul, Istanbul, and Dharamsala.  Many of RFA's journalists are unable to work in their home countries due to threats of persecution stemming from their independent journalism covering their home and neighboring countries.  They therefore operate in the United States through work visas supported by their employment at RFA.

**B.  Radio Free Asia Is Funded By Direct Congressional Appropriation**

26.     RFA is a private entity that is funded by direct appropriations from Congress, but it is not itself a federal government entity.  *See* 22 U.S.C. §§ 6208, 6209(c).

27.     Unlike other nongovernmental organizations, which receive funds at the discretion of federal agencies, RFA is funded through annual appropriations that Congress provides specifically for RFA.  All of RFA's funding comes from its federal appropriation; it has no other source of money.

28.     For Fiscal Year 2024, Congress appropriated funds for RFA in the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, 138 Stat. 460 (2024) (2024 Appropriations Act), providing that the "funds appropriated under this heading *shall be allocated* in accordance with the table included under this heading in the explanatory statement described in section 4." *Id.* at 735 (emphasis added).  The table referenced in the text of the statute allocated $60,830,000 to Radio Free Asia for the 2024 fiscal year.[10]  Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R.

---

[10] Incorporation by reference is a well-accepted legislative tool in the appropriations context, and the Government Accountability Office has recognized that incorporation by reference renders spending language legally binding. *See, e.g.*, B-316010, Consolidated Appropriations Act, 2008 – Incorporation by Reference (Feb. 25, 2008), https://www.gao.gov/assets/b-316010.pdf.

2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024).

29.    Congress has extended RFA's funding through September 2025.  For Fiscal Year 2025, Congress adopted three continuing resolutions that fund USAGM at the same levels and "under the authority and conditions" that Congress funded USAGM in Fiscal Year 2024.[11]  By appropriating funds under the same conditions specified in the 2024 Appropriations Act, the Fiscal Year 2025 continuing resolutions together mandate that approximately $60.8 million once again "shall be allocated" to RFA.

30.    The appropriations acts powerfully reinforce that USAGM lacks discretion to withhold RFA's appropriated funds wholesale.  Congress provided limited circumstances under which USAGM may reprogram funds among different programs.  Critically, USAGM may not reprogram funds if doing so would reduce funding for a program, such as RFA, by more than 5 percent.  2024 Appropriations Act, 138 Stat. at 735; *see also* 170 Cong. Rec. at H2087.  And USAGM may not even implement that modest (less than 5 percent) reprogramming of funds unless it provides the House and Senate Appropriations Committees with 15 days advance notice.  *Id.*; *see also* 170 Cong. Rec. at H2087.

---

[11] *See* Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, div. A, § 101(11), 138 Stat. 1524–25 (2024) (First Continuing Resolution) (appropriating funds as provided in the 2024 appropriations law and making them available through December 20, 2024); American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722 (2024) (Second Continuing Resolution) (extending funding through March 14, 2025); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101, 139 Stat. 9 (2025) (Third Continuing Resolution) (extending funding through September 30, 2025).

31.     Once the congressional appropriation is enacted and signed into law, OMB is responsible for apportioning RFA's appropriated funds to USAGM so that they may be disbursed to RFA.  *See* 31 U.S.C. § 1513(b).[12]

32.     USAGM is required to transfer appropriated funding to RFA.  In the appropriations legislation, Congress directed that appropriated funds "shall be allocated" to RFA. In the U.S. International Broadcasting Act of 1994, Congress established the mechanism to ensure those appropriated funds are granted to RFA.  Specifically, the Act requires USAGM to "make and supervise grants" to RFA in furtherance of the Act.  22 U.S.C. § 6204(a)(5); *see also id.* § 6208(a)(1) ("Grants authorized under section 6204 of this title shall be available to make annual grants for the purpose of carrying out radio broadcasting to Asia.").  By conferring that authority on USAGM and USAGM alone, the Act mandates that USAGM award RFA its appropriated funds through grants.  Indeed, in 2020, USAGM recognized before this Court that that statutory language "dictate[s] how the CEO [of USAGM] *must exercise* his § 6204 grant-making authority when dealing with [RFA]."  Defs.' Opp. To Pls.' Mot. for TRO at 4, *Open Tech. Fund v. Pack*, No. 20-cv-1710, 2020 WL 7041426 (D.D.C. June 26, 2020), ECF No. 7 (emphases added).

