**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| |
|---|
| RADIO FREE ASIA, |
| *Plaintiff*, |
| v. |
| UNITED STATES, et al., |
| *Defendants*. |

No.1:25-cv-907

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    A.   Radio Free Asia ................................................................................. 3

    B.   Congress Funds RFA Via Direct Appropriation .............................. 4

    C.   USAGM Unlawfully Withholds RFA's Funding and Terminates its Grant .................... 7

    D.   USAGM's Withholding of Funds Is Causing Significant and Immediate Harm ........... 9

LEGAL STANDARD ........................................................................................ 11

ARGUMENT ................................................................................................... 12

  I.   RFA Is Likely to Succeed on the Merits. .......................................... 12

    A.   Congress Has Directly Appropriated Funds to RFA, and Defendants Have No Authority to Refuse to Provide Those Funds to RFA ........................... 12

    B.   RFA Is Likely to Succeed on its APA Claims ................................ 15

        1.   Defendants' Impoundment of RFA's Appropriated Funds Must Be Set Aside. ........ 15

        2.   RFA Is Likely to Succeed on its APA § 706(1) Claim to Compel the Disbursement of Funds Unlawfully Withheld or Unreasonably Delayed. ................... 19

    C.   RFA Is Likely to Prevail Regardless of Whether the APA Is Available. ....................... 20

    D.   Defendants' Withholding of RFA's Appropriated Funds and the Termination of its Grant Violate the Constitutional Separation of Powers. ...................... 21

        1.   The Appropriations and Spending Clauses ............................... 22

        2.   Presentment Clause .................................................................. 25

        3.   Take Care Clause ...................................................................... 27

        4.   Separation of Powers ............................................................... 28

    E.   The Government's Likely Contention that this Court Lacks Jurisdiction is Meritless. 30

  II.   RFA Will Suffer Irreparable Harm Without a Temporary Restraining Order. ............ 33

    A.   RFA Cannot Continue to Operate Without Congressionally Appropriated Funds ........ 34

    B.   The Freeze in Funding Threatens the Safety of RFA Journalists and Staff. ............... 35

    C.   RFA's Inability to Access Its Funds Threatens Irreparable Damage to RFA's Reputation as a Trusted Employer and Provider of Accurate Reporting to People Living Under Authoritarian Regimes. .................................... 37

i

    D.   For RFA's APA Claims, Damages Are Unavailable and Would Not Cure the Harms Caused by USAGM's Actions. ........................................................................................ 38

  III.  The Balance of Equities and Public Interest Weigh in Favor of Preliminary Relief. ....... 38

CONCLUSION ................................................................................................................................. 40

## TABLE OF AUTHORITIES

Page(s)

FEDERAL CASES

*A.B.-B. v. Morgan*,
    548 F. Supp.3d 209 (D.D.C. 2020) ............................................................................36

*AIDS Vaccine Advocacy Coalition v. U.S. Dep't of State*,
    2025 WL 752378 (D.D.C. Mar. 10, 2025)...........................................................32, 37

*\*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013).......................................................14, 23, 25, 28

*All. for Retired Ams. v. Bessent*,
    No. CV 25-0313, 2025 WL 740401 (D.D.C. Mar. 7, 2025)......................................37

*Am. Ass'n of Political Consultants v. SBA*,
    613 F. Supp. 3d 360 (D.D.C. 2020) ........................................................................38

*In re Am. Rivers & Idaho Rivers United*,
    372 F.3d 413 (D.C. Cir. 2004)................................................................................20

*American Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003)...............................................................................................30

*Armour & Co. v. Freeman*,
    304 F.2d 404 (D.C. Cir. 1962)................................................................................37

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters*,
    280 F. Supp. 3d 59 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019)...........................37

*Bennett v. Spear*,
    520 U.S. 154 (1997)...............................................................................................18

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988)..................................................................................30, 31, 33

*Buckley v. Valeo*,
    424 U.S. 1 (1976)...................................................................................................21

*C.G.B. v. Wolf*,
    464 F. Supp. 3d 174 (D.D.C. 2020) ........................................................................39

*Cemex Inc. v. Dep't of the Interior*,
    560 F. Supp. 3d 268 (D.D.C. 2021) ........................................................................32

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
    601 U.S. 416 (2024)..........................................................................................22, 24

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ..................................................................12

*City & Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ................................................................24

\*Clinton v. City of New York,
    524 U.S. 417 (1998) .................................................................25, 26, 27

*Cobell v. Norton*,
    240 F.3d 1081 (D.C. Cir. 2001) ..............................................................19

*Costa v. Bazron*,
    456 F. Supp. 3d 126 (D.D.C. 2020) .........................................................11

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
    38 F.4th 1099 (D.C. Cir. 2022) ................................................31, 32, 33

*Fed. Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022) ...............................................................3, 20

*Harrington v. Bush*,
    553 F.2d 190 (D.C. Cir. 1977) ................................................................22

*INS v. Chadha*,
    462 U.S. 919 (1983) .................................................................................27

\*Kendall v. United States,
    37 U.S. (12 Pet.) 524 (1838) .............................................................23, 28

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) .................................................................................22

*Maine Cmty. Health Options v. United States*,
    590 U.S. 296 (2020) .................................................................................13

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ..........................................................31, 33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ...................................................................................17

*N. Air Cargo v. U.S. Postal Serv.*,
    674 F.3d 852 (D.C. Cir. 2012) ................................................................20

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
    26 F.4th 960 (D.C. Cir. 2022) .................................................................20

*Nat'l Council of Nonprofits v. Office of Mgmt. and Budget*,
   No. 25-cv-239, 2025 WL 597959 (Feb. 25, 2025) ...............................................34

*NextWave Personal Cmmc'ns, Inc. v. FCC*,
   254 F.3d 130 (D.C. Cir. 2001) ..........................................................................15

*Nken v. Holder*,
   556 U.S. 418 (2009)............................................................................................38

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004)..............................................................................................19

*Open Communities Alliance v. Carson*,
   286 F. Supp. 3d 148 (D.D.C. 2017) ...................................................................39

*Perry Cap. LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) .......................................................................31, 32

*PFLAG, Inc. v. Trump*,
   No. CF 25-337, 2025 WL 510050 (D. Md. Feb. 14, 2025) .................................22

*Ramirez v. U.S. Immigr. & Customs Enf't*,
   471 F. Supp. 3d 88 (D.D.C. 2020) .....................................................................19

*RFE/RL, Inc. v. Lake*,
   No. 25-cv-799 (D.D.C. March 25, 2025)..................................................17, 18, 39

*Spectrum Leasing Corp. v. United States*,
   764 F.2d 891 (D.C. Cir. 1985)............................................................................32

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
   992 F.3d 350 (5th Cir. 2021) .........................................................................24, 25

*Texas Children's Hosp. v. Burwell*,
   76 F. Supp. 3d 224 (D.D.C. 2014) .....................................................................33

*Train v. City of New York*,
   420 U.S. 35 (1975).........................................................................................14, 23

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
   967 F.2d 598 (D.C. Cir. 1992), *overruled on other grounds by Perry Cap.
   LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017)................................................32

*Turner v. U.S. Agency for Glob. Media*,
   502 F. Supp. 3d 333 (D.D.C. 2020) ...................................................................16

*U.S. Dep't of Navy v. FLRA*,
   665 F.3d 1339 (D.C. Cir. 2012) .....................................................................21, 22

v

*Util. Air Regul. Grp. v. EPA*,
 573 U.S. 302 (2014).................................................................................26

*Vietnam Veterans of Am. v. Shinseki*,
 599 F.3d 654 (D.C. Cir. 2010)................................................................21

*W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*,
 59 F.4th 1124 (11th Cir. 2023)...............................................................24

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
 485 F. Supp. 3d 1 (D.D.C. 2020)............................................................38

*Whole Foods Market Grp., Inc. v. Wical Ltd P'Ship*,
 288 F. Supp. 3d 176 (D.D.C. 2016).........................................................37

*Wis. Gas Co. v. FERC*,
 758 F.2d 669 (D.C. Cir. 1985)...........................................................33, 34

\*Youngstown Sheet & Tube Co. v. Sawyer*,
 343 U.S. 579 (1952).........................................................21, 27, 28, 29

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
 576 U.S. 1 (2015)............................................................................29, 30

**REGULATORY CASES**

*Consolidated Appropriations Act, 2008 – Incorporation by Reference*,
 B-316010, 2008 WL 540192 (Comp. Gen. Feb. 25, 2008) ....................5

**FEDERAL STATUTES**

2 U.S.C. § 683(b) .......................................................................................14

5 U.S.C. § 702 ......................................................................................30, 38

5 U.S.C. § 704 ................................................................................18, 30, 32

5 U.S.C. § 706(1) ................................................................................15, 19, 21

5 U.S.C. § 706(2) ................................................................................15, 19

22 U.S.C. § 6201 ..........................................................................................1

22 U.S.C. § 6201(1) ...................................................................................39

22 U.S.C. § 6201(2) .....................................................................................3

22 U.S.C. § 6201(3) ...................................................................................39

22 U.S.C. § 6202(b)(1) ...............................................................................................4

22 U.S.C. § 6202(c)(2) ...............................................................................................4

22 U.S.C. § 6204 .......................................................................................................14

*22 U.S.C. § 6204(a)(5) ...........................................................................4, 13, 14, 16

22 U.S.C. § 6204(a)(6) .......................................................................................14, 16

22 U.S.C. § 6204(b) ...................................................................................................16

22 U.S.C. § 6208 .......................................................................................................20

*22 U.S.C. § 6208(a) ............................................................................................4, 13

22 U.S.C. § 6208(a)(1) ..............................................................................................16

22 U.S.C. § 6208(b) ...................................................................................................30

22 U.S.C. § 6208(b)(2) ..............................................................................................11

22 U.S.C. § 6208(c) ...................................................................................................25

22 U.S.C. § 6208(c)(5) ..............................................................................................16

22 U.S.C. § 6208(g) ...................................................................................................17

28 U.S.C. § 1331 .......................................................................................................30

