IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

RADIO FREE ASIA,

     *Plaintiff,*

  v.

THE UNITED STATES OF AMERICA; UNITED STATES AGENCY FOR GLOBAL MEDIA; KARI LAKE, in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media; VICTOR MORALES, in his official capacity as acting Chief Executive Officer of the United States Agency for Global Media; OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in his official capacity as Director of United States Office of Management and Budget; UNITED STATES DEPARTMENT OF TREASURY; and SCOTT BESSENT, in his official capacity as United States Secretary of the Treasury,

     *Defendants*.

</td><td>

**Case No. 1:25-cv-00907-RCL**

</td></tr>
</table>

**BRIEF OF PROPOSED AMICI CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND COMMITTEE TO PROTECT JOURNALISTS IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

i

## TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ................................................................................................... ii

INTEREST OF AMICI CURIAE ........................................................................................... 1

INTRODUCTION ................................................................................................................. 3

ARGUMENT .......................................................................................................................... 5

    I.    The editorial independence of USAGM networks is essential to their credibility, their mission, and the safety of their reporters. ........................................................... 5

    II.    Allowing the Executive to withhold USAGM networks' funding unilaterally would destroy the independence that makes them effective. ................................. 11

CONCLUSION ..................................................................................................................... 14

## TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Aids Vaccine Advoc. Coal. v. United States Dep't of State*,
Nos. 25-00400 & 25-00402, 2025 WL 752378 (D.D.C. Mar. 10, 2025)............................ 12

*City & County of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ....................................................................................... 12

*Iancu v. Brunetti*,
588 U.S. 388 (2019) ....................................................................................................... 14

*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013) ....................................................................................... 12

*Newspaper Guild of Greater Phila., Local 10 v. NLRB*,
636 F.2d 550 (D.C. Cir. 1980) ......................................................................................... 4

*Ralis v. RFE/RL, Inc.*,
770 F.2d 1121 (D.C. Cir. 1985) ............................................................................... *passim*

*Turner v. U.S. Agency for Glob. Media*,
502 F. Supp. 3d 333 (D.D.C. 2020) ......................................................................... 3, 8, 9

**Statutes:**

22 U.S.C. § 6202 ................................................................................................... *passim*

22 U.S.C. § 6205.................................................................................................... *passim*

Foreign Relations Authorization Act, Fiscal Year 1977,
Pub. L. No. 94-350, § 503, 90 Stat. 823 (1976) ................................................................. 7

International Broadcasting Act,
Pub. L. No. 93-129, 87 Stat. 456 (1973) ....................................................................... 5, 8

National Defense Authorization Act for Fiscal Year 2017,
Pub. L. No. 114-328, § 1288, 130 Stat. 2000 (2016) ......................................................... 9

National Defense Authorization Act for Fiscal Year 2021,
Pub. L. No. 116-183, 134 Stat. 3388 (2021) .................................................................... 9

Omnibus Consolidated and Emergency Supplemental Appropriations Act,
 Pub. L. No. 105-277, § 1323, 112 Stat. 2681 (1998) ..................................................9

United States International Broadcasting Act of 1994,
 Pub. L. No. 103-236, § 305, 108 Stat. 382 (1994) ....................................................9

**Other Authorities:**

Editorial Board, *A U.S. Retreat in the War of Ideas*, Wall St. J. (Mar. 19, 2025) ......................6

Elon Musk (@elonmusk), X (Feb. 9, 2025, 8:02 AM) ...................................................4

Exec. Order No. 14,238, 90 Fed. Reg. 13043 (Mar. 14, 2025)......................................4

H.R. Rep. No. 510, 93d Cong., 1st Sess. 3–5 (1973),
 *reprinted in* 1973 U.S. Code Cong. & Ad. News 2271......................................................8

Jason Rezaian, *These 10 Jailed Journalists Worked for U.S. Outlets that Trump Silenced*,
 Wash. Post (Mar. 20, 2025) ............................................................... 10

Kari Lake (@KariLake), X (March 19, 2025, 7:21 PM)...............................................13

Kunnawut Boonreak & Pimuk Rakkanam, *Journalists Visiting Deported Uyghurs in
 Xinjiang Face Chinese Surveillance*, Radio Free Asia (Mar. 20, 2025) ............................... 6

Mario Nawfal (@MarioNawfal), X (Feb. 9, 2025, 6:30 AM).......................................14

