**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

RADIO FREE ASIA,

          Plaintiff,

    v.

UNITED STATES, *et al*.,

          Defendants.

No. 25-cv-00907-RCL

MIDDLE EAST BROADCASTING
NETWORKS, INC.,

          Plaintiff,

    v.

UNITED STATES, *et al*.,

          Defendants.

No. 25-cv-00966-RCL

**DEFENDANTS' COMBINED OPPOSITIONS
<u>TO PLAINTIFFS' PRELIMINARY INJUNCTION MOTIONS</u>**

## INTRODUCTION

The United States; the United States Agency for Global Media (USAGM); Kari Lake, in her official capacity as Senior Advisor to the Acting CEO of USAGM; and Victor Morales, in his official capacity as Acting CEO of USAGM; the Office of Management and Budget (OMB); Russell Vought, in his official capacity as Director of OMB; the United States Department of the Treasury; and Scott Bessent, in his official capacity as United States Secretary of the Treasury, (together, Defendants) respectfully submit this combined opposition to Plaintiff Radio Free Asia (RFA)'s and Plaintiff Middle East Broadcasting Networks, Inc. (MBN)'s preliminary injunction motions, *see* Civ. No. 25-00907-RCL, ECF No. 12-1 (RFA Mem.); Civ. No. 25-0966-RCL, ECF No. 11-1 (MBN Mem.).

Plaintiffs challenge the termination of their grant agreements with the agency and seek emergency injunctive relief requiring the disbursement of the funds they claim they are entitled to under those agreements.  One week ago, the Supreme Court issued guidance that is dispositive of Plaintiffs' claims here:  in a case challenging the government's termination of federal grants, the Supreme Court held that "the Government [was] likely to succeed in showing that the District Court lacked jurisdiction to order the payment of money under the [Administrative Procedure Act]" because the Tucker Act vested exclusive jurisdiction over such actions in the Court of Federal Claims.  *Dep't of Education v. California*, No. 24A910, 2015 WL 1008354 (Apr. 4, 2025) (per curiam).  And one month ago, and consistent with the Supreme Court's ruling in *California*, another Judge of this Court held that the Court had no jurisdiction to grant such relief, citing Circuit precedent holding that "jurisdiction could not lie in the district court because the suit was inherently contractual."  *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 2025 WL 763738, at *8 (D.D.C. Mar. 11, 2025), *appeal docketed* USCA Case No. 25-5066, (citing

*Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985)).  Guided by that

precedent, Judge McFadden held there was no jurisdiction to hear a claim by a federal grantee

seeking specific performance on a federal grant agreement.  As to the D.C. Circuit precedent,

*Ingersoll-Rand Co. v. United States*, the Court wrote:  "[t]he Court squints in vain to see any

daylight.  Like those plaintiffs, the [plaintiff] asks the Court to order the Government to cancel

the termination, pay money due, and reinstate the contracts.  That is something this Court lacks

the power to do."  *Id.* at *6.  The same is true here.

  *California* likewise is controlling here, and for the same reasons the Supreme Court held

that the plaintiffs in that case were not likely to succeed on the merits of their claims, the

Plaintiffs in this case also cannot prevail.  This Court lacks jurisdiction to adjudicate their claims.

  Plaintiffs argue that this case is about their statutory entitlement to funds, with USAGM

serving only as a ministerial pass-through mechanism between it and taxpayer dollars.  Under

Plaintiffs' theory, because funds were appropriated for grants to RFA and MBN, all grant

funding is statutorily required to be spent on RFA and MBN, full stop.  But that theory belies the

statutory text and applicable regulations expressly contemplate that USAGM has discretion to

terminate RFA grants, notwithstanding the fact that the funds for those grants are appropriated.

And, as to MBN, the statutes are altogether silent apart from specifying the maximum budget

authority for that entity.  Put simply, there is no statutory or regulatory prohibition on

terminating RFA's or MBN's grant; the conditions on termination are those set out in the grant

agreements themselves.  Mandating otherwise would render the USAGM's mandatory oversight

and administration responsibilities of the grant a nullity and contrary to the statutory design that

Congress carefully crafted.  Congress placed USAGM in an oversight role.  As another Judge of

this Court recognized, Congress "[chose] to grant the USAGM CEO broad, unilateral powers

over grant-making." *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 31 (D.D.C. 2020), *opinion vacated as moot on other grounds, appeal dismissed*, No. 20-5195, 2021 WL 11096700 (D.C. Cir. Mar. 16, 2021).

With respect to RFA in particular, Congress provided that, if the CEO of USAGM "determines at any time that RFA, Incorporated is not carrying out the functions described in this section in an effective and economical manner, the Agency may award the grant to carry out such functions to another entity." 22 U.S.C. § 6208(g) ("alternative grantee"). And the statute also requires USAGM to include a provision in the grant that allows for termination of the grant "without fiscal obligation to the United States." 22 U.S.C. § 6208(c). In other words, Congress contemplated and intentionally gave the power to terminate grants—which would, by necessity, mean that all the money appropriated for grants to RFA may not be received by RFA. As to MBN, Congress did not, as a threshold matter, even specify that "[g]rants authorized under [the provision setting forth the authorities of the USAGM CEO] shall be available to make annual grants for the purpose of carrying out radio broadcasting [to the Middle East]." 22 U.S.C. § 6208 (authorizing such grants as to RFA "for the purpose of carrying out radio broadcasting to Asia").