33.     Pursuant to that statutory mandate, each year USAGM has entered into grant agreements with RFA, awarding funds on an ongoing basis as they are appropriated, whether by annual appropriations acts or continuing resolutions.

34.     RFA typically submits letter drawdown requests every month to request payment of the grant funds.  In the ordinary course, USAGM acknowledges receipt of RFA's drawdown

---

[12] The apportionment obligation is assigned by statute to the President, who has delegated the authority to the Director of OMB. *See Notice; Delegation of Apportionment Authority*, 90 Fed. Reg. 9737 (Feb. 18, 2025), https://www.federalregister.gov/documents/2025/02/18/2025-02720/notice-delegation-of-apportionment-authority.

requests and promptly causes RFA's appropriated funds to be transferred to its bank account by the Department of Treasury.

### C. USAGM Has Unlawfully Impounded RFA's Congressionally Appropriated Funds

35.    Consistent with its statutory mandate, USAGM began Fiscal Year 2025 by executing grant agreements with RFA.  On October 9 and 10, 2024, USAGM and RFA signed an agreement granting the funds appropriated to RFA pursuant to the First Continuing Resolution. The agreement granted an award of $11,663,384 for RFA's use.  On January 15 and 16, 2025, USAGM and RFA signed a grant agreement that granted a share of the funds appropriated to RFA pursuant to the Second Continuing Resolution.  The agreement granted an award of $13,451,372 for RFA's use, bringing RFA's total award for Fiscal Year 2025 to $25,114,756. Those funds were meant to cover RFA's operating expenses through February 28, 2025, and they were disbursed to RFA in the usual course.

36.    At the end of February 2025, RFA took steps to ensure that USAGM would grant and disburse the remaining funding that had been appropriated for its use in the Second Continuing Resolution.  The agreement would have awarded RFA an additional $4,631,068, bringing its total for Fiscal Year 2025 to $29,745,824.  These funds were meant to cover RFA's operating expenses from March 1, 2025 through the expiration of the Second Continuing Resolution on March 14, 2025.  RFA's president signed the agreement on March 13, 2025.

37.    After RFA's president signed the grant agreement for RFA's March 1 through 14, 2025 funding, the finance team at USAGM assured RFA staff that Defendant Morales would soon counter-sign the agreement.  He never did so.  Accordingly, those funds have not been granted or disbursed to RFA.

38.    On March 14, 2025, Congress passed the Third Continuing Resolution, which appropriated an additional approximately $30 million for RFA's use for the remainder of Fiscal Year 2025, which runs through September 30, 2025.  The President signed the act into law on March 15.

39.    USAGM similarly has failed to take any steps to grant or disburse the funding RFA must receive pursuant to the Third Continuing Resolution, which Congress appropriated to fund RFA's operations between March 15, 2025 and September 30, 2025.

40.    Also on March 14, 2025, Executive Order "Continuing the Reduction of the Federal Bureaucracy" was issued.[13]  The order provided that the "non-statutory components and functions of" specified agencies, including USAGM, "shall be eliminated to the maximum extent consistent with applicable law."[14]  The Executive Order directed OMB to review the budget request from USAGM and "to the extent consistent with applicable law . . . reject funding requests . . . to the extent they are inconsistent with this order."[15]  The Executive Order did not purport to define USAGM's function of granting congressionally appropriated funds to RFA as a "non-statutory function."  Nor could it have—Congress left the Executive no discretion to withhold RFA's appropriated funds.

41.    On the morning of Saturday, March 15, 2025, RFA received a one-page letter from Defendant Lake purporting to terminate RFA's funding effective that same day.  In terminating RFA's grant, USAGM confirmed that it had made a final decision to impound

---

[13] Exec. Order No. 14,238, 90 Fed. Reg. 13043 (Mar. 14, 2025).