28 U.S.C. § 1361 ..................................................................................................20, 30

Tucker Act, 28 U.S.C. § 1491(a)(1)...................................................................31, 32

American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722 (2024) ...................5

*Consolidated Appropriations Act of 2024, Pub. L. No. 118-47,
    138 Stat. 460 (2024)........................................................................................ passim

Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83
    § 101(11), 138 Stat. 1524 (2024) ...................................................................5, 6

First Continuing Resolution, Pub. L. No. 118-83 § 3, 138 stat. 1524 ........................12

United States International Broadcasting Act. Pub. L. No. 103-236, Title III,
    § 309, 108 Stat. 382 (1994)............................................................................. passim

**FEDERAL REGULATIONS**

2 C.F.R. § 200.342 .........................................................................................................19

2 C.F.R. § 200.344 ...........................................................................................................8

2 C.F.R. § 200.344-46 ......................................................................................................8

2 C.F.R. § 200.472(a)(2) ..................................................................................................9

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 9, cl. 7 ...........................................................................................22

U.S. Const. art. II, § 3 ...................................................................................................28

**LEGISLATIVE MATERIALS**

Statement Submitted by Ms. Granger, Chair of the House Committee on
    Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations
    Act, 2024, 170 Cong. Rec. H1501 (Mar. 22, 2024) .......................................5, 6, 13

**OTHER AUTHORITIES**

Exec. Order No. 14,238, 90 Fed. Reg. 13,043 (Mar. 14, 2025) ......................................7

Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*,
    164 U. Pa. L. Rev. 1835 (2016) ...............................................................................28

3 Op. Att'y Gen. 442 (1839) .........................................................................................24

4 Op. Att'y Gen. 428 (1845) .........................................................................................24

Def.'s Opp. to Pls.' Mot. TRO, *Open Tech. Fund v. Pack*,
    No. 20-cv-1710, 2020 WL 7041426 (D.D.C. filed June 26, 2020) .........................14

William H. Rehnquist, *Presidential Authority to Impound Funds Appropriated for
    Assistance to Federally Impacted Schools*, Office of Legal Counsel,
    1 Op. O.L.C. Supp. 303 (1969) ................................................................................24

## INTRODUCTION

Since 1996, Radio Free Asia (RFA) has provided independent, objective journalism to millions of people in countries across Asia that otherwise lack access to a free press. RFA is, by design, not part of the United States Government. It was established following an Act of Congress, which declared that "[i]t is the policy of the United States to promote the right of freedom of opinion and expression" and that "[i]t is in the interest of the United States to support broadcasting to other nations." 22 U.S.C. § 6201. Accordingly, since RFA's inception, Congress has appropriated funds specifically to RFA to ensure that it can fulfill its statutory mandate. Congress has directed that those funds "shall be allocated" to RFA by an Executive Branch agency called the United States Agency for Global Media (USAGM). USAGM has for decades complied with its statutory duty to provide RFA its congressionally appropriated funds. Until now.

In an unprecedented break from historical practice and congressional directive, USAGM has impounded RFA's funding, refusing to provide RFA its congressionally appropriated funds and terminating RFA's grant for not "effectuat[ing] agency priorities." USAGM's unlawful actions have had a devastating impact, threatening RFA's very existence. RFA depends entirely on congressionally appropriated funding. As a direct result of Defendants' refusal to provide RFA its funding, RFA has already been forced to furlough 75% of its domestic staff and suspend or terminate over 90% of its freelance journalists. If funding is not restored immediately, RFA may never recover, and millions of people across Asia may be deprived of objective and independent information. Just today, a catastrophic earthquake struck central Myanmar, a country governed by a military junta that has repeatedly shut off the internet and cut access to

social media to suppress dissent.  That unfolding crisis underscores the need for RFA's reliable journalism in countries with repressive regimes.

A temporary restraining order is necessary to stop Defendants' unlawful efforts to shutter RFA by starving it of funding.  RFA is likely to succeed in showing that Defendant's impoundment contravenes federal law, which provides in no uncertain terms that funds "*shall* be allocated" to RFA and charges USAGM with granting appropriated funds to RFA.  USAGM lacks discretion or authority to unilaterally withhold funds based on unspecified "agency priorities."  It is Congress that holds the power of the purse, and accordingly only Congress's priorities govern RFA's funding.  For that reason, Defendants' actions also violate constitutional provisions directing that Congress makes the laws and exercises the power of the purse, as well as bedrock separation-of-powers principles.

Defendants' unlawful impoundment is causing catastrophic, irreparable harm to RFA, and the equities overwhelmingly favor a temporary restraining order.  By freezing RFA out of its funding, Defendants have forced RFA to largely shutter its operations, severely compromising RFA's ability to perform its statutory mission and permanently undermining its credibility as a reliable and independent news organization.  Without its funding, RFA cannot protect its journalists operating in authoritarian regimes at great risk to their personal safety.  RFA cannot guard against the frequent cyberattacks it faces from malign state actors.  RFA will not be able to pay its leases, contracts, or pay its staff, which will trigger financial penalties and severance obligations that RFA cannot meet.  If RFA's appropriated funding is not promptly restored, it risks bankruptcy.  This Court's urgent intervention is necessary to forestall the existential crisis brought on by Defendant's unlawful withholding of RFA's congressionally appropriated funds.

# BACKGROUND

### A. Radio Free Asia

RFA is a private, nonprofit news organization that brings uncensored journalism to Asian countries that restrict free speech and freedom of the press. Declaration of Kevin W. Fleming ¶ 2 (Fleming Decl.). Established in 1996, RFA currently offers content in 10 languages and reaches an audience of nearly 60 million people each week. *Id.* ¶ 3. RFA has been funded by the U.S. government since its inception. *Id.*

Congress laid the groundwork for RFA's creation in 1994, when it enacted the United States International Broadcasting Act. Pub. L. No. 103-236, Title III, § 309, 108 Stat. 382, 440 (1994). In that Act, Congress found that open communication of ideas "contributes to international peace and stability" and that establishing a new broadcasting service to serve Asian countries that lack adequate sources of free information would promote information and ideas and advance U.S. foreign policy goals. 22 U.S.C. § 6201(2), (4). The Act directed USAGM's predecessor, the Broadcasting Board of Governors, to submit a detailed plan for establishing Radio Free Asia, which would carry out radio broadcasting in Asia. Pub. L. No. 103-236, § 309(a)–(c). The Act authorized the Broadcasting Board of Governors to make grants for broadcasting, and provided that those grants "shall be available" for annual grants to RFA. *Id.* §§ 305(a)(5), 309(a). And it provided that RFA would "provide accurate and timely information, news, and commentary" and "be a forum for a variety of opinions and voices from within Asian nations whose people do not fully enjoy freedom of expression." *Id.* § 309(b). RFA was officially incorporated in Washington, D.C. in March 1996 and began broadcasting later that year. To ensure that RFA's programming can meet the highest professional standards of

journalism, various statutory provisions erect a statutory firewall designed to insulate RFA's journalists and content from any political influence. *See, e.g.*, 22 U.S.C. §§ 6202(b)(1), (c)(2).

Today, RFA provides independent, uncensored, and accurate local news to audiences who lack access to a free press or live in media environments vulnerable to authoritarian disinformation. Fleming Decl. ¶¶ 4-5. Through its journalism, RFA puts pressure on the ruling Chinese Communist Party (CCP) and other malign regimes by covering sensitive issues that would otherwise be censored or ignored by state-controlled media and by dissecting false narratives and misinformation. For instance, it has offered groundbreaking reporting on the Uyghur genocide in Xinjiang, the CCP's cover-up of COVID-19 fatalities, the unfolding crisis in Myanmar since the 2021 coup, and the journeys of North Korean defectors. *Id.* ¶ 5. Its reporting has won prestigious awards and been cited by major media outlets and publications. *Id.*

RFA is able to provide quality independent news to people in repressive Asian countries because of its sustained efforts to recruit journalists and staff with the relevant language skills and cultural knowledge. Fleming Decl. ¶ 29. RFA has over 400 employees, in addition to hundreds of journalists, stringers (freelancers), and contractors, and it has offices overseas in Taipei, Bangkok, Seoul, Istanbul, and Dharamsala. *Id.* ¶ 8. Many of RFA's journalists are unable to work in their home countries due to threats of persecution stemming from their independent journalism covering their home and neighboring countries. *Id.* ¶ 30. They therefore operate in the United States through work visas supported by their employment at RFA. *Id.*

### B. Congress Funds RFA Via Direct Appropriation

The International Broadcasting Act tasks USAGM with making and supervising grants for international broadcasting. *See* 22 U.S.C. § 6204(a)(5). Under the statute, such USAGM grants "shall be available" for annual grants to RFA. *Id.* § 6208(a). In accordance with that

mandate, USAGM has made grants to RFA each year since its inception.  Fleming Decl. ¶ 11.

No other entity is authorized to make grants of or otherwise convey appropriated funds to RFA,

and RFA relies entirely on USAGM's grants to fund its operations.  *Id.* ¶¶ 10-11.

Each year, Congress sets the amount that must be allocated to RFA pursuant to USAGM

grants—and thus sharply limits USAGM's discretion to provide RFA less than its appropriated

sum.  In fiscal year 2024, Congress appropriated around $857 million to USAGM.  Further

Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, 138 Stat. 460, 735 (2024)

(2024 Appropriations Act).  The annual appropriations act specified that USAGM's appropriation

"shall be allocated in accordance with the table" in an accompanying "explanatory statement . . .

submitted by the chair of the Committee on Appropriations of the House."[1]  *Id.*; *see also id.* § 4,

138 Stat. 460, 461.  The referenced table "allocated" $60,830,000 to RFA.  *See* Explanatory

Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations,

Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501,

H2089 (Mar. 22, 2024).  Accordingly, Congress expressly designated $60,830,000 of USAGM's

funds for RFA's use.