Margret Brennan, *After Hundreds of Radio Free Asia Staff Placed on Leave, Some Fear
 Deportation*, CBS (Mar. 21, 2025) ............................................................. 6

Matthew Rice, *Trump's Special Envoy Rips Voice of America, Radio Free Europe as a
 "Relic of the Past"*, N.Y. Sun (Feb. 10, 2025) ......................................................14

*Musk Calls for Closure of US State Media*, RT (Feb. 9, 2025) ......................................13

*Myanmar Jails Filmmaker Shin Daewe for Life for Buying a Drone*, Comm. to Protect
 Journalists (Apr. 4, 2024) ............................................................. 10

*New Dissident Trials in Burma*, Radio Free Asia (Oct. 15, 2008) ...........................................6

Radio Free Asia, Freedom and Courage in Reporting (Jan. 2025) ...................................... 7

*Reporters Committee Letter: Congress Must Protect Voice of America's Editorial
 Independence*, Reps. Comm. for Freedom of the Press (Apr. 28, 2020) ..........................2

iii

*See* S. Res. 394, 117th Cong. (2022)............................................................................ 6

*Senior Advisor Kari Lake Cancels Obscenely Expensive 15-Year-Lease That Burdened The Taxpayers And Enforces Trump's Executive Order To Drastically Downsize Agency*, USAGM (March 15, 2025) ...................................................................13

Serge Schmemmann, *The Voice of America Falls Silent*, N.Y. Times (Mar. 24, 2025) .............7

Shohret Hoshur, *China Forces Uyghurs to Show Video Proof They Are Not Fasting During Ramadan*, Radio Free Asia (Mar. 18, 2025) ......................................................... 6

*The Voice of Radical America*, The White House (March 15, 2025) ...................................4, 13

*Under the Gun in Myanmar*, RFA (last visited Mar. 30, 2025) ..................................................6

U.S. Agency for Global Media, Audience and Impact: Overview for 2019 (2019) ..............8

U.S. Agency for Global Media, Audience and Impact: Overview for 2025 (2025) ............10

*Vietnam Sentences 3 Independent Journalists to More Than 10 Years in Prison*, Comm. to Protect Journalists (July 22, 2024)...........................................................................10

*Vietnam Sentences Journalist Nguyen Lan Thang to 6 Years in Prison*, Comm. to Protect Journalists (Apr. 13, 2023)................................................................................10

Voice of Am., *VOA's First Broadcasts: "The News May Be Good or Bad; We Shall Tell You the Truth"*, YouTube (Mar. 8, 2012)...............................................................6

## INTEREST OF AMICI CURIAE

Amici curiae are the Reporters Committee for Freedom of the Press (the

"Reporters Committee") and the Committee to Protect Journalists ("CPJ") (together,

"amici").[1]  The Reporters Committee is an unincorporated nonprofit association of

reporters and editors dedicated to defending the First Amendment and newsgathering

rights of the news media.  Founded by journalists and media lawyers in 1970, when the

nation's press faced an unprecedented wave of government subpoenas forcing

reporters to name confidential sources, today its attorneys provide *pro bono* legal

representation, amicus curiae support, and other legal resources to protect journalists.

The Committee to Protect Journalists is an independent, nonprofit organization

that was founded in 1981 to promote press freedom worldwide.  It defends the right of

journalists to report the news without fear of reprisal.  CPJ is a global organization

headquartered in New York City.  CPJ's board of directors is composed of prominent

journalists, media executives, and leaders from related professions.

As organizations committed to defending First Amendment freedoms, such as

the right to gather and report the news, amici have a powerful interest in ensuring that

the constitutional rights of all journalists, including working journalists at the U.S.

Agency for Global Media networks, are not infringed, *see, e.g., Reporters Committee*

---

[1]     No party or party counsel authored this amici brief in whole or in part, or made a
monetary contribution intended to fund its preparation or submission.  No person other
than amici made a monetary contribution to the preparation or submission of this brief.

*Letter: Congress Must Protect Voice of America's Editorial Independence*, Reps. Comm. for

Freedom of the Press (Apr. 28, 2020), https://perma.cc/34QC-8G5D, and that the U.S.

Agency for Global Media ("USAGM") complies with Congress's instruction to

"respect[] the professional integrity and editorial independence" of the networks, 22

U.S.C. § 6205(d)(6)(a).

  Amici respectfully submit this amici curiae brief pursuant to Local Civil Rule

7(o).