Plaintiffs' Motions demand that this Court—ahead of litigation on the merits of this action—remove the oversight authority and discretion that Congress vested in USAGM. Even if the Court had jurisdiction to enter such relief, to do so would be inconsistent with the statutory and regulatory scheme Congress carefully crafted.

As expressed in the statutory framework, while Congress allocated a specific figure so that it would be *available* for the USAGM's grant agreements with RFA and MBN (or, said differently and subject to certain qualifications, set the maximum overall size of their respective

grants), Congress chose to make the execution and administration of those funds, and the activities for which those funds must be spent, a matter of contract.  The contracts in place for both of these grantees have expired, and USAGM, in exercising its oversight responsibilities, is seeking to improve the terms of the grant agreements going forward.   Plaintiffs ask this Court to, in effect, extend their now-expired (and, in any event, terminated) grant agreements, and order specific performance on their old terms.

Moreover, the lack of subject matter jurisdiction is but one of several reasons why the Plaintiffs cannot demonstrate a likelihood of success on the merits in this matter.  Indeed, none of the four factors informing whether a party is entitled to preliminary relief favors entry of preliminary injunction here.  Plaintiffs have made no showing of cognizable irreparable harm likely to result in the absence of preliminary relief; and the balance of equities and the public interest cut against the Plaintiffs' request.  As discussed further herein, Congress vested USAGM with broad authority to oversee its grantees—including by termination in appropriate cases.  So even if this Court had jurisdiction to grant the Plaintiffs' request to override USAGM's judgment (it does not), it would not be in the public interest to enter this extraordinary relief.

For all the reasons discussed herein, the Court should deny the Plaintiffs' requests for a preliminary injunction.

## **BACKGROUND**

The mission of United States Agency for Global Media (USAGM) is to inform, engage, and connect people around the world in support of freedom and democracy.  *See* https://www.usagm.gov/who-we-are/mission/.  Several statutes and regulations govern USAGM's activities: the International Broadcasting Act of 1994, appropriations statutes, and Office of Budget and Management regulations that govern the grant process.  Each are discussed

in turn.

A. <u>International Broadcasting Act of 1994</u>

In furtherance of that mission, USAGM oversees multiple entities, including Plaintiffs RFA and MBN. *See id.*; *see also* 22 U.S.C. § 6207. To effectuate its oversight authority, Congress granted USAGM's Chief Executive Officer (CEO) with the authority to, *inter alia*: "supervise all broadcasting activities conducted" by such entities; "review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity of, all such [entities'] activities within the context of the broad foreign policy objectives of the United States"; and "[t]o undertake such studies as may be necessary to identify areas in which broadcasting activities under its authority could be made more efficient and economical." 22 U.S.C. §§ 6204(a)1, (a)(2), (a)(8).

Congress further required that USAGM employ grants, in particular, to fund many of the entities under its supervision, including those at issue here. Section 6204(a) provides authority for USAGM's CEO to: "make and supervise grants and cooperative agreements for broadcasting and related activities" and "allocate funds appropriated for international broadcasting activities among the various elements of the [USAGM] and grantees, subject to reprogramming notification requirements in law for the reallocation of funds." 22 U.S.C. §§ 6204(a)(5), (a)(6); *see also Open Tech. Fund*, 470 F. Supp. 3d at 31 (recognizing "Congress's choice to grant the USAGM CEO broad, unilateral powers over grant-making").

Section 6208(c) sets forth "limitations and restrictions" on any grants or grant agreements issued to RFA. 22 U.S.C. § 6208(c). Among other limitations, this section set a ceiling for the operating costs of RFA for a particular year, and provided that "[g]rants awarded under this section shall be made pursuant to a grant agreement." 22 U.S.C. §§ 6208(c)(4), (c)(5).

MBN, on the other hand, is not specifically identified at all in the provisions of the International Broadcasting Act.

B. <u>Appropriations Statutes</u>

Congressional appropriations statutes make funding *available* for grant awards to RFA and MBN without mandating that any specific sum within the appropriation be directly allocated to these entities (*i.e.*, without the structure and restrictions of a grant agreement). The relevant table sets a "Budget Authority" for USAGM, not a mandated payment amount for RFA or MBN. *See* Appendix A hereto (reproduction of the table appearing in the Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024). Public Law 118-47's statement that the "funds appropriated under this heading shall be *allocated* in accordance with the table," Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 735 (emphasis added), also does not mandate a payment. Furthermore, Congressional appropriations recognize flexibility for reprogramming among different USAGM grantees, and do not categorically mandate specific payment amounts. *See* Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 735 (noting that "funds may be reprogrammed within and between amounts designated in such table [i.e., for each USAGM grantee or federal entity], subject to the regular notification procedures of the Committees on Appropriations, except that no such reprogramming may reduce a designated amount by more than 5 percent.").

C. <u>Applicable Regulations</u>

In addition to statutes, the Office of Budget and Management promulgates regulations that apply to USAGM and its administration of grants. Those regulations are codified at 2

C.F.R. § 200 *et seq.*, and they provide uniform guidance for federal grant awards and agreements, including, *inter alia*, audit requirements and, as relevant here, allowable termination provisions.

D. <u>Grant Terms</u>

Both plaintiffs' most recent grant agreements contained substantially similar terms. As noted in the Declaration of Kevin W. Fleming, Chief Operating Officer of RFA, "[e]very year, RFA enters into a grant agreement with [USAGM]." Fleming Decl. ¶ 11. The Federal Award Identification Number (FAIN) for the most recently operative grant agreement was 1065-25-GO-00001. *See id.* ¶ 18. On March 15, 2025, USAGM terminated that agreement via a letter. *See* Fleming Decl. ¶ 22–24.