[14] *Id.* § 2(a).

[15] *Id.* § 2(c).

RFA's congressionally appropriated funds from March 1, 2025 through the end of Fiscal Year 2025.[16]

42.     USAGM's termination letter advised that it was terminating RFA's funding because RFA "no longer effectuates agency priorities," citing the March 14 Executive Order. The letter further instructed RFA to discharge its "closeout obligations," including the responsibility to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained," or else face enforcement action.

43.     The letter provides no information supporting USAGM's claim that RFA no longer effectuates agency priorities.  And the fact that each of RFA's sister entities received identical termination letters, simultaneously, strongly suggests that no finding regarding RFA was made.

44.     But even if the letter had provided additional detail, there is no statutory authority to withhold RFA's congressionally appropriated funds based on "agency priorities."  The statute permits termination if appropriated funds are not used "only for activities consistent with" the governing statute, and it permits USAGM to use an alternative entity if RFA is "not carrying out the functions described in [the governing statute] in an effective and economical manner."  22 U.S.C. § 6208(c)(5), (g).  Neither provision permits USAGM to terminate RFA's congressionally appropriated funding with the threadbare recital that "agency priorities" have not been effectuated.  It is Congress's priorities—and not USAGM's—that govern here.  Indeed, Congress itself insulated RFA from changing agency priorities, providing that the USAGM CEO

---

[16] Defendant Lake's March 15 letter advised that RFA could object to or challenge the termination decision via an appeal addressed directly to Defendant Lake.  RFA promptly submitted an appeal letter on March 19, 2025.  On March 20, a USAGM official informed RFA that Defendant Lake would not be responding to that appeal.

and the Secretary of State must "respect the professional independence and integrity" of RFA. *Id.* § 6204(b).

45.    In RFA's nearly three-decade history, it is not aware of any instance in which USAGM or its predecessor agency has refused to grant or disburse funds that Congress appropriated for RFA. The denial of access to funds mandated by law is unprecedented and will, if not remedied immediately, inflict irreparable harm on RFA and imminently require RFA to completely cease its operations. That is contrary to Congress's expressed intent, as indicated by the statutory provisions governing RFA's operation, as well as Congress's consistent and direct appropriation of funds to RFA, most recently in the Third Continuing Resolution, enacted on March 15, 2025.

**D.  Harm to Radio Free Asia**

46.    As a result of RFA's inability to access its congressionally appropriated funds, RFA is currently facing and will continue to face irreparable harms to its operations and to the security of its journalists. Irreparable harms also flow from USAGM's statement in the grant termination letter that RFA must make reasonable efforts to discontinue costs—that position prevents RFA from performing its ordinary operations. *See* 2 C.F.R. § 200.472. Those harms jeopardize RFA's very existence.

47.    Because of the grant termination and the withholding of its congressionally appropriated funds, RFA has already been forced to significantly scale back its operations. Due to RFA's inability to access those funds, RFA has furloughed over 200 employees, or 75% of its domestic staff, and has terminated or suspended contracts for 93% of domestic and international freelance journalists. Without its congressionally appropriated funds, RFA will continue to be

forced to stop the vast majority of its journalistic work and continue to be at risk of ceasing to exist as an organization.

48.     Failing to provide RFA with its congressionally mandated funding will effectively end RFA's operations by requiring it to halt essentially all broadcasting and news operations.  Its ability to pursue its congressionally mandated mission will be eliminated.  RFA reaches nearly 60 million people every week.  Stopping news coverage in countries where there are few alternative news sources in the local language apart from state-controlled or state-influenced media means that millions of people will be cut off from access to free and independent media coverage of critical events.  This will irrevocably harm RFA's reputation and credibility among those who rely on RFA for news.  It will also have an immeasurable impact in reducing democratic access to information and set back the work of independent journalism in these countries.