Congress expressly extended that same level of funding for RFA through fiscal year

2025.  A series of three continuing resolutions funded USAGM at the level and "under the . . .

conditions" that applied to RFA in fiscal year 2024.[2]  By appropriating funds at the same levels

---

[1] Incorporation by reference is a well-accepted legislative tool in the appropriations
context, and the Government Accountability Office has recognized that incorporation by
reference renders spending language legally binding. *See, e.g.*, *Consolidated Appropriations Act,
2008 – Incorporation by Reference*, B-316010, 2008 WL 540192 (Comp. Gen. Feb. 25, 2008).

[2] *See* Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, div. A,
§ 101(11), 138 Stat. 1524, 1524–25 (2024) ("First Continuing Resolution") (appropriating funds
as provided in the 2024 appropriations law and making them available through December 20,
2024); American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722 (2024) ("Second

specified in the 2024 Appropriations Act, these continuing resolutions mandate that, once again, around $60.8 million "shall be allocated" to RFA for fiscal year 2025, which began on October 1, 2024, and runs through September 30, 2025.

The continuing resolutions carried over other conditions from fiscal year 2024, too, including a provision that limits USAGM's ability to deviate from the appropriated amounts. The appropriations law dictates the circumstances in which USAGM may "reprogram" funds among USAGM funding recipients by taking some of the amount allocated to one program (such as RFA) and giving it to another (such as a sister broadcast network). 2024 Appropriations Act, 138 Stat. 460, 735; *see also* 170 Cong. Rec. at H2087. The statute prohibits USAGM from reprogramming funds if doing so would reduce any given program's funding by more than 5 percent of what Congress allocated. 2024 Appropriations Act, 138 Stat. 460, 735. And it requires USAGM to provide the House and Senate Appropriations Committees 15 days' advance notice before it undertakes even the modest sort of reprogramming that the statute permits. *Id.*

In the ordinary course, USAGM acts as the conduit for RFA's congressionally appropriated funding. Pursuant to its statutory obligations, each year USAGM enters a grant agreement with RFA. Fleming Decl. ¶ 11. It awards funds to RFA by entering or amending the agreement as the appropriations become available—either in a lump sum based on a full-year appropriations law, or in increments when Congress doles out money through continuing resolutions. *Id.* RFA then accesses its funds by submitting drawdown requests to USAGM for the cash it needs to cover expenses in the following month. *See id.* ¶ 13. Typically, USAGM

---

Continuing Resolution") (extending funding through March 14, 2025); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101, 139 stat. 9, 10-12 (2025) ("Third Continuing Resolution") (extending funding through September 30, 2025).

acknowledges receipt of RFA's requests and then, in short order, causes the funds to be transferred into RFA's bank account by the Department of Treasury. *See id.*

Fiscal year 2025 began in typical fashion. In the first continuing resolution, Congress appropriated moneys to fund RFA through mid-December 2024. *See* Fleming Decl. ¶ 15. Consistent with its statutory mandate, USAGM then signed an agreement awarding approximately $11.7 million to RFA. *Id.* RFA was able to request and access the money without issue. *See id.* In mid-December, the second continuing resolution was signed into law, and RFA and USAGM signed a new grant agreement. *Id.* ¶¶ 16–17. This agreement awarded an additional $13.5 million to RFA to fund its operations through the end of February, bringing its total for fiscal year 2025 to around $25.1 million. *Id.* ¶ 17. And those additional funds were promptly disbursed to RFA. *Id.*

## C. USAGM Unlawfully Withholds RFA's Funding and Terminates its Grant

In recent weeks, however, USAGM has departed from its ordinary practice. USAGM has refused to grant to RFA the $4.6 million dollars in appropriated funds that RFA needs to fund its operations for March 2025. *See* Fleming Decl. ¶¶ 18–19. On March 13, USAGM sent RFA an agreement that would have granted funding for the month of March. The President of RFA signed the paperwork, and RFA returned it to USAGM. The USAGM finance team assured RFA staff that USAGM's acting CEO, Defendant Victor Morales, would counter-sign the agreement promptly. *Id.* ¶ 19. But he never did so. *Id.* Those funds still have not been granted or disbursed to RFA. *See id.*

Instead, the Executive Branch impounded RFA's funds. On March 14, President Trump issued an executive order entitled "Continuing the Reduction of the Federal Bureaucracy." Exec. Order No. 14,238, 90 Fed. Reg. 13,043 (Mar. 14, 2025). The Order provided, among other

things, that the "non-statutory components and functions of" USAGM "shall be eliminated to the maximum extent consistent with applicable law." *Id.* § 2(a). The next morning, on Saturday March 15—the very day the President signed a continuing resolution appropriating $30.9 million for RFA's use—USAGM sent RFA a one-page letter, signed by Defendant and Senior Advisor to the Acting CEO Kari Lake, purporting to terminate RFA's grant agreement on the ground that it "no longer effectuates agency priorities." Fleming Decl. ¶ 22; Fleming Decl. Ex. 1. The letter claimed the termination was "pursuant to . . . [the prior day's] executive order mandating that the USAGM eliminate all non-statutorily required activities and functions." Fleming Decl. Ex. 1. It did not explain how RFA's statutorily mandated grant was a "non-statutorily required" activity or function. Nor did it identify the priorities the award purportedly failed to effectuate or offer any other explanation for termination.

Lake's letter also reminded RFA that grant termination comes with "closeout responsibilities as set forth in 2 C.F.R. § 200.344-46" and the terms of RFA's grant. *See* Fleming Decl. Ex. 1. Those include a directive that USAGM "promptly refund any unobligated funds" as well as accounting and recordkeeping requirements. *See id.* (quoting 2 C.F.R. § 200.344); Fleming Decl. ¶ 25.

RFA tried to appeal the termination. The letter advised that RFA could "object to or challenge" the termination "either via email or certified mail within 30 days." Fleming Decl. Ex. 1. RFA promptly filed an appeal, explaining that USAGM's "unilateral termination" lacked any "basis in law or fact" and violated both federal statutes and the U.S. Constitution. Fleming Decl. ¶ 23. On March 20, 2025, a USAGM official informed RFA that Defendant Lake did not intend to respond to its appeal. *Id.*

By terminating RFA's grant, USAGM has made clear that it does not intend to grant or disburse money to RFA for the remainder of fiscal year 2025.  Thus, USAGM has decided to impound the entirety of the $35 million sum that Congress has appropriated for RFA's use from March through September 2025.  *See* Fleming Decl. ¶¶ 18, 21.

### D.  USAGM's Withholding of Funds Is Causing Significant and Immediate Harm.

RFA is already experiencing serious harms.  The withholding of RFA's congressionally appropriated funds has forced the organization to drastically curtail its operations.  In just a few days, RFA has already furloughed over 200 employees, which amounts to 75% of its U.S.-based staff.  Fleming Decl. ¶ 26.  And it has halted contracts with 93% of freelance journalists both at home and abroad.  *Id.*  Further, Lake's termination letter triggered closeout obligations for RFA, including that RFA must immediately halt incurring "[a]ny cost." 2 C.F.R. § 200.472(a)(2).

The abrupt termination of RFA's funding also threatens the personal safety and security of many RFA journalists.  RFA's journalists often work and report on events in places that are hostile to their work such as China, North Korea, Tibet, and Xinjiang, an autonomous region in northwestern China where 12 million mostly Muslim Uyghurs live.  Fleming Decl. ¶ 34.  They are constantly targeted by the regimes that they cover, and have been subject to arrest, torture, incarceration, abduction, surveillance, harassment, and other harms.  *Id.* ¶ 31.  As part of its work, RFA endeavors to protect its journalists and their families from such threats by providing security, offering safety trainings, conducting risk assessments, helping journalists find legal representation and, if necessary, assisting them with relocation.  *Id.*  RFA also typically provides support to its journalists who are incarcerated in countries where RFA broadcasts.  *Id.*  Without the ability to draw on congressionally appropriated funds, RFA will no longer be able to protect

its journalists in the field.  *Id.*  And it will be forced to leave currently incarcerated RFA journalists without assistance.  *Id.*

RFA's funding is also necessary to ensure that many of its U.S.-based journalists may remain in this country.  RFA employs journalists who have fled from authoritarian countries such as Cambodia, Vietnam, Kazakhstan, Cambodia, and China.  Declaration of Tamara Sabljak Bralo ("Bralo Decl.") ¶ 11.  These journalists report on their home countries as well as others in the region.  *Id.*  They live and work in the United States, and they are authorized to do so based on visas that depend on their employment at RFA.  *Id.* ¶ 11.  If RFA's funding is not restored, RFA will be forced to terminate these journalists' employment, and they will be forced to leave the country.  *Id.*  If they return home, they will likely be arrested and imprisoned because of their journalistic work.  *Id.*

The halt in RFA's funding also jeopardizes the organization's cyber security.  The governments of the countries in which RFA journalists operate frequently target RFA with cyberattacks.  Bralo Decl. ¶ 12.  RFA works with a number of vendors who provide services to identify and respond to those attacks and other security threats.  *Id.*  Without its congressionally appropriated funding, RFA will be unable to pay these vendors and maintain these services, increasing the risk that personal data of journalists and their sources will be stolen.  *Id.* ¶¶ 13-14. Any breach puts their security, and their lives, at risk.  *Id.* ¶ 15.

The longer Defendants' impoundment is permitted to continue, the more the problems for RFA will escalate.  Without funding, RFA will be forced to end its relationships with the remainder of its freelance journalists, terminate its leases and contracts, and lay off staff. Fleming Decl. ¶ 26; Bralo Decl. ¶ 15.  RFA will be forced to default on a number of obligations, including its leases for its Washington, D.C. headquarters and in seven other countries, which

will cost nearly $18 million.  Fleming Decl. ¶¶ 25–26.  It will also incur over $33 million in costs to pay severance to its employees and freelance journalists across the world and break contracts with vendors.  *Id.* ¶ 25.  Absent relief, RFA will have no choice but to close virtually all its operations at the end of April and shut down permanently.  *Id.* ¶ 26.  And defaulting on its responsibilities will forever destroy RFA's credibility with its business partners, its journalists, and their sources—trust that took decades to build in the first place.  *Id.* ¶¶ 7, 28; Bralo Decl. ¶ 15.