## INTRODUCTION

For decades, Radio Free Asia ("RFA") and its sister networks funded by the U.S.

Agency for Global Media ("USAGM") have been vital sources of news and information

for hundreds of millions of people around the world—in some countries, the only

viable alternative to state-controlled media.  Through their work producing credible,

independent journalism, these networks and their reporters "export[] the cardinal

American values of free speech, freedom of the press, and open debate to the dark

corners of the world where independent, objective coverage of current events is

otherwise unavailable." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 341–

42 (D.D.C. 2020).  And to fulfill that purpose, Congress recognized, RFA and its sister

networks must enjoy "professional integrity and editorial independence."  22 U.S.C.

§ 6205(d)(6)(a).  In other words, they must be—and must be seen by their audience as—

"independent broadcasters," not just "house organs for the United States Government."

*Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1125 (D.C. Cir. 1985).

Lawmakers therefore created a detailed statutory scheme that ensures the

networks can operate with the autonomy necessary to secure the audience's trust,

producing news free from political tampering "which is consistently reliable and

authoritative, accurate, objective, and comprehensive."  22 U.S.C.  § 6202(b)(1).  Those

values, enshrined in law, are vital to the work, and safety, of USAGM journalists

around the world.  But with the stroke of a pen, the Administration has moved to

eliminate USAGM, *see*, Exec. Order No. 14,238, 90 Fed. Reg. 13043 (Mar. 14, 2025),

available at https://perma.cc/F9SY-ZDEE, and refused to disburse congressionally

appropriated funds for RFA.  It did so, the President's senior advisers suggested, on the

baseless view that USAGM network journalism is the work of "radical left crazy

people," *e.g.*, Elon Musk (@elonmusk), X (Feb. 9, 2025, 8:02 AM), https://perma.cc/L3GE-

ZWXJ, and that other USAGM networks produce "radical propaganda," *The Voice of*

*Radical America*, The White House (March 15, 2025), https://perma.cc/8L6A-P9CS.  That

attack on Congress's design and RFA's journalism not only threatens to shutter RFA

today; if upheld, it would severely undermine the USAGM networks' credibility going

forward.

Just as it would be for any other news organization, RFA's "credibility is central

to the[] ultimate product and to the conduct of the enterprise."  *Newspaper Guild of*

*Greater Phila., Local 10 v. NLRB*, 636 F.2d 550, 560 (D.C. Cir. 1980).  If the USAGM

networks were perceived to be subject to the whims of any given presidential

administration—because any disagreement with the content of their reporting could

lead the Executive Branch to withhold funding, leaving them too decimated to

operate—no audience will trust the broadcasters to produce "consistently reliable and

authoritative" news rather than propaganda.  22 U.S.C. § 6202(a)(5).  That concern is

particularly grave here, where RFA's journalists report on countries where their safety

may be at risk if they are perceived to be agents of the government.  If not blocked here

4

and now, the funding rescission will cause irreversible damage to RFA's reputation and

its ability to serve its central purpose, even if Congress or a future Administration

attempts to revive its vital work.

A temporary restraining order and preliminary injunction should issue.  The

Administration lacks authority to discard Congress's "manifest" intent—consistently

expressed over the course of five decades—that RFA and its sister networks "enjoy

independence in programming and broadcasting decisions."  *Ralis*, 770 F.2d at 1125.

For the reasons set forth herein, amici urge the Court to grant Plaintiff's request for

immediate emergency relief to safeguard the independence of USAGM networks and to

protect the safety of their dedicated journalists, who work to bring the world the news.

## ARGUMENT

I.     **The editorial independence of USAGM networks is essential to their**
       **credibility, their mission, and the safety of their reporters.**

For the better part of a century, Congress has supported RFA to ensure *bona fide*

reporting and "freedom of opinion and expression" can reach countries that do not

have a free press.  International Broadcasting Act, Pub. L. No. 93-129, 87 Stat. 456, 457–

58 (1973).  And from the outset, publicly funded broadcasting overseas has staked its

claim to that audience's trust on credibility and autonomy.  As Voice of America's first

transmission in 1942 announced to the world, "The news may be good or bad; we shall

tell you the truth."  *See* Voice of Am., *VOA's First Broadcasts: "The News May Be Good or*

*Bad; We Shall Tell You the Truth"*, YouTube (Mar. 8, 2012), https://tinyurl.com/y2ccoc28.