MBN likewise entered into a grant agreement with USAGM "[e]very year." Declaration of Dierdre Kline, Chief Operating Officer of MBN ¶ 16. The Federal Award Identification Number (FAIN) for the most recently operative grant agreement was MN01-25-GO-00001. On March 15, 2025, USAGM terminated that agreement via a letter. *See* Kline Decl. ¶ 29.

Among other provisions, both Plaintiffs' grant agreements state that "the Parties are subject to all Federal laws and regulations pertaining to Federal grants, including . . . 2 CFR Part 200." RFA Grant Agreement, attached hereto as Appendix B, Article VIII(a), at pp. 16; MBN Grant Agreement Article VIII(a), attached hereto as Appendix C, at pp. 15. As noted above, 2 CFR Part 200 are government-wide regulations promulgated by the Office of Management and Budget. Included within part 200 is 2 C.F.R. § 200.340, which states that a "Federal award may be terminated in part or its entirety . . . [b]y the Federal awarding agency . . . to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).

E.  Procedural History

On March 27, 2025, RFA initiated its action, and, on March 28, 2025, RFA filed its motion for preliminary relief.  In its request for preliminary relief, RFA asks the Court to "enjoin[ Defendants] from impounding, blocking, or otherwise interfering with payment of funds appropriated to Radio Free Asia, including by interfering with the apportionment, obligation, and ultimate disbursement of such funds."  Proposed Order, 1:25-cv-00907, ECF 12-4.  RFA also asks the Court to enjoin Defendants "from enforcing or otherwise giving effect to the termination of RFA's grant, including through the enforcement of closeout obligations."  *Id.*

MBN initiated its action on April 1, 2025, and, on April 9, 2025, MBN filed its motion for a preliminary injunction, seeking substantially the same relief that RFA seeks, except as to MBN.  *See* 1:25-cv-00966, ECF No. 11-6.

## **LEGAL STANDARD**

A preliminary injunction is 'an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion.'" *State v. Musk*, --- F. Supp. 3d ---, 2025 WL 520583, at *2 (D.D.C. Feb. 18, 2025) (quoting *Hulli v. Mayorkas*, 549 F. Supp. 3d 95, 99 (D.D.C. 2021)).  To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  The third and fourth factors of the analysis—harm to others and the public interest—"merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"Although the Court of Appeals has not yet expressly held that a plaintiff must make a

clear showing on each of the four *Winter* factors, current caselaw in this jurisdiction favors that approach." *Cmty. Oncology All. v. Becerra*, No. 23-CV-2168 (CJN), 2023 WL 9692027, at *3 (D.D.C. Dec. 21, 2023); *see also In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) (requiring proof on all four factors); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting that, after *Winter*, "the old sliding-scale approach to preliminary injunctions—under which a very strong likelihood of success could make up for a failure to show a likelihood of irreparable harm, . . . is no longer . . . viable") (internal quotation and citation omitted). Indeed, relief that "deeply intrudes into the core concerns of the executive branch"—including foreign affairs and national security—may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1978).

Moreover, the particular form of injunction Plaintiffs seek here—an affirmative injunction ordering USAGM to change the status quo and proceed to make monthly payments to the Plaintiffs for the duration of this litigation, notwithstanding that Plaintiffs have no currently operative grant agreements in place—comprises a highly disfavored form of relief. Mandatory preliminary injunctions, which seek to alter rather than preserve the status quo by compelling affirmative action, "are disfavored as an even more extraordinary remedy than the typical preliminary injunction, especially when directed at the United States Government." *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92–93 (D.D.C. 2021) (quotation marks and citations omitted); *see also*, *e.g.*, *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000). Plaintiffs seeking such relief "face a significantly heightened burden" of showing an entitlement to relief. *Feng Wang v. Pompeo*, 354 F. Supp. 3d 13, 20 (D.D.C. 2018). "[C]ourts exercise extreme caution in assessing" motions seeking affirmative injunctive relief, and as a

general rule they deny such relief unless "the facts and law clearly favor the moving party."

*Shipbrokers*, 560 F. Supp. 3d at 93 (quotation marks omitted).

## ARGUMENT

I.    **Plaintiffs Cannot Establish a Likelihood of Success on the Merits.**

    A.  **The Tucker Act vests exclusive jurisdiction over Plaintiffs' claims in the Court of Federal Claims.**

To begin, Plaintiffs are unlikely to prevail on the merits because their claims, fundamentally, are an effort to enforce payments to which they claim they are entitled under their respective grant agreements, and to reinstate or extend their grant agreements, which they claim were improperly terminated. *See*, *e.g.*, RFA Proposed Order, Civ. No. 25-00907-RCL, ECF No. 12-4 at ¶2; MBN Proposed Order, Civ. No. 25-0966-RCL, ECF No. 11-6 at ¶2. Those grant agreements are contract with the federal government. Because Congress vested the Court of Federal Claims with exclusive jurisdiction over such claims, this Court lacks "the authority to afford the 'drastic' emergency relief that [Plaintiffs] seek[]." *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 2025 WL 763738, at *8 (D.D.C. Mar. 11, 2025), *appeal docketed* USCA Case No. 25-5066, (quoting *F.T.C. v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980)).