49.     RFA's loss of funding and the termination of its grant will also impose unrecoverable financial losses on the organization.  For example, RFA is responsible for multiple leases and obligations on which it will be forced to default without Congress's appropriated funds.  Terminating staff will also impose very significant costs in the form of providing required severance.  RFA does not have the funds to meet these obligations.

50.     RFA relies on journalists from and in other countries to do some of its most critical reporting.  Many of these journalists have faced threats to their personal security arising from their reporting.  RFA journalists and their family members are constantly targeted by the regimes that they cover, and have been subject to arrest, torture, imprisonment and ill treatment in prison, abduction, denial of legal representation, physical surveillance, online harassment, and publication of their personal information online (doxxing).  RFA helps protect its journalists

from these dangers by advising on physical and digital safety, providing safety equipment, conducting risk assessments prior to news assignments, conducting safety trainings, helping detained journalists secure legal representation, and assisting staff with relocation, including bringing them to safety in the United States. If RFA's congressionally appropriated funding is not restored, it will not be able to provide such assistance to its journalists, and the security of those journalists and their families will be endangered.

51.     Given the nature of RFA's work to support journalistic freedom, it is a frequent target of cyber threats and attacks, including by foreign state actors. If RFA does not receive its congressionally appropriated funding, it will not be able to pay its vendors who defend against cyberattacks. Some of RFA's critical cybersecurity defense tools have monthly licenses that will lapse in thirty days if there is a delay in payment. Weakened cybersecurity measures greatly increase the chance of an attack that could harm the organization by damaging its systems, disrupting its network, and allowing data theft. And any data breach will risk exposing the personal information of journalists working in authoritarian states, putting their security, and potentially their lives, at risk.

52.     RFA's workforce relies heavily on language-qualified journalists who have fled from authoritarian regimes in countries such as Cambodia, Vietnam, Myanmar, North Korea, Laos, and China. Dozens of such journalists live and work in the United States on non-immigrant, employment-based visas. Those visas require them to be working and paid for their work to remain here. If RFA does not receive its congressionally appropriated funding, it will have to furlough or terminate these staff members, at which point they will no longer satisfy the terms of their visas and may be forced to return to their home countries, where some will face immediate arrest and detention because of their journalism.

53.    Absent judicial relief to ensure the restoration of access to congressionally appropriated funding, RFA's reputation and ability to perform its mission will be harmed irrevocably long into the future.  Many RFA journalists operate in risky environments.  It takes time and effort for RFA to build trust and credibility with its journalists, and journalists with their sources.  If forced to close its doors, even for a short period of time, RFA's credibility will be damaged with journalists it may later hope to employ or re-employ.  Moreover, if RFA is not able to protect its current journalists, it will be very difficult for RFA to persuade journalists to join or rejoin RFA in the future.  The lack of access to congressionally appropriated funding therefore severely undermines RFA's journalistic mission and contribution to freedom of the press around the world.

## CLAIMS FOR RELIEF

### COUNT ONE
### APA, 5 U.S.C. § 706(2)(A)–(C)
### (Against All Defendants)

54.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

55.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" "contrary to constitutional right, power, privilege, or immunity[,]" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"  5 U.S.C.§ 706(2)(A)–(C).

56.    Defendants' impoundment of RFA's congressionally appropriated funding and termination of RFA's grant agreement is final agency action reviewable under 5 U.S.C. § 704.

57.    Defendants' actions are "final" because USAGM's refusal to grant and disburse RFA's congressionally appropriated funds beginning in March 2025, and culminating in

Defendant Lake's March 15, 2025, Notice of Grant Termination Letter, "mark[s] the consummation of the agency's decisionmaking process" and is an action by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation and internal quotation marks omitted).

58.     Defendants' actions are contrary to law and in excess of statutory authority because the International Broadcasting Act and the relevant appropriations laws create a mandatory, non-discretionary duty for Defendants to make available to RFA its congressionally appropriated funds.  22 U.S.C. §§ 6204(a)(5), 6208(a); Second Continuing Resolution; Third Continuing Resolution.  Defendants have not fulfilled that duty.