Collectively, the harms that flow from the withholding of RFA's congressionally appropriated funds constitute an existential threat to its statutory mission.  RFA reaches over 60 million people each week.  Fleming Decl. ¶ 3.  But without funding, RFA will be forced "to cease essentially all broadcasting and news operations."  *Id.* ¶ 28.  Stopping its coverage in places where the only remaining news sources are controlled by authoritarian regimes will deprive millions of people across Asia of their access to a free press.  *Id.*  That will cause incalculable damage to RFA's reputation and credibility among its audience.  *Id.*  And it will allow authoritarian regimes to fill the gap left by RFA's absence with skewed coverage, preventing RFA from fulfilling its mission to ensure that news consumers in nations "whose people do not fully enjoy freedom of expression" have access to a "variety of opinions and voices."  22 U.S.C. § 6208(b)(2).

## LEGAL STANDARD

A motion for temporary restraining order is analyzed under the same four-factor test as applies to a motion for preliminary injunctive relief.  *Costa v. Bazron*, 456 F. Supp. 3d 126, 133 (D.D.C. 2020).  To obtain such relief, "the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the [temporary restraining

order] were not granted, (3) that [such an order] would not substantially injure other interested parties, and (4) that the public interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). All four factors clearly weigh in favor of a temporary restraining order here.

## ARGUMENT

### I. RFA Is Likely to Succeed on the Merits.

Congress has directly appropriated money for RFA's use through the end of Fiscal Year 2025. And it has required Defendants to provide that money to RFA. Nonetheless, Defendants have impounded RFA's funds. By refusing to make RFA's money available and terminating RFA's grant, they have violated their obligations under appropriations legislation, the International Broadcasting Act, and the U.S. Constitution.

#### A. Congress Has Directly Appropriated Funds to RFA, and Defendants Have No Authority to Refuse to Provide Those Funds to RFA

Through appropriations legislation and the International Broadcasting Act, Congress has mandated that USAGM must fund RFA's operations for fiscal year 2025. In fiscal year 2024, Congress appropriated approximately $857 million to USAGM, and it expressly provided that approximately $60 million of that appropriation "shall be allocated" for RFA's use. 2024 Appropriations Act, 138 Stat. 460, 735. Congress has since extended that funding for fiscal year 2025. The continuing resolutions covering 2025 have appropriated funding "at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2024 and under the authority and conditions provided in such Acts." First Continuing Resolution, Pub. L. No. 118-83 § 3, 138 stat. 1524, 1524. Accordingly, as in fiscal year 2024, Congress has specified that approximately $60 million of USAGM's appropriation "shall be allocated" to fund RFA's operations in fiscal year 2025. This use of "mandatory language" imposes a hard-and-fast

12

"requirement" on USAGM to allocate funds to RFA.  *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020) (citation omitted).

Another provision of the appropriations acts underscores the mandatory nature of USAGM's duty to make congressionally appropriated funds available to RFA.  The acts specify that up to 5 percent of the approximately $60 million allocated to RFA may be redirected to another USAGM-funded entity, but prohibit any reprogramming of more than that amount.  *See* 2024 Appropriations Act, 138 Stat. 460, 735.  That confirms that USAGM lacks authority to reduce RFA's allocation of funding by any more than 5 percent.  What is more, the appropriations acts further dictate that any such reprogramming is "subject to the regular notification procedures of the Committees on Appropriations."  *Id.*  Accordingly, USAGM cannot even reduce RFA's funding by 5 percent unless it notifies the House and Senate Appropriations Committees at least 15 days before the funds are obligated.  170 Cong. Rec. H1501, H2087.  This careful delineation of the circumstances in which (and the extent to which) USAGM may provide RFA with less than its full $60 million allocation makes clear that USAGM cannot withhold RFA's funds wholesale.

The International Broadcasting Act confirms that USAGM has a mandatory duty to grant and disburse RFA's congressionally appropriated funding.  It endows the CEO of USAGM with the authority to "make and supervise grants . . . for broadcasting and related activities."  22 U.S.C. § 6204(a)(5).  And it further specifies that such grants "***shall*** be available to make annual grants" to RFA.  *Id.* § 6208(a) (emphasis added).  These provisions leave USAGM with no discretion—the mandatory language requires the CEO to exercise his grant-making power and ensure grants are available to fund RFA.  Indeed, even USAGM has endorsed this reading, explaining in a 2020 court filing that these provisions of the Act "dictate how the [USAGM]

CEO must exercise his § 6204 grant-making authority when dealing with" RFA.  Def.'s Opp. to Pls.' Mot. TRO at 4, *Open Tech. Fund v. Pack*, No. 20-cv-1710, 2020 WL 7041426 (D.D.C. filed June 26, 2020), ECF No. 7.  The exclusive nature of USAGM's authority to convey to RFA its allocated funding provides additional support for this conclusion.  No other entity is authorized, as USAGM is, to "make . . . grants" of RFA's appropriated funds, 22 U.S.C. § 6204(a)(5), or to "allocate funds appropriated for international broadcasting" among RFA and its sister grantees, *id.* § 6204(a)(6).  As a result, the only way RFA can obtain the funding that the appropriations acts specify "shall be allocated" to it is to receive the money from USAGM.  USAGM accordingly has a duty to fulfill that function.  In other words, it lacks any authority to withhold RFA's appropriated funds.

Bedrock principles of appropriations law confirm that USAGM has no discretion to impound RFA's congressionally appropriated funding.  As the D.C. Circuit has explained, the Executive Branch does not have "unilateral authority" to refuse to spend the "full amount appropriated by Congress for a particular project or program."  *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).  Instead, if a statutory mandate to spend conflicts with a contrary Presidential directive, the statute prevails.  *See Train v. City of New York*, 420 U.S. 35, 41, 47-49 (1975) (invalidating a Presidential directive to "withhold[]" funding because it could not be "squared with the statute").  If the Executive Branch prefers to spend less than what Congress has appropriated, it must ask Congress to pass a new statute to that effect pursuant to the Impoundment Control Act of 1974—and Congress has directed that if it does not enact a rescission statute within 45 days, the funds in question "shall be made available [by the Executive Branch] for obligation."  2 U.S.C. § 683(b); *see In re Aiken Cnty.*, 725 F.3d at 261 n.1. The Executive Branch's duty is therefore doubly mandatory here: the appropriations laws leave

USAGM no discretion to deny RFA's funding, and the Impoundment Control Act reaffirms that only Congress has the authority to reconsider its decision to direct appropriated funds to the RFA.  Needless to say, it has not done so.  Indeed, just this month, Congress appropriated another $30 million for RFA's use. RFA is entitled to these statutorily appropriated funds.

**B.  RFA Is Likely to Succeed on its APA Claims**

RFA is likely to succeed on its APA claims. First, Defendants' withholding of RFA's appropriated funds and the termination of its grant must be set aside under APA § 706(2) both because those actions are contrary to law and because they are arbitrary and capricious.  Second, APA § 706(1) separately entitles RFA to an order compelling the release of its appropriated funds—action that Defendants have unlawfully withheld or unreasonably delayed.

**1.  Defendants' Impoundment of RFA's Appropriated Funds Must Be Set Aside.**

The APA provides that a court "shall" "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" "contrary to constitutional right, power, privilege, or immunity[,]" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"  5 U.S.C. § 706(2)(A)–(C). Defendants' impoundment of RFA's appropriated funds must be set aside both as "not in accordance with law" and "arbitrary and capricious."

*a.  Defendants' Impoundment of RFA's Appropriated Funds Is Unlawful and Exceeds Statutory Authority*

RFA is likely to succeed on its claim that USAGM's impoundment of its congressionally appropriated funds is "not in accordance with law" and "in excess of statutory . . .  authority," 5 U.S.C. § 706(2).  That provision requires a court to invalidate agency action that conflicts with federal law.  *NextWave Personal Cmmc'ns, Inc. v. FCC*, 254 F.3d 130, 149 (D.C. Cir. 2001).

Defendants flouted federal law by withholding RFA's appropriated funds. Congress appropriated funds specifically for RFA's use, commanding that those funds "shall be allocated" to RFA. *See* 2024 Appropriations Act, 138 Stat. 460, 735. And Congress directed that USAGM grant RFA its appropriated funds. *See* 22 U.S.C. §§ 6204(a)(5)-(6), 6208(a)(1). Yet USAGM has unilaterally impounded RFA's funding. USAGM refused to grant RFA the remaining $4.6 million in appropriated funds for March. Fleming Decl. ¶¶ 18-19. And on March 15, USAGM terminated RFA's entire grant wholesale for "no longer effectuat[ing] agency priorities." Fleming Decl. ¶ 22. That termination confirmed that USAGM has made a final decision to permanently impound the $35 million balance of RFA's appropriated funds for Fiscal Year 2025 in violation of the appropriations laws and the International Broadcasting Act. Fleming Decl. ¶¶ 18-19, 21.

USAGM lacks authority to countermand Congress's specific appropriation, much less discretion to impound funds based on unspecified "agency priorities." *See supra* pp. 12-15. No provision of the relevant statutes gives USAGM the authority to terminate the entirety of RFA's funding, much less on a vague ground that appears nowhere in the governing statutes. Indeed, to ensure RFA's editorial independence, Congress affirmatively insulated RFA from changing "agency priorities," requiring that USAGM must "respect the professional independence and integrity" of RFA. 22 U.S.C. § 6204(b).[3] Accordingly, the Act permits termination of a grant agreement only if funds are used for activities inconsistent with the *Act*. *Id.* § 6208(c)(5). And it permits USAGM to award RFA's funds to another entity only if RFA is "not carrying out the functions described in [the *Act*] in an effective and economical

---

[3] This provision is "known as the 'statutory firewall,' the legal guarantee of the networks' journalistic independence in the face of government oversight." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 344 (D.D.C. 2020).

manner." 22 U.S.C. § 6208(g).  USAGM did not purport to invoke either provision here, and

regardless neither provision applies—USAGM did not award RFA's funds to another entity, and

it terminated RFA's grant based entirely on its own "priorities," not activities inconsistent with

the Act.