In periods of turbulence and change, RFA and its sister networks have consistently provided access for all people, including those living under repressive regimes, to accurate media.  *See* S. Res. 394, 117th Cong. (2022) (celebrating the accomplishments of RFA and its news coverage on the 25th anniversary of its formation).  And they have won the trust of audiences "in countries where media are controlled by governments that lie about the world."  Editorial Board, *A U.S. Retreat in the War of Ideas*, Wall St. J. (Mar. 19, 2025), https://bit.ly/4iJxUp1.  RFA was formed after the Tiananmen Square Massacre to give people in China and others living in an authoritarian regime access to an "unbiased news service," and "to broadcast facts into countries where governments are afraid of them."  Margret Brennan, *After Hundreds of Radio Free Asia Staff Placed on Leave, Some Fear Deportation*, CBS (Mar. 21, 2025) https://perma.cc/9ZMQ-EH9T.  RFA provided vital coverage, for instance, of Myanmar's 2007 Saffron Revolution, *see New Dissident Trials in Burma,* Radio Free Asia (Oct. 15, 2008), https://bit.ly/42fDIj2, and has been on the front lines covering life in Myanmar following the 2021 coup, *Under the Gun in Myanmar*, RFA (last visited Mar. 30, 2025), https://bit.ly/4iLmsch.   RFA has likewise provided essential information about the mass detentions of Uyghurs and other minorities in China, *see* Shohret Hoshur, *China Forces Uyghurs to Show Video Proof They Are Not Fasting During Ramadan*, Radio Free Asia (Mar. 18, 2025), https://bit.ly/4l1x0FM; *see also* Kunnawut Boonreak & Pimuk Rakkanam, *Journalists Visiting Deported Uyghurs in Xinjiang Face Chinese*

*Surveillance*, Radio Free Asia (Mar. 20, 2025), https://bit.ly/4237WHf.  Today, with the

funding the Administration has moved to freeze—which accounts for a majority of the

organization's funding—Radio Free Asia reports reaching over 58 million people per

week, in 10 languages and 6 countries without free media.  *See* Radio Free Asia,

Freedom and Courage in Reporting 1 (Jan. 2025), available at https://perma.cc/763R-

F2VX.

Throughout that history, bipartisan majorities in Congress have recognized that

independent, professional broadcasters like RFA would advance "[t]he long-range

interests" of the United States—not instead of reporting the news, but *by* reporting the

news.  *See* Foreign Relations Authorization Act, Fiscal Year 1977, Pub. L. No. 94-350, §

503, 90 Stat. 823, 831 (1976).  Congress has therefore expressly rejected opportunities "to

transform [USAGM networks] from independent broadcasters into house organs for the

United States Government," which it saw "as inimical to the fundamental mission of

those stations."  *Ralis*, 770 F.2d at 1125 (citing H.R. Rep. No. 510, 93d Cong., 1st Sess. 3–5

(1973), *reprinted in* 1973 U.S. Code Cong. & Ad. News 2271, 2272–74).

For good reason.  RFA and its sister networks can accomplish Congress's goals

only if they maintain meaningful independence—both actual independence and the

perception of it—from political control.  *See Ralis*, 770 F.2d at 1125.  RFA and its sister

"outlets are not intended to promote uncritically the political views and aspirations of a

single U.S. official, even if that official is the U.S. President."  *Turner*, 502 F. Supp. 3d at

7

342 (recognizing the First Amendment rights of journalists at Voice of America and rejecting effort to subvert statutory "firewall" protecting them).  Listeners turn to these stations as an alternative to state media, not as their second state-media option.  *See, e.g.*, U.S. Agency for Global Media, Audience and Impact: Overview for 2019, at 17 (2019) (finding that videos fact-checking local disinformation are among VOA and RFE/RL's most popular offerings in Russia).  Editorial independence for these newsrooms is "central to [the] success of this critical foreign policy" embodied in the USAGM statute. *Turner*, 502 F.Supp. 3d at 342.