In *Dep't of Education v. California*, 2015 WL 1008354, the Supreme Court stayed a temporary restraining order that had "enjoin[ed] the Government from terminating various education-related grants." *Id.* at *1. The Supreme Court held that the government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," reasoning that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* at *1–2 (quoting 28 U. S. C. §1491(a)(1)). The same jurisdictional bar equally applies to the claims in this case, which are based on USAGM's respective grant agreements with Plaintiffs, and seeks payments

- 10 -

of funds the Plaintiffs claim they are entitled to under those now-terminated grant agreements. *See* RFA Mem. at 16 (arguing that "USAGM terminated RFA's entire grant wholesale" for an impermissible reason); MBN Mem. at 18 (arguing that "USAGM terminated MBN's entire grant wholesale" for an impermissible reason).

In sum, because there is no statutory obligation requiring that the payment of funds from USAGM to Plaintiffs, Plaintiffs' claims are, in reality, grounded in contract.

As the Supreme Court in *California* explained, the Tucker Act, 28 U.S.C. § 1491(a)(1), provides for judicial review of breach claims for express or implied contracts over $10,000 in the Court of Federal Claims (or district court for claims less than $10,000) "unless such jurisdiction was explicitly withheld or withdrawn by statute." *Slattery v. United States*, 635 F.3d 1298, 1321 (Fed. Cir. 2011) (*en banc*). The D.C. Circuit has long "interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government." *U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *4 (quoting *Transohio Sav. Bank v. Dir. Off. Of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (emphasis in original)). Put another way, "[t]he only remedy to which the United States has consented in cases of breach of contract is to the *payment of money damages* in either the Court of Claims [now the Court of Federal Claims], if the amount claimed is in excess of $10,000, 28 U.S.C. § 1491(a)(1), or the district courts, where the amount in controversy is $10,000 or less. 28 U.S.C. § 1346(a)(1)." *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989) (emphasis in original). And "[f]ederal courts do not have the power to order specific performance by the United States of its alleged contractual obligations." *Id.* at 3.

Plaintiffs' claims are, at heart, contractual. Their respective grant agreements are contracts, because they set out obligations that RFA and MNB must do in exchange for

consideration from the government.  *See*, *e.g.*, RFA Grant Agreement at 2 ("USAGM agrees to make, and [RFA] agrees to accept, the grant of funds in accordance with the following provisions"); MBN Grant Agreement at 2 ("USAGM agrees to make, and [MBN] agrees to accept, the grant of funds in accordance with the following provisions").  Plaintiffs are seeking to require the payment of funds to which they contend they are entitled under those contracts.  *See*, *e.g.*, RFA Grant Agreement, Article VII, § (c) ("USAGM will make disbursements in monthly increments or on such other basis as may be consistent with the Approved Financial Plan."); MBN Grant Agreement, Article VII, § (c) ("USAGM will make disbursements in monthly increments or on such other basis as may be consistent with the Approved Financial Plan."). And they assert that their contracts were improperly terminated.  *See* RFA Mem. at 16 (arguing that "USAGM terminated RFA's entire grant wholesale" for an impermissible reason); MBN Mem. at 18 (arguing that "USAGM terminated MBN's entire grant wholesale" for an impermissible reason).

To attempt to avoid the jurisdictional bar of the Tucker Act, Plaintiffs focus their attention on Congressional appropriations, and depict their claims as requests for equitable relief stemming from statutes.  *See*, *e.g.*, RFA Proposed Order, ECF No. 12-4 (requesting preliminary relief prohibiting interfering with payment of "funds appropriated to Radio Free Asia"); MBN Proposed Order, ECF No. 11-6 (requesting preliminary relief prohibiting interfering with payment of "funds appropriated to [MBN]").  Plaintiff's arguments that this is not a contractual dispute thus rest on the notion that the International Broadcasting Act and the appropriations statutes somehow come together to create a statutory entitlement to funds for RFA and MBN, thus turning the inquiry from one of contract analysis to one of statutory assessment.  In other words, Plaintiffs claim they are entitled to funds by statute, not by contract.  As discussed above,

Congress made clear that any funds disbursed to grantees like Plaintiffs are paid solely pursuant to grant agreements, *i.e.* contracts, between USAGM and the grantees. Although Plaintiffs depict USAGM's hands as being tied, and characterized the grants as "required," RFA Mem. at 12; MBN Mem. at 15, Congress imbued the agency with considerable discretion. *See Open Tech. Fund*, 470 F. Supp. 3d at 31 (recognizing "Congress's choice to grant the USAGM CEO broad, unilateral powers over grant-making").

Specifically, Plaintiffs repeatedly cite appropriations laws that state certain funds "shall be allocated" in accordance with a budgetary table. But, as evident by their text, such statutes do not create any statutory obligation as to specific funds owed to RFA or MBN, and nor do they create a statutory prohibition on terminating a grant. Rather than requiring that funds be expended, such provisions comprise an instruction for an appropriation, and *that appropriation has been made*. When Congress wants to do more, it can. *Compare*, *e.g.*, *Sullivan v. United States*, 395 U.S. 169, 172 (1969) (quoting statutory language providing that funds "shall be allocated to *and expended for*") (emphasis added). At most, the appropriations act sets the size of the grant (subject to certain modifications that the agency may reprogram); it does not preclude the termination of that grant.