59.     Defendants' actions are also contrary to law because they breach the statutory firewall that Congress enacted to protect RFA journalists from political influence, including through USAGM.  That firewall aims to ensure that RFA programming will meet the "highest professional standards of broadcast journalism," 22 U.S.C. § 6202(a)(5), and be "consistently reliable and authoritative, accurate, objective, and comprehensive," *id.* § 6202(b)(1).  Pursuant to that firewall, the USAGM CEO must "respect the professional independence and integrity" of RFA.  *Id.* § 6204(b).  As officers of USAGM and its associated entities, Defendants Lake and Morales are bound by the statutory firewall.  They have violated the firewall by interfering with and indeed preventing RFA's newsgathering and news dissemination.

60.     Defendants' actions are also contrary to the United States Constitution because Defendants are unlawfully withholding funds appropriated by Congress for RFA through the constitutionally prescribed legislative process, in violation of the Separation of Powers, as well as the Take Care Clause, the Appropriations Clause, the Spending Clause, and the Presentment Clause of the United States Constitution.

61.     Defendants' actions are arbitrary and capricious because, among other things, Defendants' impoundment of RFA's funds lacks any lawful basis; because Defendants have not articulated an adequate, reasoned, or lawful basis for the withholding of RFA's congressionally appropriated funds; because Defendants' actions threaten RFA's continued existence, in direct contravention of Congress's expressed intention that RFA shall use its appropriated funds to fulfill its statutory mandate; and because Defendants have entirely failed to consider the substantial reliance interests in RFA's continued funding and operation, including without limitation: RFA's ability to fulfill its statutory mandate; RFA's employees, some of whom will be at risk of physical harm, or of losing their visas and subsequently being deported, if RFA does not receive its congressionally appropriated funding; and the leases, cybersecurity contracts, and other obligations on which RFA will be forced to default without its funding.

## COUNT TWO

### APA, 5 U.S.C. § 706(1)

### (Against All Defendants)

62.     Plaintiff restates and realleges all paragraphs above as if fully set forth here.

63.     The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed[.]"  5 U.S.C. § 706(1).

64.     In the Second and Third Continuing Resolutions, Congress appropriated funds for RFA.

65.     USAGM has a non-discretionary duty to make grants available to RFA from congressionally appropriated funds.  22 U.S.C. §§ 6204(a)(5), 6208(a).  The Department of the Treasury has a non-discretionary duty to disburse the funds in its charge upon receipt of a properly executed voucher.  31 U.S.C. § 3325.

66.     Defendants have not complied with their non-discretionary duties to grant appropriated funds to RFA and disburse those appropriated funds to RFA.

67.     Defendants' actions are also contrary to the United States Constitution because they are unlawfully withholding funds appropriated by Congress for RFA through the constitutionally prescribed legislative process, in violation of the Separation of Powers, as well as the Take Care Clause, the Appropriations Clause, the Spending Clause, and the Presentment Clause of the United States Constitution.

68.     The Court should thus compel Defendants to grant and disburse to RFA the funds appropriated for that purpose and to which RFA is entitled for Fiscal Year 2025.

## COUNT THREE
### Mandamus Act, 28 U.S.C. § 1361; All Writs Act, 28 U.S.C. § 1651
### (Against Defendants USAGM, Kari Lake, Victor Morales, OMB, Russell Vought, Department of Treasury, and Scott Bessent)

69.     Plaintiff restates and realleges all paragraphs above as if fully set forth here.

70.     The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

71.     The All Writs Act, 28 U.S.C. § 1651, authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction.

72.     In the Second and Third Continuing Resolutions, Congress appropriated funds for RFA.

73.     USAGM has a non-discretionary duty to make annual grants available to RFA from congressionally appropriated funds.  22 U.S.C. §§ 6204(a)(5), 6208(a).  The Department of

the Treasury has a non-discretionary duty to disburse the funds in its charge upon receipt of a properly executed voucher. 31 U.S.C. § 3325.

74.     Defendants have not complied with their non-discretionary duties to grant appropriated funds to RFA and disburse those appropriated funds to RFA.