Accordingly, Defendants' impoundment of RFA's congressionally appropriated funds

defies Congress's express commands and must be set aside as contrary to law and in excess of

Defendants' statutory authority.  Defendants' contravention of Congress's statutory directives

also violates the constitutional provisions discussed further below, *see infra* pp. 21-30, and must

be set aside on that basis as well.

      b.  *Defendants' Impoundment of RFA's Appropriated Funds Is Arbitrary and Capricious.*

RFA is also likely to succeed on its claim that Defendants' withholding of RFA's

congressionally appropriated funds and termination of its grant are arbitrary and capricious.  The

APA requires the agency to "examine the relevant data and articulate a satisfactory explanation

for its action[,] including a 'rational connection between the facts found and the choice made.'"

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)

(citation omitted).  USAGM's cursory, one-page grant termination letter flunks that test.  As this

Court has already determined with respect to a virtually identical termination letter issued to

RFA's sister organization, "the 'explanation' offered by USAGM can scarcely be characterized as

an explanation: it amounted to one line in the termination letter stating that 'the award no longer

effectuates agency priorities.'" Order at 6, *RFE/RL, Inc. v. Lake*, No. 25-cv-799 (D.D.C. March

25, 2025), ECF No. 14 ("*RFE/RL* Order"); *see* Fleming Decl. ¶ 22.  As the Court held, "[t]his

conclusory statement, unsupported by any facts or reasoning, is not a 'satisfactory explanation'

and offers no 'rational connection between the facts found and the choices made.'"  *RFE/RL*

Order at 6. USAGM's termination of RFA's grant must be set aside as arbitrary and capricious for the same reason.

### c. *Defendants' Impoundment Is Final Agency Action.*

Defendants' withholding of RFA's funds culminating in the termination of RFA's grant constitutes reviewable "final agency action." 5 U.S.C. § 704. Earlier this week, this Court had "no trouble concluding" that USAGM's nearly identical termination of a grant to Radio Free Europe/Radio Liberty was "'final' agency action given the unambiguous language of the grant termination letter." *RFE/RL* Order at 5. That decision was correct and applies with full force here.

Agency action is final if it "mark[s] the 'consummation' of the agency's decisionmaking process," meaning that it is not "tentative" or "interlocutory," and determines "rights or obligations" or imposes "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Defendants' impoundment of RFA's funds, consummated by USAGM's grant termination, easily qualifies as final agency action because it conclusively determines RFA's rights to its appropriated funding and imposes "legal consequences" by requiring RFA to undertake closeout tasks on threat of enforcement actions. *See RFE/RL* Order at 5. And there can be no question that the grant termination reflects "consummation of the agency's decisionmaking process." The March 15 letter "terminate[d]" RFA's grant "in its entirety" effective that same day and imposed closeout obligations. Fleming Decl., Ex. 1; s*ee RFE/RL* Order at 5 ("USAGM has taken a firm position that all grants are terminated, and RFE/RL must begin closeout procedures.").

That USAGM invited an "appeal" of its termination notice does not change anything. Despite the fact that USAGM has never identified any "written procedures for processing

objections, hearings, and appeals," 2 C.F.R. § 200.342, as the law requires, RFA submitted a letter appealing the termination.  A USAGM official promptly informed RFA that the agency would not respond, further confirming that its impoundment decision was final, reviewable agency action.  Fleming Decl. ¶ 23.  After filing this lawsuit, Counsel for RFA asked the Department of Justice (DOJ) if USAGM intends to withdraw its termination of RFA's grant agreement, as USAGM has done recently with respect to other grantees.  DOJ responded that USAGM plans to issue a response in the context of RFA's appeal letter.  That was a surprise to RFA, which has received only contrary indications from USAGM.  This exchange—between litigation counsel, and not between RFA and USAGM—following the filing of RFA's lawsuit, and in the context of RFA's effort to avoid burdening the court with a motion for a TRO, does not erase the finality of the agency's decision.[4]

### 2. RFA Is Likely to Succeed on its APA § 706(1) Claim to Compel the Disbursement of Funds Unlawfully Withheld or Unreasonably Delayed.

For similar reasons, RFA is likely to succeed on its claim under APA § 706(1) to "compel agency action unlawfully withheld or unreasonably delayed." *See Ramirez v. U.S. Immigr. & Customs Enf't*, 471 F. Supp. 3d 88, 94, 191 (D.D.C. 2020) (allowing plaintiffs to bring two counts, under 5 U.S.C. § 706(1) and (2), that "focus[ed] on the same conduct.").  To prevail on such a claim, a plaintiff must identify a "discrete agency action" that the agency is "required to take," either by statute or regulation.  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004)

---

[4] Even if the grant termination and decision to withhold funds were somehow not final agency action, RFA would still likely prevail on its claim under APA § 706(1) to "compel agency action unlawfully withheld or unreasonably delayed." *See infra* Section I.B.2. Because such a claim challenges an agency's *failure* to take final action, there need be no final agency action for the Court to review an APA § 706(1) claim. *See Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) (explaining that court has jurisdiction to review APA claim absent final agency action "where plaintiffs claim that a governmental action was unlawfully withheld or unreasonably delayed").

(emphasis omitted).  Defendants' refusal to provide RFA its appropriated funds satisfies that requirement.  As explained above, Congress has directed that RFA's funds "shall be allocated" to RFA by USAGM, imposing an exclusive and mandatory duty on USAGM to grant RFA its appropriated funds.  *See supra* pp. 12-15.  In withholding RFA's funding, Defendants failed to take "discrete" steps "required" by law.  *Norton*, 542 U.S. at 64.

### C.  RFA Is Likely to Prevail Regardless of Whether the APA Is Available.

1.  In the alternative, RFA is likely to prevail on its nonstatutory *ultra vires* claim.  An *ultra vires* cause of action is available when an "agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory."  *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (citation omitted).[5] "Moreover, an agency acts *ultra vires* when its decision is not supported by 'a contemporaneous justification by the agency itself,' but only a '*post hoc* explanation [by] counsel.'"  *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 975 (D.C. Cir. 2022) (quoting *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 860 (D.C. Cir. 2012)).

Defendants' impoundment of RFA's congressionally appropriated funds is *ultra vires*. No statute, constitutional provision, or other source of law authorizes Defendants to impound these funds.  In fact, the International Broadcasting Act and relevant appropriations laws require just the opposite.  *See supra* pp. 12-15.  Defendants' actions thus "disregard a specific and unambiguous statutory directive" from Congress to allocate these funds.  *Fed. Express Corp.*, 39

---

[5] The plaintiff must also show that "there is no express statutory preclusion of all judicial review" and "there is no alternative procedure for review of the statutory claim."  *Fed. Express Corp.*, 39 F.4th at 763.  Here, the International Broadcasting Act does not expressly preclude all judicial review, *see* 22 U.S.C. § 6208, and if this Court determines that RFA cannot bring an APA claim, RFA will have no alternative procedure for review of its statutory claim.

F.4th at 764 (citation omitted).  This goes "beyond mere legal or factual error" and amounts to a "clear departure by the agency from its statutory mandate." *Id.*

2. RFA is also likely to prevail on its request for mandamus relief.  A writ of mandamus may be granted to "correct transparent violations of a clear duty to act." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004) (citation omitted); 28 U.S.C. § 1361. The standard for finding that an agency failed to fulfill such a duty is "essentially the same" as the standard for finding that it "unlawfully withheld" action under the APA.  *See Vietnam Veterans of Am. v. Shinseki,* 599 F.3d 654, 659 n.6 (D.C. Cir. 2010).  For the same reasons that Defendants' conduct amounts to "agency action unlawfully withheld," 5 U.S.C. § 706(1), RFA is entitled to mandamus.  *See supra* pp. 19-20.  Therefore, even if this Court deemed APA relief unavailable for failure to meet some other requirement under § 706(1), RFA would still be likely to succeed in challenging Defendants' unlawful withholding of funds via mandamus relief.

### D.  Defendants' Withholding of RFA's Appropriated Funds and the Termination of its Grant Violate the Constitutional Separation of Powers.

Defendants' withholding of funds violates the Appropriations Clause, the Spending Clause, the Presentment Clause, and the Take Care Clause.  These clauses both embody and reflect the Constitution's separation of powers.  *See infra* (describing each clause).  These "checks and balances" act as "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Buckley v. Valeo*, 424 U.S. 1, 122 (1976).  These safeguards "diffuse[] power" to "secure liberty." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).  A likelihood of showing a violation of any one of these provisions is sufficient to show a likelihood of success on the merits.  Taken together, Defendants' multiplicity of violations reinforces that they have exceeded their

constitutional authority and encroached on Congress's, in violation of the broader structural separation of powers. *See id.* at 637–38.

### 1. The Appropriations and Spending Clauses

Defendants' actions violate the Appropriations and Spending Clauses, which reflect and enshrine the Framers' decision to give Congress the "exclusive power over the federal purse," *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (citation omitted). By declining to disburse funds lawfully appropriated by Congress, the Executive Branch is unconstitutionally encroaching on Congress's exclusive appropriations and spending powers. *See PFLAG, Inc. v. Trump*, No. CF 25-337, 2025 WL 510050, at *17 (D. Md. Feb. 14, 2025) (holding that executive "unconstitutionally intrude[d] upon the Congressional prerogative to control the public fisc" when it refused to spend appropriated funds without "ask[ing] Congress to rescind" them).

a. The Appropriations Clause is the "bulwark of the Constitution's separation of powers" and a "particularly important . . . restraint . . . on [the] Executive Branch." *U.S. Dep't of Navy*, 665 F.3d at 1347; *see also* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause). The Constitution gives Congress broad authority to define the terms of its appropriations. *See CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425–32 (2024); *see also Harrington v. Bush*, 553 F.2d 190, 194 (D.C. Cir. 1977) (describing Congress's "plenary power" to define the terms of appropriations). Congress may exercise that authority both in how it legislates specific appropriations, *CFPB*, 601 U.S. at 425-32, and in passing generally applicable laws related to spending, *Harrington*, 553 F.2d at 194. As a result, Congress may use a lump-sum appropriation to "give an agency the capacity to adapt to changing circumstances and meet its statutory

responsibilities in what it sees as the most effective or desirable way." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993).