The framework carefully crafted by Congress reflects that commitment.[2]  In 1994, when Congress acted to consolidate non-military broadcasting into USAGM, it also established firm guardrails protecting the networks' autonomy—including the requirement that agency leadership "respect the[ir] professional independence and integrity."  United States International Broadcasting Act of 1994, Pub. L. No. 103-236, § 305, 108 Stat. 382, 436 (1994).  Congress retained that requirement when it reorganized the networks in 1998, *see* Omnibus Consolidated and Emergency Supplemental Appropriations Act, Pub. L. No. 105-277, § 1323, 112 Stat. 2681, 2681–780, again when it reorganized them further in 2016, *see* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1288, 130 Stat. 2000, 2548, and again in 2021 when it revised the structure in response to attacks on Voice of America's independence, *see*

---

[2]    The First Amendment likewise underpins it.  *See Turner*, 502 F. Supp. 3d at 376.

8

National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-183, 134 Stat.

3388, 4023.  Those guarantees make possible Congress's goal of ensuring that the

audience can trust the networks' journalism will be "reliable and authoritative,

accurate, objective, and comprehensive"—not politically motivated.  *Id*. § 6202(b)(1).

Today, USGAM networks' independence and commitment to high-quality

journalism remains their core value, helping them attract a massive audience.  The

networks collectively report a staggering 427 million viewers and listeners across all

media.  *See* U.S. Agency for Global Media, Audience and Impact: Overview for 2025, at

1 (2025), https://perma.cc/KLY4-HYMX.  And that audience trusts the networks to

provide them with factual information about global politics, economic developments,

and other subjects.  Ninety-eight percent of RFA's weekly audience finds the stations to

be trustworthy; 80 percent of listeners said they rely on RFA to help them form opinions

on important issues.  *Id.* at 2.  The networks could not have achieved that degree of

success had they operated as, or been seen as, a Ministry of Truth that could be

redirected or dismantled with a single stroke by any given president.

Nor could USAGM reporters do their work safely under those circumstances.  In

fulfilling their role, these journalists often report on events in hostile foreign countries,

where they risk retaliation and threats to their physical safety.  *See, e.g.*, Jason Rezaian,

*These 10 Jailed Journalists Worked for U.S. Outlets that Trump Silenced*, Wash. Post (Mar. 20,

2025), https://bit.ly/4j6N1Z9.  Some of them are freelancers who still live in those

nations, and the sudden elimination of their funding has left them without security and in immediate danger of physical harm.  Other journalists have fled their native countries and continue to report on events there from the United States, but now—without jobs—they risk the loss of legal status and removal to a country run by a hostile government that resents their coverage.

The dangers are very far from hypothetical.  As amicus Committee to Protect Journalists has documented, at least 13 journalists and media workers who worked for or contributed to RFA or its regional outlets have been imprisoned in connection with their work since 2008.  Five remain in prison today, including Shin Daewe, a regular contributor to Radio Free Asia, who was sentenced to life in prison in Myanmar for possession of an unregistered video drone that she had ordered to film a documentary, *see Myanmar Jails Filmmaker Shin Daewe for Life for Buying a Drone*, Comm. to Protect Journalists (Apr. 4, 2024), https://perma.cc/6RN2-DKQN; Nguyen Tuong Thuy, sentenced to 11 years for "making, storing, and disseminating documents and materials for anti-state purposes," *see Vietnam Sentences 3 Independent Journalists to More Than 10 Years in Prison*, Comm. to Protect Journalists (July 22, 2024), https://perma.cc/HR9E-54F6; and Nguyen Lan Thang, a freelancer imprisoned in Vietnam for "creating, storing, disseminating or propagandizing information, materials, items and publications" against the state, *see Vietnam Sentences Journalist Nguyen Lan Thang to 6 Years in Prison*, Comm. to Protect Journalists (Apr. 13, 2023), https://perma.cc/9U5J-RVXZ.  Each attack

on the independence of the networks not only threatens their ability to serve their

fundamental mission, then—it endangers the lives and liberty of the reporters

dedicated to bringing that news to the world audiences.

**II.    Allowing the Executive to withhold USAGM networks' funding unilaterally would destroy the independence that makes them effective.**

By executive order, the President has moved to dismantle USAGM and freeze

funding to RFA and its sister networks, overturning Congress's "manifest" intent that

the networks "enjoy independence in programming and broadcasting decisions." *Ralis*,

770 F.2d at 1125.  If the gambit succeeds, the damage to the project of federally funded

broadcasting overseas will be irreparable.  Even if a future Administration or a future

Congress were to restore the impounded funds, the knowledge that a threat like this

one hangs over the networks heads—a Sword of Damocles waiting to fall if their

coverage angers the President—would leave a lasting tarnish on their credibility.