The government acknowledges that both RFA's grant and MBN's grant is funded via appropriations, but that is true for all government contracts—after all, no federal funds can be paid absent appropriations. *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 207 (2020) (noting that most agencies rely on the annual appropriations process for funding). Under Plaintiffs' reasoning, because all grants are funded by appropriations, all grant-related actions or terminations would be statutory claims—not contracts claims—that proceed in federal district court. This view is a complete end run around the jurisdiction of the Court of Federal Claims—

- 13 -

which regularly hears disputes over grant agreements.  *See, e.g., Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021); *see also San Juan City Coll. v. United States*, 391 F.3d 1357, 1360-62 (Fed. Cir. 2004) (treating a "Program Participation Agreement" and related grants under the Higher Education Act as a contract).

Nothing in the statutory framework mandates payment by methods other than via grant agreements, *see supra* at 5–6, and Plaintiffs ultimately acknowledge that they seek "to set aside the [allegedly] unlawful termination of [their respective] grant agreements."  RFA Mem. at 16; MBN Mem. at 17–18.  However cloaked, the relief Plaintiffs seek "sounds in contract."  *U.S. Conf. of Catholic Bishops*, 2025 WL 763738, *5 (quoting *Albrecht v. Comm. On Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004)).

In fact, although Plaintiff MBN argues that the grantees in *California* sought to proceed solely on contractual claims, MBN Mem. at 35–36—and ascribes the Supreme Court's conclusion on jurisdiction in that case solely to that position—Plaintiff MBN is mistaken.  The decision of the Circuit Court in that case evidences that the plaintiffs there made much the same arguments as those presented to this Court now:  the First Circuit observed that plaintiffs in that case "want[ed] the Department [of education] to once again make available already-appropriated federal funds for existing grant recipients."  *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 97 (1st Cir. 2025).  The Court held that "[a]s a result, we see no jurisdictional bar to the district court's TRO" on the basis of the Tucker Act, citing the Supreme Court's holding in *Bowen v. Massachusetts* "that a district court could hear a claim for an injunction requiring the government to pay certain Medicaid reimbursements because it was '*a suit seeking to enforce the statutory mandate itself*.'"  *Id.* (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 900–01 (emphasis added).  This is the same argument advanced by Plaintiffs here, based on the same precedent.  *See* MBN

Mem. at 32–33 (discussing and quoting the same portion of *Bowen v. Massachusetts*); RFA Mem. at 30–31 (same). The Supreme Court has now unequivocally rejected it as error. *See California*, 2015 WL 1008354, at *1–2.

Indeed, it is well-established that a plaintiff cannot avoid the Court of Federal Claims simply by artful pleading. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985) ("We begin with the well-accepted proposition that a plaintiff may not avoid the jurisdictional bar of the [Contract Disputes Act, vesting jurisdiction in the Court of Federal Claims] merely by alleging violations of regulatory or statutory provisions rather than breach of contract."). In a case challenging an agency's decision to terminate a contract for convenience, the D.C. Circuit has explained "[t]hat the termination also arguably violates certain other regulations does not transform the action into one based solely on those regulations. Nor does plaintiff's decision to allege only a violation of the regulations change the essential character of the action." *See id.* at 78 ("where plaintiff was awarded contract and government terminated for convenience, cause of action is on the contract despite plaintiff's allegations of statutory and constitutional violations" citation omitted).

Last month, another Judge of this court held that the Court lacked jurisdiction to order strikingly similar relief. In *U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *4–8 (D.D.C. Mar. 11, 2025), a grantee that had been receiving funds via cooperative agreements with the State Department, sought a temporary restraining order preventing the State Department from terminating its cooperative agreements with that grantee. *Id.* at *2–3. The court noted that the grantee had millions of dollars in requested reimbursements pending with State, and that without ongoing funding the grantee claimed that "thousands of refugees already in its care would soon

lack enough support." *Id.* at *2.  Nonetheless, the court declined to grant preliminary relief, holding the Tucker Act stripped it of jurisdiction to entertain such a claim.  *See id.* at *4–8.

The court further explained that "the ultimate inquiry of whether a claim is 'essentially a contract action' turns on two key considerations:  '[t]he source of rights upon which the plaintiff bases its claims' and the type of relief sought." *Id.* at *5 (quoting *Albrecht*, 357 F.3d at 68).  The court then found the latter factor to be dispositive, reasoning that the relief the plaintiff sought in that case "sounds in contract.' *Id.* (quoting *Albrecht*, 357 F.3d at 68).  There, as here, the grantee sought an order enjoining the government from taking steps to give effect to a letter terminating the plaintiff's grant.  *See id.*  As the court explained, "[s]tripped of its equitable flair, the requested relief seeks one thing:  [plaintiff] wants the court to order the Government to stop withholding the money due under [its grant agreements]." *Id.* at *7.  The court held that treating the remedies sought in that case as equitable "would be to distort the obvious" since plaintiffs asked the court to reverse is the Government's decision to cease a financial relationship with the [plaintiff]." *Id.*

The Court of Appeals has been clear that, where "the essence of [a] claim is a request for specific performance of the original contract"—whether or not it is pled as a contract claim at all—the jurisdiction for that action lies with the Court of Federal Claims.  *Ingersoll-Rand*, 780 F.2d at 80.  The Supreme Court's recent decision in *California* confirms that this is the correct jurisdiction for suits by federal grantees challenging the Government's actions as to their grants. That is so for all of the relief requested in Plaintiffs' proposed preliminary injunctions— Plaintiffs seek to require the government to continue to perform under their terminated grant agreements.  Because Plaintiffs cannot establish jurisdiction, they cannot succeed on the merits, and their requests for extraordinary injunctive relief should be rejected on that basis alone.