75.     USAGM indicated that RFA could challenge the termination letter by filing an appeal with the agency.  RFA did so.  USAGM then informed RFA that it would not respond to the appeal.  RFA has therefore pursued the only alternative remedy that the agency has indicated may be available.

76.     It is necessary and appropriate for this Court to issue a writ of mandamus pursuant to 28 U.S.C. §§ 1361 and 1651 and under this Court's equitable authority to compel Defendants to grant, disburse, and otherwise make accessible RFA's appropriated funds.

<u>**COUNT FOUR**</u>

**Presentment Clause, U.S. Const. art. I, § 7, cl. 2**

**(Against Defendants Kari Lake, Victor Morales, Russell Vought, and Scott Bessent)**

77.     Plaintiff restates and realleges all paragraphs above as if fully set forth here.

78.     This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

79.     The Presentment Clause provides, in relevant part: "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it[.]" U.S. Const. art. I, § 7, cl. 2.  Under the Presentment Clause, the President lacks authority to modify or amend duly enacted Legislation—the President may only "approve all the parts of a Bill, or reject it in toto." *Clinton v. City of New York*, 524 U.S. 417, 439–40 (1998) (citation

omitted).  The President cannot delegate powers to other executive branch officials that violate the Constitution.

80.    The International Broadcasting Act and the congressional appropriations laws mandating that funds be allocated to RFA for Fiscal Year 2025 are duly enacted legislation that leave no room for executive discretion.

81.    Defendants' unlawful impoundment of RFA's congressionally appropriated funds therefore amounts to an attempt to amend, modify, or partially veto duly enacted legislation in violation of the Presentment Clause.

## <u>COUNT FIVE</u>

**Appropriations Clause, U.S. Const. art. I, § 9, cl. 7**
**(Against Defendants Kari Lake, Victor Morales, Russell Vought, and Scott Bessent)**

82.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

83.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund*, 561 U.S. at 491 n.2.

84.    The Appropriations Clause of the Constitution provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law[.]" U.S. Const. art. I, § 9, cl. 7. The Clause protects Congress's "exclusive power over the federal purse." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)).  The Executive Branch does not have constitutional authority to override or disregard Congress's appropriations.  *In re Aiken Cnty.*, 725 F.3d 255, 260–61 (D.C. Cir. 2013).

85.    Defendants' unlawful impoundment of RFA's congressionally-appropriated funds infringes Congress's exclusive power over the federal purse.  That exclusive power is conferred

and protected in part by the Appropriations Clause, and the Executive has no constitutional authority to countermand it.

## COUNT SIX

### Spending Clause, U.S. Const. art. I, § 8, cl. 1
**(Against Defendants Kari Lake, Victor Morales, Russell Vought, and Scott Bessent)**

86.     Plaintiff restates and realleges all paragraphs above as if fully set forth here.

87.     This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund*, 561 U.S. at 491.

88.     The Spending Clause of the Constitution provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States."  U.S. Const. art. I, § 8, cl. 1.  The Spending Clause vests the power of the purse, including the power to attach conditions to the expenditure of federal funds, exclusively with Congress.

89.     Defendants' unlawful impoundment of RFA's congressionally-appropriated funds infringes Congress's exclusive power over the federal purse.  That exclusive power is conferred and protected in part by the Spending Clause, and the Executive has no constitutional authority to countermand it.

## COUNT SEVEN

### Take Care Clause, U.S. Const. art. II, § 3
**(Against Defendants Kari Lake, Victor Morales, Russell Vought, and Scott Bessent)**

90.     Plaintiff restates and realleges all paragraphs above as if fully set forth here.

91.     This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund*, 561 U.S. at 491 n.2.

92.     Under the Constitution, the executive power vested in the President and, by extension, all subordinate officers to whom he may delegate executive functions, includes the duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

93.     The Take Care Clause forbids the Executive Branch from refusing to faithfully execute the laws of the United States.