But Congress has no constitutional obligation to structure appropriations that way. Instead, "Congress may always circumscribe agency discretion to [spend] by putting restrictions in the operative statutes," *id.* at 193, or by mandating that funds be spent in a particular way or amount. In such cases, the Executive Branch is "not free simply to disregard" Congress's statutory directions to disburse and spend appropriated funds. *Id.* Courts have repeatedly affirmed that the President—and by extension the Executive Branch—"does not have unilateral authority to refuse to spend" congressionally-appropriated funds. *In re Aiken Cnty.*, 725 F.3d at 261 n.1.

In *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 610 (1838), the Supreme Court granted a writ of mandamus compelling an executive branch official to pay a congressionally mandated award that he had attempted to withhold. The Court explained that Congress had authority to "impose" a duty on an executive officer to comply with the appropriation. *Id.* at 610-11. The Court further explained that the officer had no independent constitutional authority regarding the expenditure because his "obligation to perform, or his right to resist the performance, must depend upon the act of congress." *Id.* Likewise, in *Train v. City of New York*, 420 U.S. 35, 43 (1975), the Supreme Court held that a statute providing that sums "authorized to be appropriated . . . *shall be allotted*" required the expenditure of the entire amount, leaving the Executive no discretion to reduce the amount of funding. *Id.* at 42-43 (emphasis added). These decisions establish that while Congress may, at its discretion, give the Executive authority to spend less than the fully appropriated amount, the Executive has no independent constitutional authority to do so. Congress's choice to give the Executive the authority to redirect only 5% of RFA's

funding necessarily means that Congress required the Executive to disburse between 95% and 100% of the allotted funds to RFA. Where, as here, Congress mandates an expenditure, the Executive must comply. *See supra* pp. 12-15.

Consistent with these precedents, the Executive Branch's own longstanding view has been that it lacks the authority to impound or otherwise impede the flow of mandatory appropriations. In 1969, in a memorandum authored by William Rehnquist, the Department of Justice's Office of Legal Counsel ("OLC") concluded that any asserted presidential constitutional power to "decline to spend appropriated funds . . . is supported by neither reason nor precedent." William H. Rehnquist, *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, Office of Legal Counsel, 1 Op. O.L.C. Supp. 303, 309 (1969). As OLC explained, the Executive had no "power to refuse to spend appropriations *other than such power as may be found or implied in the legislation itself*." *Id.* at 310 (emphasis added). That is consistent with Executive Branch legal opinions from the early 19th century.[6] Indeed, OLC found no instance, in almost two hundred years of prior practice, in which the Executive had refused to comply with a mandatory congressional appropriation. *Id.* at 309.

b. The Spending Clause similarly empowers Congress and constrains the President. Specifically, "the ability to place conditions on federal grants ultimately comes from the Spending Clause, which empowers Congress, *not the Executive*, to spend for the general welfare." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021) (emphasis

---

[6] *See, e.g.*, Transfers of Appropriations, 4 Op. Att'y Gen. 428, 428–29 (1845) (concluding the Executive lacked the authority to transfer funds between appropriated items); Transfer of Specific Appropriations of House of Representatives to Contingent Fund, 3 Op. Att'y Gen. 442, 442–43 (1839) (same). And these views are consistent with founding-era and common law practices. *See CFPB*, 601 U.S. at 430–32 (describing historical practice of both permissive and mandatory appropriations).

added); *see also City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018).

Thus, "[a]llowing an executive agency to impose a condition that is not otherwise ascertainable

in the law Congress enacted 'would be inconsistent with the Constitution's meticulous separation

of powers.'" *W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124,

1147 (11th Cir. 2023) (quoting *Tex. Educ. Agency*, 992 F.3d at 362). The Executive therefore

cannot impose additional conditions on the disbursal of funds to RFA beyond those that Congress

has provided.

Congress has spoken with respect to the conditions on RFA's grant funding. Congress

enumerated a number of specific detailed conditions on RFA in the Act, including limits on

where RFA and its senior employees may be located and conditions on lease terms it may enter

into. *See* 22 U.S.C. § 6208(c). The Executive therefore has no constitutional or statutory

authority to impose additional conditions (stated or unstated) on RFA's funding. The Executive

may not simply withhold RFA's appropriated funds based on its own "priorities." *See In re

Aiken*, 725 F.3d at 261 (the Executive lacks authority to decline to spend funds for policy

reasons).

### 2. Presentment Clause

The Executive's withholding of RFA's funds is also an effective nullification of both the

Act and the appropriations statutes, in violation of the Presentment Clause. "There is no

provision in the Constitution that authorizes the President to enact, to amend, or to repeal

statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). But that is precisely what

Defendants' withholding amounts to. As already explained, both the Act and the appropriations

statutes require the Executive Branch to fund RFA's activities at a particular level. *See supra* pp.

12-15. The Executive's refusal to comply with Congress's instructions effectively repeals those

congressional commands.  Because neither the President nor his subordinates have any such unilateral power to amend or repeal of statutes, the Executive's interference with RFA's funding violates the Presentment Clause.

The Supreme Court's decision in *Clinton v. City of New York*, 524 U.S. at 438, which struck down the Line Item Veto Act, is dispositive.  That act authorized the President to "cancel in whole" certain kinds of statutory provisions, including: "(1) any dollar amount of discretionary budget authority; (2) any item of new direct spending; or (3) any limited tax benefit."  *Id*. at 436 (citation omitted).  President Clinton had exercised the authority granted to him by that act to cancel both a statutory provision that would have relieved certain state and local entities of their obligation to pay certain back taxes and an amendment to the capital gains tax.  *Id.*  The Supreme Court reasoned that this authority to cancel portions of duly enacted statutes—though provided to the President via legislation—violated the Presentment Clause because "[i]n both legal and practical effect," it gave the President the authority to "amend[] . . . Acts of Congress by repealing . . . portion[s]" thereof.  *Id.* at 438.  Consistent with extensive historical practice, the Supreme Court construed the Presentment Clause as requiring that the President either "approve all the parts of a Bill, or reject it in toto."  *Id.* at 439-40.  The Line Item Veto Act exceeded that limitation by authorizing the President to cancel portions of a bill *after* it became law.

Zeroing out Congress's specified funding for RFA is a form of line item veto.  As already explained, the appropriations laws mandate that a specific sum of funds "shall be allocated" to RFA.  The appropriations laws specify that USAGM may redirect only 5% of RFA's funding and leave no room for executive discretion to reduce RFA's grant funding by even a single dollar more.  *See supra* pp. 12-15.  They certainly do not authorize the Executive to entirely zero it out.

*Clinton* was clear:  If the President wants to eliminate or reduce federal funding for RFA, he must work with Congress to repeal the relevant appropriations provisions.  He may not functionally repeal or amend the terms of already-passed laws.  Nor may his subordinates.  *Cf. Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) (holding that an agency may not "rewrite clear statutory terms to suit its own sense of how the statute should operate").

It makes no difference that the Executive has not expressly purported to "cancel" any statute.  Separation-of-powers inquiries are functional, not formal, in character.  *See Clinton*, 524 U.S. at 438 (describing the Line Item Veto Act as a functional repeal because of its "legal *and practical effect*" (emphasis added)); *see also INS v. Chadha*, 462 U.S. 919, 953 (1983) ("Whether actions taken by either House are, in law and fact, an exercise of legislative power *depends not on their form* but upon whether they contain matter which is properly to be regarded as legislative in its character and effect." (emphasis added and citation omitted)).  By entirely cutting off funds to RFA, Congress's statutory command to fund RFA at a particular level has been functionally repealed.  It is therefore indistinguishable from President Clinton's line item veto that denied the plaintiffs congressionally-mandated tax relief.  If anything, the fact that President Clinton was operating pursuant to an (unconstitutional) grant of authority by Congress to cancel its own statutes makes the Executive's actions here *more* offensive to the separation of powers, not less.[7]  *See Youngstown Sheet & Tube Co.*, 343 U.S. at 637 (Jackson, J., concurring).

### 3.  Take Care Clause

Defendants' withholding of congressionally mandated funds also constitutes a failure of the Executive to fulfill its obligations under the Take Care Clause.  That Clause imposes on the

---

[7] The fact that RFA seeks relief against Defendants who are not the President does not affect its ability to seek relief on this claim because the President may not delegate power he does not possess.

President, and by extension his subordinates, the duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. "The President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker," *Youngstown Sheet & Tube Co.*, 343 U.S. at 587, and thus places a significant limitation on the Executive's authority. Dictating federal spending and effectively repealing duly enacted statutes are legislative, not executive, acts. *See supra* pp. 25-26, 28. Defendants' actions here thus flout the President's duty under the Take Care Clause.

The principle that the President cannot refuse to implement duly enacted laws—including spending-related laws—is a bedrock component of the Take Care Clause. *See Kendall*, 37 U.S. (12 Pet.) at 612-13. In *Kendall*, the Supreme Court expressly rejected the argument that the Take Care Clause's obligation "to see the laws faithfully executed, implies a power to forbid their execution." *Id.* at 612-13. The Court reasoned that the Constitution denied the President any power analogous to the "dispensing power" that the Crown enjoyed at common law to dispense with or suspend acts of Parliament. *Id.*; *see* Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. Pa. L. Rev. 1835, 1850 & n.110 (2016) (describing the dispensing power and its rejection in the English Bill of Rights). More recently, the D.C. Circuit reaffirmed this "settled, bedrock principle[] of constitutional law," explaining that "[u]nder Article II of the Constitution . . . the President must follow statutory mandates," and that "the President may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d at 259. Here, the Executive's refusal to comply with Congress's direction to fund RFA at specific levels functionally effects a repeal of those laws, in violation of the core of the Take Care Clause's limitation on Executive authority.