That unilateral funding freeze is unlawful.  "[I]f [Congress's] authority to make

law and control spending is to mean anything, it means the President may not

disregard a statutory mandate to spend funds 'simply because of policy objections.'"

*Aids Vaccine Advoc. Coal. v. United States Dep't of State*, Nos. 25-00400 & 25-00402, 2025

WL 752378, at *15 (D.D.C. Mar. 10, 2025) (quoting *In re Aiken County*, 725 F.3d 255, 259

(D.C. Cir. 2013)); *see also City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir.

2018) ("[T]he Administration may not redistribute or withhold properly appropriated

funds in order to effectuate its own policy goals.").  And that fundamental separation-

of-powers principle has special importance here, where tolerating this degree of

presidential control would make a nullity of Congress' stated goal of maintaining RFA

as an independent network rather than a politicized "house organ[] for the United

States Government."  *Ralis*, 770 F.2d at 1125.  Congress has, through clear and consistent

statutory language, insisted that USAGM networks remain outlets for independent

journalism that is not dictated by the government.  Because of the freedom Congress

has codified, USAGM networks have earned trust and built reputations that have

allowed their journalists to gather and disseminate news to audiences without other

access to independent sources of news.  But if any President has the power to effectively

shutter RFA at any time, the foundation for that reliability disappears—unlikely to

return.

The harm is only underscored by the reality that the Administration has justified

defunding USAGM and RFA by pointing to editorial disagreements with the networks'

content.  The Executive Branch has not been shy about its disdain for certain reporting

done by Voice of America.  *See The Voice of Radical America*, The White House (March 15,

2025), https://perma.cc/8L6A-P9CS (explaining that the Executive Order was a response

to what the President perceived as "radical propaganda" produced by VOA); *Senior*

*Advisor Kari Lake Cancels Obscenely Expensive 15-Year-Lease That Burdened The Taxpayers*

*And Enforces Trump's Executive Order To Drastically Downsize Agency*, USAGM (March

15, 2025), https://perma.cc/T95P-2ZLA (criticizing work product that purportedly

"parrots the talking-points of America's adversaries"); Kari Lake (@KariLake), X (March

19, 2025, 7:21 PM), https://perma.cc/LMM9-LHRR. (taking issue with VOA's

purportedly "anti-American content").  Likewise, senior adviser to the President Elon

Musk insisted that USAGM networks are "just radical left crazy people talking to

themselves."  *Musk Calls for Closure of US State Media*, RT (Feb. 9, 2025),

https://perma.cc/VB26-9PG8 (reporting that "[t]he head of DOGE has said Radio Free

Europe and Voice of America are essentially 'radical left'" and "called for [them] to be

shut down") (citing Mario Nawfal (@MarioNawfal), X (Feb. 9, 2025),

https://x.com/MarioNawfal/status/1888550915784733106).  In any context, that sort of

avowed discrimination on the basis of a media organization's perceived viewpoint is

"poison to a free society."  *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J.,

concurring).  But it causes special damage here, where the USAGM networks' future

listeners, readers, and watchers will predictably assume, with good reason, that the

networks can now only distribute information that aligns with the particular policy

preferences of whichever president holds office at the time.  This will remain so for

many administrations to come.

That result contravenes the express will of Congress, and the President lacks any

constitutional authority to overturn Congress's judgment that independent reporting—

not political propaganda—best serves the interests of the United States.  If not stopped

here, the Administration's unilateral funding freeze will put the entire model of

13

federally funded networks at risk, not just today but well into the future.  And it will

risk, too, the safety of reporters who have committed their careers to producing credible

journalism under exceptionally challenging and dangerous conditions.  This Court

should enjoin it.

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to grant Plaintiff's

motion for a temporary restraining order and preliminary injunction.

Dated: April 10, 2025

Respectfully submitted,

/s/ Bruce D. Brown
Bruce D. Brown
(D.C. Bar No. 457317)
  *Counsel of Record for Amici Curiae*
Gabriel Rottman (D.C. Bar No. 992728)
Mara Gassmann (D.C. Bar No. 1014532)
Grayson Clary (D.C. Bar No. 1735810)
Renee M. Griffin (D.C. Bar No. 1766634)
Ellen Goodrich (D.C. Bar No. 90017843)*
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1020
Washington, DC 20005
Telephone: 202.795.9300
bbrown@rcfp.org

*Of Counsel

*Counsel for Amici Curiae*

14