**B. The agency's decision to terminate the grant agreements is committed to the agency's discretion by law.**

Although the APA presumes that agency action can be judicially reviewed, "[t]his is 'just' a presumption …. [U]nder § 701(a)(2) agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'" *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (citing *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)). Broadly speaking, courts have found that Section 701(a)(2) precludes review where "a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Lincoln*, 508 U.S. at 191 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)), including situations where the agency decision "involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Id.* (quoting *Heckler*, 470 U.S. at 830). Such is the case here. USAGM's agency priorities—and the determination of whether a given grant agreement is in accord with those priorities—is uniquely within the expertise of the USAGM. As such, the termination of a grant agreement as no longer effectuating agency priorities falls outside the presumption for judicial review.

**C. The termination letters are not arbitrary and capricious because they comply with federal regulations that permit Defendants to terminate a federal award if it no longer effectuates agency priorities.**

The Agency's termination letters is not arbitrary and capricious.[1] An agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

---

[1] Defendants emphasize that the Court would only reach this analysis if it decides that this is not a claim sounding in contract such that it belongs in the Court of Federal Cliams and if the Court then decides that such decisions are not committed to agency discretion by law.

before the agency," or its decision "is so implausible that it could not be ascribed to a difference

in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  In other words, a court may not "substitute its

judgment for that of the agency." *Id.*  Under this deferential standard, the agency's decision is

presumed valid, and a court reviews only whether that decision "was based on a consideration of

the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve*

*Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).  This deference is further heightened

where, as here, a case implicates national security or foreign affairs.  *See Holder v.*

*Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010).

The March 15 termination letters explain that the grant to RFA and MBN "no longer

effectuate[] agency priorities" and "[t]herefore, pursuant to 2 C.F.R. § 200.340, Article Vlll(a) in

your grant award, and the President's March 14, 2025 executive order mandating that the

USAGM eliminate all non-statutorily required activities and functions, the USAGM hereby

terminates" the grantees' respective then-operative grant agreements.  March 15 Letter (citing

*Continuing the Reduction of the Federal Bureaucracy, E.O.* (March 14, 2025)).

Article Vlll(a) in both Plaintiffs' grant provides that "[t]he Parties acknowledge and agree

that the Parties are subject to all Federal laws and regulations pertaining to Federal grants . . . and

implementing regulations, and 2 CFR Part 200."  RFA Grant Agreement Article VIII(a), at pp.

16; MBN Grant Agreement Article VIII(a), at pp. 15.  That provision permits an agency to

terminate a grant if an award no longer effectuates the program goals or agency priorities."  2

C.F.R. § 200.340(a)(4).  The termination letters explained just that, *i.e.* that RFA's and MBN's

grants no longer effectuate agency priorities.  In light of that, USAGM acted consistent with its

regulations in terminating those grants.

**B.  Plaintiffs' Mandamus Claims Fail for Lack of Jurisdiction.**

Plaintiffs present their mandamus claims as a backstop to their Administrative Procedure Act ("APA") claims.  *See* RFA Mem. at 21 ("even if the Court deemed APA relief unavailable, RFA would still be likely to succeed . . . via mandamus relief"); MBN Mem. at 23 ("even if the Court deemed APA relief unavailable, MBN would still be likely to succeed . . . via mandamus relief").  But that is mistaken.  Mandamus jurisdiction "is strictly confined. . . mandamus is 'drastic'; it is available only in 'extraordinary situations'; it is hardly ever granted; those invoking the court's mandamus jurisdiction must have a 'clear and indisputable' right to relief.'" *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc); *Citizens for Resp. & Ethics in Washington v. Trump* ("*CREW*"), 924 F.3d 602, 606 (D.C. Cir. 2019) ("[T]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations.").

To establish a court's jurisdiction over such a claim, a plaintiff seeking mandamus relief must show (1) "a 'clear and indisputable right to relief,'" (2) "that the defendant has a "'clear duty to act,'" and (3) "that 'no adequate alternative remedy exists.'"  *Id.* (quoting *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016)); *see also Lovitsky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020).  "These three threshold requirements are jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction."  *CREW*, 924 F.3d at 606.  And, even when these requirements are met, "a court may grant relief only when it finds compelling equitable grounds."  *Lovitsky*, 949 F.3d at 759.  As discussed below, Plaintiffs fail to establish either the first or the second requirement.

For the reasons explained above, *see supra* 10–18, Plaintiffs do not have the clear and indisputable right to relief that is necessary to establish mandamus jurisdiction.  Nor can Plaintiffs establish the requisite duty to act.  In the context of mandamus, the duty to be

performed must be "ministerial and the obligation to act peremptory, and clearly defined." *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980) (quoting *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931)).  A ministerial duty "is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty." *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).

Plainly, the USAGM's duties as to its oversight of its grantees are not merely "ministerial."  To the contrary, the Court in *Open Tech. Fund* recognized "Congress's choice to grant the USAGM CEO broad, unilateral powers over grant-making." *See Open Tech. Fund*, 470 F. Supp. 3d at 31.  Several statutory provisions discussed above reflect USAGM's substantial discretion in this regard.  USAGM's CEO is empowered to "review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity of, all [grantees'] activities within the context of the broad foreign policy objectives of the United States"; and "[t]o undertake such studies as may be necessary to identify areas in which broadcasting activities under its authority could be made more efficient and economical."  22 U.S.C. §§ 6204(a)1, (a)(2), (a)(8).  All of these authorities make clear that execution and termination of the agreement are not ministerial responsibilities.

For all these reasons, Plaintiffs cannot show a likelihood of success on their mandamus claims.