94.     Defendants' unlawful impoundment of RFA's congressionally appropriated funds violates the Take Care Clause.

## COUNT EIGHT
### Violation of the Separation of Powers
### (Against Defendants Kari Lake, Victor Morales, Russell Vought, and Scott Bessent)

95.     Plaintiff restates and realleges all paragraphs above as if fully set forth here.

96.     This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund*, 561 U.S. at 491 n.2.

97.     Defendants' unlawful impoundment of RFA's congressionally appropriated funds exceeds the executive branch's constitutional authority and impermissibly usurps the legislature's power, in violation of the Separation of Powers.  *See* U.S. Const. art. II, § 3; U.S. Const. art. I, § 9, cl. 7; U.S. Const. art. I, § 8, cl. 1; U.S. Const. art. I, § 7, cl. 2.

## COUNT NINE
### Ultra Vires
### (Against All Defendants)

98.     Plaintiff restates and realleges all paragraphs above as if fully set forth here.

99.     This Court has inherent equitable power to enjoin executive ultra vires conduct. *See Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).  Judicial "[r]eview for ultra vires acts rests on the longstanding principle that if an agency action is

unauthorized by the statute under which [the agency] assumes to act, the agency has violate[d] the law and the courts generally have jurisdiction to grant relief." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (alterations in original) (citation and internal quotation marks omitted).

100.    An agency acts ultra vires when it "plainly acts in excess of its delegated powers." *Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158, 162 (D.C. Cir. 2021).

101.    No statute, constitutional provision, or other source of law authorizes Defendants to impound RFA's congressionally appropriated funds.  To the contrary, the International Broadcasting Act and the relevant appropriations laws require that Defendants make available annual grants to RFA from congressionally appropriated funds.  22 U.S.C. § 6208(a); Second Continuing Resolution; Third Continuing Resolution.

102.    Defendants' unlawful withholding of the RFA's congressionally appropriated funds is ultra vires.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

a.  Issue a temporary restraining order and preliminary injunction barring Defendants from impounding RFA's congressionally appropriated funds and barring Defendants from enforcing or otherwise giving effect to the termination of RFA's grant, including through the enforcement of closeout obligations;

b.  Stay the termination of RFA's grant pursuant to 5 U.S.C. § 705;

c.  Declare unlawful and set aside Defendants' impoundment of RFA's congressionally appropriated funds;

d.  Declare that the termination of RFA's grant is unlawful and null and void and set that termination aside;

e.  Declare that Defendants are required by law to take all necessary steps to ensure that USAGM disburses to RFA all congressionally appropriated funds through September 30, 2025;

f.  Issue a permanent injunction barring Defendants from withholding RFA's congressionally appropriated funds and requiring Defendants to disburse RFA's congressionally appropriated funds;

g.  Award RFA reasonable attorneys' fees and costs; and

h.  Grant such other relief as the Court deems necessary, just, and proper.

March 27, 2025

Respectfully submitted,

/s/ Kristin Bateman
Kristin Bateman*^
Jennifer Fountain Connolly (D.C. Bar No. 1019148)*
Robin F. Thurston (D.C. Bar No. 1531399)
Skye L. Perryman (D.C. Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org
jconnolly@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

/s/ Donald B. Verrilli, Jr.
Donald B. Verrilli, Jr. (D.C. Bar. No. 420434)
Ginger D. Anders (D.C. Bar No. 494471)
Jeremy S. Kreisberg (D.C. Bar No. 1048346)
Helen E. White (D.C. Bar No. 1741368)*
Esthena L. Barlow (D.C. Bar No. 90000252)*
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com
Ginger.Anders@mto.com
Jeremy.Kreisberg@mto.com
Helen.White@mto.com
Esthena.Barlow@mto.com

Hailyn J. Chen**
Adeel Mohammadi**
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Hailyn.Chen@mto.com

Adeel.Mohammadi@mto.com

Gabriel M. Bronshteyn**
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
(415) 512-4000
Gabriel.Bronshteyn@mto.com


*Admission pending
**Pro hac vice application forthcoming
^Admitted only in California; practice
supervised by members of the D.C. Bar


*Attorneys for Radio Free Asia*