**4. Separation of Powers**

The Executive's usurpation of multiple legislative powers here also directly violates the Constitution's structural separation of powers.  Where, as here, Defendants have violated a clear, mandatory statutory command, *see supra* pp. 12-15, the Executive's "power is at its lowest ebb," *Youngstown Sheet & Tube Co.*, 343 U.S. at 637 (Jackson, J., concurring).  In such cases, the Executive's action is permissible only if it is based "on powers the Constitution grants to [it] alone," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015).  The powers on which the Executive purports to base its actions must be both "exclusive" and "conclusive."  *Id*.  And those exclusive authorities are narrowly drawn.  *Id.*  Defendants cannot be understood to be exercising exclusive or conclusive executive powers because they are in fact are exercising powers assigned to Congress—in some cases, solely so.

Defendants cannot justify their defiance of Congress by relying on the fact that RFA's work involves foreign affairs.  "In foreign affairs, as in the domestic realm, the Constitution 'enjoins upon its branches separateness but interdependence, autonomy but reciprocity.'" *Zivotofsky*, 576 U.S. at 16 (quoting *Youngstown,* 343 U.S. at 635 (Jackson, J., concurring)).  And as the Court emphasized in *Zivotofsky*, "whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law."  *Id*. at 21.  Even in the foreign affairs context, then, the President "may rely solely on powers the Constitution grants to him alone" to contravene a statutory command.  *Id*. at 10.

The RFA's work does not implicate any aspect of the foreign affairs power that is expressly conferred to the President "alone," such as the recognition power or the negotiation of treaties.  *See id*.  In *Zivotofsky* itself, the Court recognized that Congress may exert authority over foreign affairs via the Appropriations Clause, confirming that this is not an area in which the President possesses exclusive authority.  *Id*. at 16.  Congress elected to carry out RFA's critical

work via a private party—not the U.S. government directly.  RFA has a statutory obligation to provide both "accurate and timely information, news, and commentary about events in Asia" and to "be a forum for a variety of opinions and voices from within Asian nations."  22 U.S.C. § 6208(b).  RFA therefore does not purport to speak either on behalf of the U.S. or even with one voice of its own.  It therefore cannot be something on which "the Nation must 'speak . . . with one voice.'"  *Zivotofsky*, 576 U.S. at at 14 (quoting *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 424 (2003)).  Because Defendants have no inherent authority to cut off RFA's funding or its critical work, their disregard for Congress's express command violates the separation of powers.

### E.  The Government's Likely Contention that this Court Lacks Jurisdiction is Meritless.

The government will likely argue that this Court lacks jurisdiction.  Not so.  RFA brings this action to enjoin unlawful agency action and to compel the performance of non-discretionary statutory duties; RFA's claims are founded in the APA, other federal statutes, and the Constitution itself.  Accordingly, they are properly before this Court.  *See* 5 U.S.C. § 704; 28 U.S.C. § 1331, § 1361.

The Administrative Procedure Act (APA) waives sovereign immunity for federal actions "seeking relief other than money damages."  5 U.S.C. § 702.  In *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988), the Supreme Court held that district courts have jurisdiction over APA cases seeking to compel or set aside agency action, even when, as a natural consequence, money will flow to the plaintiff.  This case is materially indistinguishable from *Bowen*.  RFA, like Massachusetts in *Bowen*, is suing to "enforce [a statutory provision], which provides that the [government] 'shall'" perform a certain duty; thus, RFA is not "seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it

is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." *Id.* at 900.  Like Massachusetts in *Bowen*, RFA here seeks prospective relief requiring compliance with the statutory funding scheme moving forward.  *See id.* at 905.  The *Bowen* Court was "not willing to assume" that a "naked money judgment against the United States" was an "adequate substitute for prospective relief fashioned in the light of the rather complex ongoing relationship between the parties." *Id.*; *see* 900 n.31.  So too here.

      *Bowen* was not a contracts case, and neither is RFA's suit.  The D.C. Circuit has interpreted the Tucker Act, 28 U.S.C. § 1491(a)(1), to "'impliedly forbid[]' contract claims against the Government from being brought in district court under the waiver in the APA." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618–19 (D.C. Cir. 2017) (citation omitted).  But that Court has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (reversing dismissal for lack of jurisdiction) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982)).  Likewise, "[e]xclusive jurisdiction in Claims Court under the Tucker Act does not lie merely because . . . success on the merits may obligate the United States to pay the complainant." *Crowley*, 38 F.4th at 1108 (internal citation and quotation marks omitted).  To determine whether an action is, in "its essence," contractual, courts examine "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Perry Cap. LLC*, 864 F.3d at 619 (citation omitted).

On the first prong, the question is whether "the plaintiff's asserted rights and the government's purported authority arise from statute" or from contract. *Crowley*, 38 F.4th at 1107. Here, it is crystal clear that RFA does not seek to enforce any duty imposed upon USAGM by grant agreement—the only arguable contract present in this case. Instead, the sources of RFA's claimed rights are the International Broadcasting Act and the relevant appropriations laws, all of which require Defendants (many of whom are not party to USAGM's grant agreements) to disburse congressionally appropriated funds to RFA. RFA further alleges, and is likely to succeed on its claims that, Defendants' violations of those statutes also violate the Constitution. The rights that RFA asserts, therefore, cannot be contract rights: They "existed prior to and apart from rights created under [any] contract." *See Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (affirming dismissal for lack of jurisdiction when that was not the case). And analyzing whether Defendants have infringed those rights requires an examination of the relevant statutory and constitutional provisions—not of any USAGM grant agreement provision. *See Crowley*, 38 F.4th 1108–09.

Against that backdrop, RFA's arguments plainly do not sound in contract, especially as whether a claim falls under the APA or the Tucker Act "depends not simply on whether a case involves contract issues, but on whether, despite the presence of a contract, plaintiffs' claims are founded *only* on a contract, or whether they stem from a statute or the Constitution." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (emphasis added), *overruled on other grounds by Perry Cap.*, 864 F.3d at 620;[8] *see AIDS Vaccine*

---

[8] In *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (2017), the D.C. Circuit abrogated *Transohio*'s unrelated holding concerning the status of the "adequate remedy" bar of 5 U.S.C. § 704. Courts continue to favorably cite *Transohio*'s analysis of what type of claims fall within the Tucker Act. *See, e.g.*, *Cemex Inc. v. Dep't of the Interior*, 560 F. Supp. 3d 268, 276 (D.D.C. 2021).

*Advocacy Coalition v. U.S. Dep't of State*, 2025 WL 752378, at *9 (D.D.C. Mar. 10, 2025) ("[I]t would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach.").

On the second prong, the "crux of th[e] inquiry . . . boils down to whether the plaintiff effectively seeks to attain monetary damages in the suit." *See Crowley*, 38 F.4th at 1107.  RFA is not seeking "money damages," which are "given to the plaintiff to *substitute* for a suffered loss." *Bowen*, 487 U.S. at 895.  Instead, RFA seeks only declaratory and injunctive relief that amounts to no more, and no less, than its statutory entitlement.

Because RFA does not seek to enforce or recover on any government contract, under the governing test, RFA's case is not "a disguised contract action," *Megapulse*, 672 F.2d at 968, and this Court's jurisdiction is proper.

## II. RFA Will Suffer Irreparable Harm Without a Temporary Restraining Order.

To establish irreparable harm, a movant must demonstrate that it faces an "injury that is 'both certain and great; it must be actual and not theoretical,' and of a nature 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242 (D.D.C. 2014) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  "[I]f a plaintiff has shown that financial losses are certain, imminent, and unrecoverable, then the imposition of a preliminary injunction is appropriate and necessary." *Id.* (quoting *Wis. Gas*, 758 F.2d at 53).

RFA is suffering irreparable harm due to Defendants' withholding of RFA's congressionally appropriated funds.  RFA's operations have been essentially shuttered, making it nearly impossible to perform its statutory mission.  Its journalists—who often risk their lives to

provide reliable and unbiased news in countries that are hostile to a free press—may soon lose

RFA's advocacy and protection and will be subjected to the risk of imprisonment and physical

harm.  Meanwhile, RFA's reputation—as a reliable news source, a protector of journalists who

put themselves in harm's way, and as a business partner—may never recover.  These harms

threaten the very existence of RFA.  Absent judicial intervention, it will completely shut down at

the end of April.  Immediate judicial intervention is warranted.

### A.  RFA Cannot Continue to Operate Without Congressionally Appropriated Funds.

USAGM's refusal to provide RFA's congressionally appropriated funds "threatens the

very existence" of the organization.  *Wis. Gas*, 758 F.2d at 674; *see Nat'l Council of Nonprofits v.*

*Office of Mgmt. and Budget*, No. 25-cv-239, 2025 WL 597959, at *18 (Feb. 25, 2025) ("A freeze

will not simply inconvenience them, it will devastate them."). Absent additional funding, RFA

will have no choice but to close the vast majority of its operations at the end of April and may

ultimately shut down permanently.  Fleming Decl. ¶ 26.  RFA has limited cash on hand to sustain

basic institutional operating costs, and has already begun the process of winding down its

operations in light of the lack of access to its appropriations. *Id*.  That wind-down process will

include "terminating all RFA's contracts with freelance journalists, terminating its leases and

contracts, and laying off staff." *Id*.  RFA is responsible for leases in eight different countries and

other financial obligations around the world, and it will be forced to default on these obligations

without access to its congressionally appropriated funds.  *Id*. ¶ 33.  RFA has payments due on its

lease for its Washington, D.C. headquarters that it will not be able to pay next month without

furloughing the remaining 25% of its U.S.-based staff.  *Id.*

Failing to provide RFA its congressionally appropriated funding will require it "to cease

essentially all broadcasting and news operations."  Fleming Decl. ¶ 27.  RFA reaches over 60

million people every week.  *Id.*  Stopping news coverage in countries where there are few, if any, alternative news sources apart from state-controlled media means those people will be cut off from access to free and independent media coverage of critical events.  *Id.*  This will allow the state-controlled media in those countries to fill the gap with coverage that is favorable to the particular narratives favored by local governments.  *Id.* ¶ 34.