### C.   Plaintiffs Are Not Likely to Prevail on Their Constitutional Claims.

Plaintiffs' constitutional claims are barred because they are, at their heart, purely statutory.  As to the Presentment Clause, Plaintiffs allege, "the Executive's withholding of [Plaintiffs'] funds is also an effective nullification of both the Act and the appropriations statutes." RFA Mem. at 25; MBN Mem. at 27.  As to the Appropriations and Spending Clauses,

Plaintiffs address them together, and simply stating that "[b]y declining to disburse funds lawfully appropriated by Congress, the Executive Branch is unconstitutionally encroaching on Congress's exclusive appropriations and spending powers." RFA Mem. at 22; MBN Mem. at 28. Likewise, as to the Take Care Clause, Plaintiffs allege that "Defendants' withholding of congressionally mandated funds also constitutes a failure of the Executive to fulfill its obligtaions under the Take Care Clause." RFA Mem. at 27; MBN Mem. at 29. And, on Separation of Powers, Plaintiff argues "Defendants have violated a clear, mandatory statutory command." RFA Mem. at 29; MBN Mem. at 31. Finally, as to its ultra vires claim, Plaintiff asserts "No statute, constitutional provision, or other source of law authorizes Defendants to impound [Plaintiffs'] congressionally appropriated funds." RFA Mem. at 20; MBN Mem. at 22.

In sum, each claim hinges, in turn, on Plaintiffs' allegations concerning their statutory claims. The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review . . . ." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* at 472. Because Plaintiffs' claims here comprise restatements of the allegation that USAGM acted in excess of its statutory duty, Plaintiffs cannot prevail on their claims alleging constitutional violations.

Nor, to any extent, are these claims viable. RFA and MBN are not funded through direct congressional appropriations, rather, they are explicitly funded through grant agreements. Execution of those grant agreements—and its termination—are governed by the applicable grant agreement. USAGM's conduct under those grant agreements is reviewable—as Defendants argue, in the Court of Federal Claims—but the mere fact that a grant agreement is funded

through line-item appropriations does not mean that the routine execution of that grant

agreement takes on statutory—let alone constitutional—dimensions.  At base, while the *amount*

of the grant is set by appropriations law, at least generally, the *conduct* of that grant agreement is

governed by the grant agreement's terms and agency oversight responsibility.  This reading gives

meaning to both the Congressional appropriations statutes and the Broadcasting Act's

recognizing of USAGM's important oversight responsibilities, including terminating a grant

when necessary.


### II.    Plaintiffs Cannot Establish Irreparable Harm.

Plaintiffs likewise fail to establish that they will suffer irreparable harm absent

preliminary relief.  To demonstrate irreparable harm, Plaintiffs must meet a "high standard" and

show that they face injuries that are "certain, great, actual, and imminent," *Hi-Tech Pharmacal*

*Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (citation omitted), and that are "beyond

remediation."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir.

2006).  Making that showing requires "proof" that the harm it identifies "is certain to occur in the

near future."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

Plaintiffs identify three sources of irreparable harm:  economic harms stemming from the

funding pause, cybersecurity harms, reputational harms, and additional harms to third parties.

*See* RFA Mem. at 33–38; MBN Mem. at 37–43.  None are sufficient to justify entry of a

preliminary injunction here.

As to economic harms:  Plaintiffs identify several harms that stem from their lack of

access to grant funds, in the form of harms to their operations and efforts to fulfill their missions.

But "[m]ere injuries, however substantial, in terms of money, time and energy necessarily

expended in the absence of [relief] are not enough." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)). Rather, it is black-letter law that economic harm is generally not irreparable. *Wis. Gas Co.*, 758 F.2d at 674 (describing that principle as "well-settled"). The only exceptions are "where the loss threatens the very existence of the movant's business," *id.* (citation omitted), or "where the claimed economic loss is unrecoverable." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014) (citation omitted).

The first exception is a narrow one—it encompasses only cases where the plaintiffs demonstrate "extreme hardship to the business" or a threat to the business's "very existence." *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1025 (D.D.C. 1981). Plaintiffs may be forced to make difficult choices and lose profits in critical areas of their business without incurring irreparable harm sufficient to warrant injunctive relief. *Cf. Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 118–19 (D.D.C. 2003) ("[T]he forced sale of a house, a boat or stock. . . do[es] not rise to the level of 'irreparable' harm necessary to warrant the extraordinary remedy of a preliminary injunction."). And Plaintiffs must document any claim that an alleged harm is a threat to the business's very existence with specific details. *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 51–52 (D.D.C. 2011) (plaintiff needed to "offer a projection of anticipated future losses, tie that to an accounting of the company's current assets, [and] explain with . . . specificity how he arrived at the conclusion that he would be forced out of business in eighteen months" to show irreparable harm on this theory). Here, Plaintiff allege that a lack of funds "'threatens the very existence' of the organization," RFA Mem. at 34 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)), MBN Mem. at 38 (same), but supply none of the detailed

projections required under the caselaw to substantiate such a claim, *see* RFA Mem. at 34, MBN Mem. at 38.

The second exception, for monetary harms unrecoverable because a defendant enjoys sovereign immunity, likewise does not apply. As discussed above, *supra* at 10–11, Plaintiffs' economic injuries are reparable through the Tucker Act for contract disputes concerning monetary payments. Sovereign immunity is not an obstacle for monetary recovery on Plaintiffs' claims because of that statute. *See Safari Club Int'l*, 47 F. Supp. 3d at 37.