### B.  The Freeze in Funding Threatens the Safety of RFA Journalists and Staff.

RFA frequently relies on freelance journalists to do its most critical reporting. Declaration of Tamara Bralo ("Bralo Decl.") ¶ 3.  Many of these journalists operate in some of the countries "most hostile to independent reporting in the world" such as China, North Korea, Tibet, and Xinjiang.  Fleming Decl. ¶ 28.  As a result, they have faced threats to their personal security arising from their reporting including physical surveillance, online harassment, surveillance and harassment, and imprisonment of their family members.  Bralo Decl. ¶¶ 3-6.  In addition, there are six RFA journalists who, as a result of their reporting, are currently incarcerated in countries where RFA broadcasts.  *Id.* ¶ 8.  In Vietnam, four journalists are in prison and one is under house arrest.  *Id.*  One RFA journalist is currently incarcerated in Myanmar.  *Id.*  In Cambodia, two other journalists have ongoing legal cases.  *Id.*

RFA has already furloughed 75% of its U.S.-based employees, stopped accepting work from stringers (freelancers) around the world, and terminated the vast majority of its hundreds of independent contractor agreements.  Fleming Decl. ¶ 25; Bralo Decl. ¶ 10.  Without the ability to draw on congressionally appropriated funds, RFA will no longer be able to protect its journalists who are operating in authoritarian countries from the threats they routinely face. Bralo Decl. ¶ 9. It will also leave the RFA journalists currently incarcerated without representation or anyone to advocate on their behalf. *Id.* ¶ 8.

Relatedly, RFA's work relies on journalists who fled from authoritarian countries such as Cambodia, Vietnam, Kazakhstan, Cambodia, and China who are living and working in the United States. Bralo Decl. ¶ 11. Their residency is dependent on their employment at RFA. *Id.* ¶ 11. If RFA is not funded, it will be forced to terminate its contracts with these journalists and lay off the vast majority of its employees by the end of April 2025. *Id.* ¶ 10; Fleming Decl. ¶ 25. RFA journalists whose residency relies on their employment may be forced to return to their home countries. Bralo Decl. ¶ 11. RFA has approximately 35 journalists from countries including Vietnam, Hong Kong, India, China, Kazakhstan, and Cambodia who are currently working in the United States on non-immigrant, employment-based visas that require them to be working and paid for their work to remain here. *Id.* If RFA has to furlough these staff members or close its doors, these employees will have 60 days before losing legal status and being forced to return to their home countries. *Id.* "To say the least, this harm could not be remedied after the court has an opportunity to rule on the merits of plaintiffs' complaint." *A.B.-B. v. Morgan*, 548 F. Supp.3d 209, 221 (D.D.C. 2020).

Given the nature of RFA's work, RFA is frequently targeted by cyber threats and attacks, including by foreign state actors. To guard against those threats, RFA works with a number of vendors who provide services to identify and respond to cyberattacks and other security threats to RFA servers, cloud-based systems, desktops, laptops and mobile devices. Bralo Decl. ¶ 13. Without access to its congressionally appropriated funding, RFA cannot pay these vendors. In addition, some of RFA's critical cybersecurity defense digital safety tools have monthly licenses that will lapse in thirty days if there is a delay in payment. Shutting down RFA's cybersecurity mechanisms greatly increases the chances that cyber attackers will gain access to RFA's systems, leading to system damage, network disruption, and data loss. *Id.* ¶¶ 14-15. Such damage would

expose the personal data of over 300 people in 34 countries, including in countries where RFA journalists risk their lives to provide accounts of the actions of authoritarian regimes, putting their lives at risk. *Id.*; *see also All. for Retired Ams. v. Bessent*, No. CV 25-0313, 2025 WL 740401, at *22 (D.D.C. Mar. 7, 2025) (in preliminary injunction context, plaintiffs may show irreparable harm by "demonstrating that such a [data] breach or improper disclosure is likely in the absence of an injunction" (citation and quotation marks omitted)).

### C. RFA's Inability to Access Its Funds Threatens Irreparable Damage to RFA's Reputation as a Trusted Employer and Provider of Accurate Reporting to People Living Under Authoritarian Regimes.

RFA's inability to access its congressionally appropriated funds would harm RFA's long-term reputation. "Injury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction." *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103–04 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019). *See also Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (finding irreparable harm where conduct "could not fail to damage [the plaintiff's] good name"); *Whole Foods Market Grp., Inc. v. Wical Ltd P'Ship*, 288 F. Supp. 3d 176, 189-90 (D.D.C. 2016) (noting that breaking lease and forcing commercial tenant to move can cause "harm to its reputation in the community—harm that cannot be reversed"); *AIDS Vaccine*, 2025 WL 752378 at *19 n.19 (noting "disruptions to relationships with longstanding partners whose trust had been cultivated over decades, . . . and having to go back on previous assurance made to clients and partners in reliance on the agreements that have now been canceled").

As discussed, RFA employs freelance journalists who work in the field in some of the countries most hostile to independent reporting in the world. Bralo Decl. ¶ 3. Recruiting freelance journalists in these countries is "extremely challenging due to the personal and

professional risks involved," and RFA has "spent decades" developing relationships with local journalists and organizations to establish itself as a reliable and secure broadcaster of independent news.  Fleming Decl. ¶ 29.  If RFA cannot access its congressionally appropriated funds, it will be forced to terminate those relationships, undermining RFA's reputation as a reliable partner and potentially prevent RFA from being able to reestablish relationships with those journalists again.  *Id.*

Relatedly, if RFA is forced to abruptly close its doors and cease its activities, journalists will be left unprotected and, in many cases, face deportation to dangerous countries, where they will be prosecuted and imprisoned.   Bralo Decl. ¶ 15. This will "destroy the trust, credibility, and relationships RFA has built over decades with its journalists who rely on RFA for their continued safety."  *Id.*  This lasting damage is irreparable harm.

### D. For RFA's APA Claims, Damages Are Unavailable and Would Not Cure the Harms Caused by USAGM's Actions.

As set forth above, damages would not compensate RFA for the irreparable harm to the safety of its journalists or to the irreversible damage to its reputation as a reliable news source, a protector of journalists who put themselves in harm's way, and a business partner.  In addition, because RFA's claims are brought under the APA, it cannot recover damages.  5 U.S.C. § 702. By definition, those damages are unrecoverable.  *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs*., 485 F. Supp. 3d 1, 59 (D.D.C. 2020).

### III. The Balance of Equities and Public Interest Weigh in Favor of Preliminary Relief.

"The final two temporary restraining order factors—balancing the equities and weighing the public interest—"merge when the Government is the opposing party."  *Am. Ass'n of Political Consultants v. SBA*, 613 F. Supp. 3d 360, 365 (D.D.C. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Here, RFA's likelihood of success on the merits, see *supra* pp. 12-33, itself

establishes that the equities and public interest favor a temporary restraining order. "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (citation and quotation marks omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (citation omitted). On the other hand, "there is a substantial public interest in having governmental agencies abide by the federal laws . . . that govern their existence and operations." *Id.* (citations and quotation marks omitted). Accordingly, for the same reasons that Plaintiffs are likely to succeed on the merits, equity and the public interest requires relief.

Beyond that, restoring funding to ensure the continued operations of RFA is in the public interest. Since its inception, RFA has fulfilled its statutory purpose by providing accurate, uncensored news in countries where free press is threatened, and now reaches nearly 60 million people every week. Fleming Decl. ¶ 2. Congress itself has declared that "[i]t is the policy of the United States to promote the right of freedom of opinion and expression" and that "[i]t is in the interest of the United States to support broadcasting to other nations." 22 U.S.C. § 6201(1), (3); *accord RFE/RL* Order at 8 (finding public interest factors favored temporarily restraining defunding of Radio Free Europe/Radio Liberty in part because "Congress has enshrined into law that "[i]t is in the interest of the United States to support broadcasting to other nations"). And Congress has chosen to advance that mission through the continued funding of RFA. *See* 2024 Appropriations Act, 138 Stat. 460, 735. Restoration of funding to RFA is therefore in the public interest.

Nor is there an equitable basis for withholding a temporary restraining order, which would restore the decades-long status quo of RFA receiving its congressionally appropriated

funds and putting them to use to fulfill its statutory mandate.  It would also restore the appropriate balance between Congress, with its power of the purse, and the Executive Branch, which must take care that Congress's instructions are followed. Conversely, no meaningful interest weighs in favor of withholding RFA's congressionally appropriated funding.

## CONCLUSION

For the foregoing reasons, this Court should grant the motion for a temporary restraining order.

March 28, 2025

Respectfully submitted,

/s/ Kristin Bateman
Kristin Bateman*^
Jennifer Fountain Connolly (D.C. Bar No. 1019148)*
Robin F. Thurston (D.C. Bar No. 1531399)
Skye L. Perryman (D.C. Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org
jconnolly@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

/s/ Donald B. Verrilli, Jr.
Donald B. Verrilli, Jr. (D.C. Bar. No. 420434)
Ginger D. Anders (D.C. Bar. No. 494471)
Jeremy S. Kreisberg (D.C. Bar No. 1048346)
Helen E. White (D.C. Bar No. 1741368)*
Esthena L. Barlow (D.C. Bar No. 90000252)*
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Donald.Verilli@mto.com
Ginger.Anders@mto.com
Jeremy.Kreisberg@mto.com
Helen.White@mto.com
Esthena.Barlow@mto.com

Hailyn J. Chen**
Adeel Mohammadi**
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Hailyn.Chen@mto.com
Adeel.Mohammadi@mto.com

Gabriel M. Bronshteyn**
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
(415) 512-4000

Gabriel.Bronshteyn@mto.com

*Admission pending
**Pro hac vice application forthcoming
^ Admitted only in California; practice
supervised by members of the D.C. bar

*Attorneys for Radio Free Asia*