Plaintiffs also claim severe "reputational harm" because of Defendants' conduct. RFA Mem. at 37–38; MBN Mem. at 40–41. But "[t]he loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms"—and therefore recoverable. *Air Transport Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012). Further, the alleged harm must "directly result from the action which the movant seeks to enjoin." *Wis. Gas Co.*, 758 F.2d at 674. When a harm is "based on independent market variables such as how [a company's] customers and/or retail consumers might react," that harm does not flow directly from the challenged action. *Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013). Here, it also requires speculation regarding those expected reactions, which may ascribe blame to Defendants rather than Plaintiffs.

Likewise with the Plaintiffs' assertions concerning potential cybersecurity risks, *see* RFA Mem. at 35–37, MBN Mem. at 39–40; this risk is speculative and falls far short of the strong showing required to justify a temporary restraining order. In this Circuit any alleged irreparable injury "must be both certain and great; it must be actual and not theoretical." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. It also must be of such "*imminence* that there is a clear and

present need for equitable relief." *Id.* (citing *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)) (emphasis in original).  Plaintiffs' unsupported predictions regarding potential cyberattacks risks cannot fulfill this standard.

Finally, Plaintiffs identify other forms of harm that may flow to third parties, including their employees, journalists with whom it contracts, or individuals served by Plaintiffs' mission. RFA Mem. at 37–38; MBN Mem. at 40–41.  But "harm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court." *State v. Musk*. --- F. Supp. 3d ---, 2025 WL 520583, at \*4 (D.D.C. 2025) (quoting *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021)).  Thus, in *State v. Musk*, although the Court noted that "[t]erminating thousands of federal employees may cause extreme harm to the individual employees, and potentially the institution writ large," *id.* at \*4, the Court held that it could not consider alleged harm to parties not before the Court on a request for emergency injunctive relief.  *See id.* Likewise, in this case, Plaintiffs' allegations concerning possible harm to third parties cannot support the requested preliminary injunction.

### III.    The Balance of the Equities (Including the Public Interest) Does Not Favor Preliminary Relief.

Preliminary relief also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor.  *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party").  In this setting, granting the preliminary injunctions that Plaintiffs seek would disrupt USAGM's oversight of its grantees to ensure taxpayer money is stewarded well, as intended by the statutory scheme that Congress provided. *See supra* at 5–6.  In another case seeking preliminary equitable relief against USAGM, the Court recognized that "thwarting the lawful exercise of authority of a duly appointed official

would be inequitable and disserve the public interest." *Open Tech. Fund*, 470 F. Supp. 3d at 31. The Court held: "[s]etting USAGM's priorities and managing, at a broad level, U.S. international broadcasting is the prerogative of the USAGM CEO—not that of plaintiffs, and certainly not of this Court. Moreover, Congress's choice to grant the USAGM CEO broad, unilateral powers over grant-making and oversight of USAGM grantees is itself 'a declaration of public interest and policy which should be persuasive in inducing courts to give relief.'" *Id.* (quoting Va. *Ry. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937)). Meanwhile, Plaintiffs, as discussed above, will suffer no cognizable irreparable harm from the denial of their motions, as each of the potential harms that Plaintiffs identify is economic, and therefore inherently not irreparable; speculative; or asserted on behalf of a third party not before this Court.

Indeed, the Supreme Court's decision in *California* indicates that the balance of harms favors the Defendants in this case rather than Plaintiffs. *See California*, 2015 WL 1008354, at *2 ("[R]espondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed."). As here, "[n]o grantee promised to return withdrawn funds should its grant termination be reinstated,' and the District Court declined to impose bond." *Id*. (internal quotations omitted).

On these facts, the balance of the equities and the public interest align against the entry of relief.

### IV. Plaintiffs Should Be Ordered to Post Security in Connection with Any Preliminary Injunctive Relief and this Court Should Stay Any Order Granting Relief

For the reasons stated above, Defendants submit that the Court can and should deny Plaintiffs' motions in their entirety. However, should the Court be inclined to order any injunctive relief, the Court should also order Plaintiffs to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives

security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues a preliminary injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any such preliminary injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond"). As Plaintiffs are seeking the monthly disbursement of funds, the Court should order the posting of a bond each month, equal to the size of any payment that the Court orders on a preliminary basis here. Without such a protective measure, there may be no way to recover the funds lost to United States taxpayers if the Court were later to find that Defendants were "wrongfully enjoined." *See* Fed. R. Civ. P. 65(c); *cf. California*, 2015 WL 1008354, at *2 (acknowledging "the Government's representation that it is unlikely to recover the grant funds once they are disbursed," and noting that "[n]o grantee promised to return withdrawn funds should its grant termination be reinstated, and the District Court declined to impose bond").

Finally, this Court should stay any order requiring disbursement of funds for at least seven days to allow the Solicitor General to determine whether to authorize the Government to seek a stay pending appeal.

## CONCLUSION

For the foregoing reasons, the Court should deny the Plaintiffs' Motions.

Dated: April 11, 2025                   Respectfully submitted,

                                        YAAKOV M. ROTH
                                        Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

/s/ *Abigail Stout*
ABIGAIL STOUT
(DC Bar No. 90009415)
*Counsel*
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-2000
Email: Abigail.Stout@usdoj.gov

/s/ *Julia A. Heiman*
JULIA A. HEIMAN (D.C. Bar No. 986228)
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington, DC  20005
Tel. (202) 616-8480 / Fax (202) 616-8470
julia.heiman@usdoj.gov

*Attorneys for Defendants*