**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| RADIO FREE ASIA,<br><br>         *Plaintiff*,<br><br>v.<br><br>UNITED STATES, et al.,<br><br>         *Defendants*. | No. 25-cv-907-RCL |
| MIDDLE EAST BROADCASTING<br>NETWORKS, INC.<br><br>         *Plaintiff*,<br><br>v.<br><br>UNITED STATES, et al.,<br><br>         *Defendants*. | No. 25-cv-966-RCL |

**RADIO FREE ASIA AND MIDDLE EAST BROADCASTING NETWORKS'
COMBINED REPLY IN SUPPORT OF THEIR RESPECTIVE MOTIONS FOR
PRELIMINARY INJUNCTIONS**

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

INTRODUCTION ..............................................................................................................1

ARGUMENT .................................................................................................................2

I.     RFA and MBN Are Likely to Succeed on the Merits. ........................................2

      A.     This Court Has Jurisdiction. ...................................................................3

      B.     Defendants Lack Authority to Withhold RFA and MBN's Congressionally
           Appropriated Funds. ..............................................................................8

      C.     The Networks Are Likely to Succeed on Their APA Claims. ................15

      D.     The Networks Are Likely to Succeed on Their Mandamus and *Ultra Vires*
           Claims. ..................................................................................................17

      E.     The Networks' Are Likely to Succeed on Their Constitutional Claims. ...............17

II.     RFA and MBN Respectively Have Demonstrated Irreparable Injury...............18

      A.     The Networks Have Established Irreparable Harm to Their Very
           Existence. ...............................................................................................18

      B.     The Networks Have Established Irreparable Harms to Their Reputation,
           Credibility, and Mission............................................................................20

      C.     The Networks Have Established Irreparable Harms to the Safety and
           Wellbeing of Their Journalists and Staff..................................................21

III.     The Balance of the Equities and Public Interest Favor Relief. ..........................22

IV.     The Proposed Injunction Is Proper.....................................................................23

V.     The Court Should Not Require a Bond Under Rule 65(c)....................................24

VI.     The Court Should Not Grant a Stay. ..................................................................25

CONCLUSION...............................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*,
 357 F.3d 62 (D.C. Cir. 2004) ................................................................................................3

*In re Am. Rivers & Idaho Rivers United*,
 372 F.3d 413 (D.C. Cir. 2004) ............................................................................................17

*Astra USA, Inc. v. Santa Clara Cnty.*,
 563 U.S. 110 (2011) ..............................................................................................................5

*Bowen v. Massachusetts*,
 487 U.S. 879 (1988) ................................................................................................3, 5, 6, 8

*Bufkin v. Collins*,
 145 S. Ct. 728 (2025) ............................................................................................................9

*Church v. Biden*,
 573 F. Supp. 3d 118 (D.D.C. 2021) ....................................................................................22

*Colorado v. HHS*,
 2025 WL 1017775 (D.R.I. Apr. 5, 2025) .............................................................................24

*Community Legal Servs. in East Palo Alto v. HHS*,
 2025 WL 973318 (N.D. Cal. Apr. 1, 2025) .........................................................................24

*Crowley Gov't Servs, Inc. v. GSA*,
 38 F.4th 1099 (D.C. Cir. 2022) .............................................................................................5

*Dalton v. Specter*,
 511 U.S. 462 (1994) .............................................................................................................17

*Dep't of Educ. v. California*,
 2025 WL 1008354 (U.S. Apr. 4, 2025) ...........................................................................7, 23

*DSE, Inc. v. United States*,
 169 F.3d 21 (D.C. Cir. 1999) ..............................................................................................24

*Endo Par Innovation Co. v. Becerra*,
 2024 WL 2988904 (D.D.C. 2024) .......................................................................................23

*Fed. Express Corp. v. U.S. Dep't of Com.*,
 39 F.4th 756 (D.C. Cir. 2022) .............................................................................................17

*Huisha-Huisha v. Mayorkas*,
 27 F.4th 718 (D.C. Cir. 2022) .............................................................................................23

*Ingersoll-Rand Co. v. United States*,
  780 F.2d 74 (D.C. Cir. 1985) ................................................................6, 7

*Kendall v. United States*,
  37 U.S. (12 Pet.) 524 (1838) ...................................................................18

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ............................................................................16, 17

*Make the Road, New York v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020) ...............................................................16

*Maryland v. U.S. Dep't of Agriculture*,
  2025 WL 800216 (D. Md. Mar. 13, 2025) .............................................25

*Mathis v. U.S. Parole Comm'n*,
  749 F. Supp. 3d 8 (D.D.C. 2024) ...........................................................23

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) .........................................................4, 5, 6

*Nat'l Council of Nonprofits v. OMB*
  2025 WL 314433 (D.D.C. 2025) ............................................................23

*Nat'l Council of Nonprofits v. OMB*,
  2025 WL 368852 (D.D.C. Feb. 3, 2025) ................................................22

*Nat'l Council of Nonprofits v. OMB*,
  2025 WL 597959 (D.D.C. Feb. 25, 2025) .........................................24, 25

*Nat'l Min. Ass'n v. Jackson*,
  768 F. Supp. 2d 34 (D.D.C. 2011) .........................................................20

*New Mexico v. Musk*,
  2025 WL 520583 (D.D.C. Feb. 18, 2025) ..............................................22

*NRDC v. Morton*,
  337 F. Supp. 167 (D.D.C. 1971) ............................................................24

*Open Technology Fund v. Pack*,
  470 F. Supp. 3d 8 (D.D.C. 2020) .............................................11, 14, 23

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*,
  502 F. Supp. 3d 492 (D.D.C. 2020) .......................................................24

*Pacito v. Trump*,
  2025 WL 893530 (W.D. Wash. Mar. 24, 2025) .....................................25

*Perry Cap. LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ............................................................................3, 4

*Ralis v. RFE/RL, Inc.*,
    770 F.2d 1121 (D.C. Cir. 1985) .............................................................................14

*RFE/RL, Inc. v. Lake*,
    2025 WL 900481 (D.D.C. Mar. 25, 2025) ......................................................16, 22

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ..................................................................................................12

*Spectrum Leasing Corp. v. United States*,
    764 F.2d 891 (D.C. Cir. 1985) .................................................................................6

*Suburban Mortg. Assocs., Inc. v. HUD.*,
    480 F.3d 1116 (Fed. Cir. 2007) ...........................................................................5, 6

*Sullivan v. United States*,
    395 U.S. 169 (1969) ................................................................................................10

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
    992 F.3d 350 (5th Cir. 2021) ..................................................................................18

*Texas Children's Hosp. v. Burwell*,
    76 F. Supp. 3d 224 (D.D.C. 2014) .........................................................................19

*Tootle v. Sec'y of Navy*,
    446 F.3d 167 (D.C. Cir. 2006) .................................................................................5

*Train v. City of New York*,
    420 U.S. 35 (1975) ......................................................................................9, 10, 16

*Transohio Sav. Bank v. Dir. Off. of Thrift Supervision*,
    967 F.2d 598 (D.C. Cir. 1992) .................................................................................4

*United States Conference of Catholic Bishops v. United States Department of
    State*,
    2025 WL 763738 (D.D.C. Mar. 11, 2025) .............................................................7, 8

*United States v. W. Elec. Co., Inc.*,
    46 F.3d 1198 (D.C. Cir. 1995) ...............................................................................23

*Voters of the United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ..............................................................................22, 23

*W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*,
    59 F.4th 1124 (11th Cir. 2023) ..............................................................................15

*Widakuswara v. Lake*,
   2025 WL 945869 (S.D.N.Y. Mar. 28, 2025) ............................................................13, 22, 25

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ......................................................................................21, 23

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ..............................................................................................................18

**FEDERAL STATUTES**

5 U.S.C. § 706(1) ...........................................................................................................................16

5 U.S.C. § 706(2) ...........................................................................................................................16

22 U.S.C. § 6201(1) .......................................................................................................................22

22 U.S.C. § 6201(3) .......................................................................................................................22

22 U.S.C. § 6204(a)(20) (2017) ....................................................................................................14

22 U.S.C. § 6204(a)(1) ..................................................................................................................11

22 U.S.C. § 6204(a)(2) ..................................................................................................................11

22 U.S.C. § 6204(a)(6) ....................................................................................................................9

22 U.S.C. § 6204(a)(8) ..................................................................................................................11

22 U.S.C. § 6204(b) .......................................................................................................................14

22 U.S.C. § 6204(c)(1) ....................................................................................................................9

22 U.S.C. § 6208(c)(5) ..................................................................................................................11

22 U.S.C. § 6208(c)(5) ..................................................................................................................12

22 U.S.C. § 6208(g) ................................................................................................................11, 12

28 U.S.C. § 1361 ...........................................................................................................................17

2024 Appropriations Act, Pub. L. 118-47, 138 Stat. 460 (2024)..............................................9, 10

National Defense Authorization Act for Fiscal Year 2021, Pub. L. 116-283,
   134 Stat. 3388 (2021)............................................................................................................11

National Defense Authorization Act for Fiscal Year 2023, Pub. L. 117-263,
   136 Stat 2395 (2022)..............................................................................................................14

**FEDERAL REGULATIONS**

2 C.F.R. 200.340(a)(4).............................................................................................12

**OTHER AUTHORITIES**

Black's Law Dictionary (12th ed. 2024).........................................................................9

Tim Balk, *Trump Cutbacks Force Layoffs at U.S.-Backed Broadcaster in the
    Middle East*, N.Y. Times (April 12, 2025),
    https://www.nytimes.com/live/2025/04/12/us/trump-administration-
    news/trump-cutbacks-force-layoffs-at-us-backed-broadcaster-in-the-middle-
    east ...............................................................................................................19

William H. Rehnquist, *Presidential Authority to Impound Funds Appropriated for
    Assistance to Federally Impacted Schools*, Office of Legal Counsel,
    1 Op. O.L.C. Supp. 303 (1969)........................................................................18

Wright & Miller, Federal Practice and Procedure § 2954 (3d ed. 2025)

## INTRODUCTION

Congress directed that approximately $60 million "shall be allocated" to Radio Free Asia (RFA) and approximately $100 million "shall be allocated" to the Middle East Broadcasting Networks (MBN, and collectively "the Networks"). Defendants have flagrantly violated those statutory commands by freezing the Networks' funds. The Networks have moved for emergency relief to halt this unlawful impoundment and ensure compliance with Congress's demands.

Defendants' opposition is an exercise in misdirection. Defendants primarily contend that this Court lacks jurisdiction because the Networks' claims purportedly sound in contract. But Defendants ignore the dispositive distinction between the Networks' claims and the claims at issue in every decision on which they rely: the Networks possess a *statutory entitlement* to funds that Congress has appropriated directly to them, by name, in a mandatory federal appropriations statute. The Networks are not suing to enforce grant-agreement terms, and indeed the Networks would have the exact same statutory and constitutional claims if no grant agreements existed. D.C. Circuit precedent compels the conclusion that such claims belong in district court.

Defendants' arguments on the merits are equally unpersuasive. At bottom, USAGM seeks to destroy the very broadcasting networks that Congress saw fit to fund and to charge USAGM with facilitating. So it is unsurprising that USAGM's actions are impossible to defend as a statutory or constitutional matter. Substituting ipse dixit for the statutory text, Defendants contend that USAGM has "considerable discretion" to refuse to disburse the Networks' congressionally appropriated funds. Opp. 13. But the statutes at issue are clear. Congress appropriated $60.83 million to RFA and $100 million to MBN for fiscal year 2025, directing that those funds "shall be allocated" to the Networks. Congress expressly limited USAGM's discretion to reprogram that funding by providing that only up to 5% may be reprogrammed. USAGM thus has no authority to refuse entirely to disburse the appropriated funding. That

conclusion also disposes of Defendants' equally insubstantial assertion that USAGM's refusal to follow unambiguous statutes is somehow committed to agency discretion by law or authorized by regulations that themselves permit termination only to the extent permitted by law.

This Court must act now because the Networks are experiencing dire irreparable harm. The Networks have been forced into mass furloughs and layoffs and will shortly shut down core operations—all to stretch their last remaining dollars to stay on life support while fighting in court as long as they can. Their credibility and reputation have long allowed them to work with journalists and sources in some of the most dangerous media environments on the planet, but the illegal chokehold USAGM has placed on their funding has forced them to terminate important contracts and has undermined their status as a trusted and reliable partner. Without funding, the Networks will no longer be able to protect their journalists and staff who face deportation, persecution, and physical danger. None of this can be compensated at the end of litigation; all of it warrants emergency relief, especially given that the Government will suffer no harm from following Congress's direction while the litigation unfolds.

Defendants' playbook is clear: they will stop at nothing—not even binding judicial orders—to evade Congress's command to fund the Networks. They refused to rescind the Networks' termination notices even after this Court enjoined one that was materially indistinguishable. They refused to pay the Networks even after another court enjoined the termination notices. And most recently, they have conditioned future funding to the Networks on their agreement to unlawful and draconian contract terms—much like those this Court is now reviewing in another case. *See RFE / RL, Inc. v. Lake*, No. 25-cv-799-RCL, ECF No. 28 (Apr. 9, 2025); Exs. A & B (RFA); Exs. C & D (MBN). This blatant defiance of the law must end.

## ARGUMENT

## I.     RFA and MBN Are Likely to Succeed on the Merits.

A.    **This Court Has Jurisdiction.**

Defendants devote the majority of their response to disputing jurisdiction.  *See* Opp. 1-2, 10-16.  Drawing from cases holding that *discretionary* grantees must bring their *contract* claims in the Court of Federal Claims, Defendants argue that the *mandatory* grantees in this case must bring their *statutory and constitutional* claims there as well.  Defendants badly miss the mark.

1.  Jurisdiction turns on whether the Networks bring "essentially a contract action," which the Tucker Act diverts exclusively to the Court of Federal Claims, *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004), or whether they are instead "enforc[ing] [a] statutory mandate," which this Court can and does routinely adjudicate, *Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988).  As all agree (*see* Opp. 16), this question is determined by two considerations:  (1) the source of the rights upon which the plaintiffs "base[] [their] claims" and (2) the relief sought.  *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (citation omitted).

Both considerations self-evidently require that jurisdiction remain here.  The Networks are enforcing rights granted by Congress (under the International Broadcasting Act and fiscal year 2025 appropriations legislation) and the U.S. Constitution—specifically, Congress's direction that the Networks, identified by name, receive sums certain for fiscal year 2025, subject only to narrow, statutorily defined discretion in USAGM to reprogram up to 5% of those funds. RFA Br. 32-33; MBN Br. 34-35.  At the same time, the Networks do not seek to enforce any provision of their individual grant agreements; they would have the exact same claims even if there had been no grant agreement in place.  RFA Compl. 26-27; MBN Compl. 24-25 (prayer for relief does not turn on any contractual provision).  And they seek an injunction that requires Defendants to halt their unlawful interference with Congress's spending decisions; they do not seek "money damages" to "*substitute* for a suffered loss."  *Bowen*, 487 U.S. at 895.  The

Networks' suits therefore fall within this Court's jurisdiction.  As the United States itself

informed the Supreme Court in another case, proper "APA suits do not 'claim a breach of

contract' . . . such claims instead rest on statutory or constitutional theories independent of the

contract terms."  Application to Vacate Order, *Dep't of Educ. v. California*, 2025 WL 945313, at

*14 (U.S. Mar. 26, 2025).  That is a perfect description of the Networks' claims.

      2.  Even Defendants acknowledge that "Plaintiffs claim they are entitled to funds by

statute, not by contract."  Opp. 12.  So at the first stage of the analysis, Defendants try to avoid

the inquiry by skipping straight to the merits.  They argue that "Plaintiffs' claims are, in reality,

grounded in contract" because "there is no statutory obligation requiring that [*sic*] the payment of

funds from USAGM to Plaintiffs."  Opp. 11; *see id.* 11-13.  That is plainly wrong:  Congress

expressly directed that USAGM "shall" allocate specified funds to the Networks.  *See infra* Part

I.B.  But even if the point were debatable, it would not defeat *jurisdiction*.  The question for

jurisdictional purposes is whether the Networks' "*claims* . . . stem from a statute or the

Constitution," rather than from contract—not whether the Networks are *correct* that they have a

statutory entitlement to their funding.  *See Transohio Sav. Bank v. Dir. Off. of Thrift Supervision*,

967 F.2d 598, 609 (D.C. Cir. 1992) (emphasis added), *overruled on other grounds by Perry*

*Cap.*, 864 F.3d at 620; *Perry Cap.*, 864 F.3d at 619 (jurisdictional question is source upon which

plaintiff "*bases* its claims").  Eliminating any doubt, the D.C. Circuit has concluded that a

plaintiff's claims were not "disguised contract claims" when the plaintiff did "*not claim* a breach

of contract" and its "position *[wa]s ultimately based*, not on breach of contract, but on an *alleged*

. . . violation" of federal law.  *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969 (D.C. Cir. 1982)

(emphases added).  So too here.

      Defendants next pivot to a more extreme contention—that because USAGM provides

funds to the Networks through grant agreements, the claims at issue (no matter the source of the

Networks' entitlement) are necessarily contractual. *See* Opp. 11-12. Not so. The D.C. Circuit has already "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract.'" *Crowley Gov't Servs, Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (citation omitted). The Circuit has, again and again, *rejected* Tucker Act arguments despite the presence of a contractual relationship between the plaintiff and the government. *See, e.g.*, *id.* at 1108; *Megapulse*, 672 F.2d at 967-68. That makes sense: Congress often directs or authorizes the Executive Branch to use contracts as a mechanism to implement a statutory scheme, but as the Supreme Court has expressly held, the existence of such contracts does not transform claims under the statutory scheme into contract claims. *See Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 118 (2011). Here, that USAGM uses grant agreements to structure and oversee the disbursement of the Networks' funding does not alter the fact that Congress directed that funding to the Networks in a statute.

Defendants' argument would also produce untenable consequences that the Circuit has already rejected. The Court of Federal Claims "does not have the general equitable powers of a district court to grant prospective relief." *Bowen*, 487 U.S. at 905. As a result, under Defendants' view, a plaintiff subjected (like the Networks here) to a campaign of flagrantly unlawful government conduct could not receive any injunctive protection, merely because of the existence of a contract. Unsurprisingly, the D.C. Circuit has resisted that unacceptable conclusion. That court has "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006).[1]

_____

[1] By the same token, the analysis in the Court of Claims begins with whether that court can "provide an adequate remedy under the Tucker Act for the alleged wrong" because that question "often will be dispositive." *Suburban Mortg. Assocs., Inc. v. HUD.*, 480 F.3d 1116, 1125 (Fed.

Defendants also accuse the Networks of "artful pleading" (Opp. 15) to recast a contract claim as one based in statute. But the Networks' claims are not "disguised" contract claims. *Megapulse*, 672 F.2d at 968. Congress's express allocation of appropriated funds to the Networks by name creates a *statutory* entitlement to that funding. The Networks are suing to vindicate that statutory entitlement. That conclusion is underscored by the case on which Defendants rely. In *Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985), the Air Force awarded a procurement contract to the plaintiff, who then challenged the termination of the contract as arbitrary and capricious under the APA. Because the plaintiff did not allege any statutory or constitutional entitlement to sell air compressors to the Air Force, the court held that the arbitrariness claim was at its core a complaint that "the contract forbids termination under th[e] conditions" presented. *Id*. at 78. That is not remotely true of the Networks' claims.[2] Indeed, the Networks would have the very same statutory claims *even if USAGM had refused to enter into grant agreements altogether.* In that case, as this one, the Networks would be arguing that Congress required USAGM to disburse to them their congressionally appropriated funds. The Networks' claims thus "exist[] prior to and apart from rights created under [their] contract[s]." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985).

3. Unable to muster a sound argument under the precedent long followed in this District, Defendants focus on two recent cases. Neither is apposite.

---

Cir. 2007). Here, a "naked money judgment" is not an "adequate substitute for prospective relief fashioned in the light of the rather complex ongoing relationship between the parties." *Bowen*, 487 U.S. at 905. All the more so because the Networks seek "injunctive relief to modify the Government's *future* obligations." *Suburban Mortg. Assocs.*, 480 F.3d at 1127.

[2] That distinction disposes of Defendants' contention that "[u]nder Plaintiffs' reasoning, because all grants are funded by appropriations, all grant-related actions or terminations would be statutory claims." Opp. 13.

First, Defendants insist that the Supreme Court's terse stay order in *Department of Education v. California*, 2025 WL 1008354 (U.S. Apr. 4, 2025), controls this case. In fact, it is easily distinguishable. The plaintiffs there were just like the plaintiff in *Ingersoll-Rand*: discretionary grantees *who did not allege that the termination of their grants violated any statute*. Mem. in Supp. of Mot. for TRO at 16-23, *California v. Dep't of Educ.*, No. 25-cv-10548 (D. Mass.), ECF No. 7. No act of Congress specified that those grantees in particular must receive specified sums of appropriated funds. Any obligation to provide funds to those grantees arose solely from grant agreements with the Department of Education following a competitive grant process. The plaintiffs therefore contended that the "terms and conditions of [their] grant awards d[id] not permit termination on the grounds" the government had invoked and that (like the *Ingersoll-Rand* plaintiff alleged) the termination was arbitrary. *Id.* Faced with those facts, the Court concluded that the district court's orders improperly "enforce[d] a contractual obligation to pay money," notwithstanding the plaintiffs' invocation of the APA. *California*, 2025 WL 1008354, at *1 (citation omitted). Precisely the opposite conclusion is warranted here. The Networks base their claims on allegations that Congress has directed that RFA and MBN *in particular* must receive specified sums of appropriated funds.

Second, Defendants invoke *United States Conference of Catholic Bishops v. United States Department of State*, 2025 WL 763738 (D.D.C. Mar. 11, 2025), but that case proves our point. In *Catholic Bishops*, the statutory scheme at issue authorized the State Department to enter into agreements with private agencies, but (as in *California*) did not mandate that any particular entity be funded. *See id.* at *1, *7. Under those circumstances, the Government contended (just last month) that jurisdiction was not proper because the plaintiff was not "seeking 'funds to which a statute allegedly entitles it.'" Opp. to Mot. for Prelim. Inj. at 13, *U.S. Conf. Catholic Bishops*, No. 25-cv-465 (D.D.C. Feb. 26, 2025), ECF No. 25 (quoting and

distinguishing *Bowen*, 487 U.S. at 895).[3]  In other words, the Government relied on the very distinction that separates this case from *California*.  The Court then said the same thing in its opinion, explaining that, "[e]ven if a dispute implicates a contract, it may be heard in district court if it still 'stem[s] from a statute or the Constitution.'"  2025 WL 763738, at *4 (citation omitted).  But, that Court held, in the case of a discretionary grantee whose entitlement arises only from contract, like the plaintiff in *Catholic Bishops*, the claim is at bottom for "money due" under a contract—and so jurisdiction does not lie.  *Id.* at *5.

This case is thus nothing like *California* and *Catholic Bishops*.  The Networks are mandatory grantees.  Congress commanded USAGM to fund them, expressly naming both RFA and MBN in the statute.  *See* RFA Br. 12-15; MBN Br. 15-17; *infra* pp. 8-15.  That the funding occurs through grant agreements is incidental.  This is a quintessential statutory and constitutional case, seeking prospective relief, in the heartland of this Court's jurisdiction.

**B.    Defendants Lack Authority to Withhold RFA and MBN's Congressionally Appropriated Funds.**

Congress directed that RFA and MBN receive specified sums of congressionally appropriated funds, and that USAGM provide those funds directly to the Networks through the mechanism of grant agreements.  Congress did not confer on USAGM any discretion to deny those funds altogether because USAGM decides it has different "priorities" than Congress.  Defendants disregarded those unambiguous statutory commands in terminating the Networks' grants, and they are now withholding the Networks' appropriated funds and conditioning the Networks' receipt of further funds on unlawful and improper terms.

---

[3] *See also id.* (arguing that the authorizing statute "does not require the [Government] to reimburse Plaintiff for providing resettlement services—only the terms o[f] the cooperative agreements address it"); *id.* at 15 (arguing that because "[t]he source of the right sought here arises from the Agreements," "the terms of [the] Agreements will determine whether the State Department had the authority to suspend" them (internal quotation marks omitted)).

1.  Congress appropriated approximately $60 million to RFA and $100 million to MBN for fiscal year 2025, directing that those funds "shall be allocated" to the Networks.  RFA Br. 12; MBN Br. 15.  Congress mandated that USAGM provide each Network substantially all of its appropriated funds, prohibiting USAGM from reprogramming more than 5% of either Network's funding to different programs.  2024 Appropriations Act, 138 Stat. 460, 735; RFA Br. 13; MBN Br. 16.  As Defendants concede, "Congress further required that USAGM employ grants" to fund the Networks.  Opp. 5; 22 U.S.C. § 6204(a)(6) (USAGM to "allocate funds appropriated for international broadcasting" to the Networks); *id.* § 6204(a)(5) (USAGM to "make and supervise grants" to the Networks).  As to RFA, the Act further specifies that such grants "shall be available to make annual grants."  *Id.* § 6208(a).[4]  The law is clear:  Congress required USAGM to provide the Networks their appropriated funds.

2.  Defendants try in vain to resist that straightforward conclusion.  They first assert that Congress's unambiguous directive that specific sums of appropriated funds "shall be allocated" to the Networks "does not mandate a payment" or "expend[iture]."  Opp. 6, 13.  That argument refutes itself.  "'Shall'" means 'must.'"  *Bufkin v. Collins*, 145 S. Ct. 728, 737 (2025); Shall, Black's Law Dictionary (12th ed. 2024) (defining "shall" to mean "[h]as a duty to," "is required to"—"the mandatory sense that drafters typically intend").  "Allocate" means "distribute." Allocate, Black's Law Dictionary (12th ed. 2024)*.*  In the context of an appropriation of a specific sum of money, Congress's direction that funds "shall be allocated" plainly requires USAGM to "distribute" the funds to the Networks.  The Supreme Court's decision in *Train v.*

_____

[4] Defendants highlight that the Act lacks an equivalent provision for MBN, but concedes that the Act requires USAGM to make grants to MBN, too.  Opp. 5.  Defendants are also wrong to assert that MBN "is not specifically identified at all in the provisions of the [Act]."  *Id.* at 6.  The Act includes both "Radio Free Asia" and "the Middle East Broadcasting Networks" in its definition of "Agency Grantee Networks."  22 U.S.C. § 6204(c)(1).

*City of New York*, 420 U.S. 35 (1975), removes any doubt. In that case, the Court held that a statute providing that sums "authorized to be appropriated . . . *shall be allotted*" required the Executive to expend the entire amount. *Id.* at 42. The Court even clarified that "allotted" and "allocated" mean the same thing in this context. *See id.* at 43 & n.9.

Defendants nevertheless insist that "allocate" is distinct from "expend." They assert that "[w]hen Congress wants to do more" than merely allocate funding, "it can." Opp. 13. Their sole support for this assertion is a quotation of a statute providing that funds "shall be allocated to and *expended for*." *Id.* (quoting *Sullivan v. United States*, 395 U.S. 169, 172 (1969)). Defendants fail to mention that the quoted language was from a *Connecticut tax law*. It thus raises no inference about what language *Congress* might use in an appropriations statute—especially in a statutory scheme like that here, in which USAGM allocates and then the *Networks* expend funds. It most certainly cannot overcome *Train*'s clear holding, which Defendants ignore.

Defendants also contend that the appropriations legislation only made "funding *available* for grant awards," and thereby set a maximum "Budget Authority" for the Networks. Opp. 6. That is not what the statute says. It not only directs that the Networks "shall be allocated" their funds, but goes one step further—expressly *prohibiting* USAGM from reprogramming more than 5% of either Network's appropriated funding. *See* 2024 Appropriations Act, 138 Stat. 460, 735. Congress already anticipated USAGM's potential desire to divert the Networks' funds, and Congress expressly restricted USAGM's ability to do so. If that were not enough, *Train* compels the same conclusion. Indeed, the Government made the same argument in *Train* that it makes here. *See* 420 U.S. at 43 ("The Administrator contends . . . that the sums that must be allotted are merely sums that do not exceed the amounts specified. . . . [T]hat there is a maximum, but no minimum.") The Court gave that argument the back of the hand, dismissing it as a plea for "seemingly limitless power to withhold funds from allotment and obligation." *Id.* at 46.

3.  Defendants thus shift their focus to the International Broadcasting Act, citing various statutory provisions that, in their view, justify their decision to stop disbursing the Networks' funds.  Opp. 2-3, 5, 20.  Those provisions show the opposite—that USAGM has no statutory authority whatsoever to deny the Networks their appropriated funds simply because USAGM has "priorities" that differ from the priorities that Congress enacted into law.

Start with the USAGM CEO's general supervisory authorities.  The USAGM CEO may "review and evaluate" grantees' operations; "assess" the quality, effectiveness, and integrity of their activities; and "undertake . . . studies" to identify improvements in economy and efficiency.  *See* Opp. 20 (citing 22 U.S.C. §§ 6204(a)(1), (a)(2), (a)(8)).  None of those authorities confers a power to freeze funds, especially given the express statutory command that the funds "shall" go to the Networks.  Defendants cite *Open Technology Fund v. Pack*, 470 F. Supp. 3d 8, 31 (D.D.C. 2020), for the proposition that the USAGM CEO has "broad, unilateral powers over grant-making."  Opp. 2-3.  But that case did not address an asserted authority to freeze funds; it addressed the USAGM CEO's authority to remove the head of a grantee.  *See* 470 F. Supp. 3d at 18.  And after the court upheld that authority, Congress amended the statute to remove it—which, again, the government fails to mention.  *See* National Defense Authorization Act for Fiscal Year 2021, Pub. L. 116-283, 134 Stat. 3388, 4024 (2021).

Defendants next invoke two RFA-specific provisions.  The first calls for the RFA grant agreement to "require[] that grant funds be used only for activities consistent with this section, and that failure to comply with such requirements shall permit the grant to be terminated without fiscal obligation to the United States."  22 U.S.C. § 6208(c)(5).  The second says that if the USAGM CEO determines that RFA is "not carrying out the functions described in this section in an effective and economical manner, the Agency may award the grant to carry out such functions to another entity."  *Id.* § 6208(g).  Neither provision helps Defendants.

11

Most obviously, Defendants have never relied on either to justify their lawless actions. Defendants terminated the Networks' grants because, in Defendants' words, they "no longer effectuate[] agency priorities." They have made no finding that RFA used funds in a manner inconsistent with the statute, nor have they found that RFA failed to carry out its functions in an effective and economical manner. Certainly they have not gone the next step of identifying an alternative grantee and "award[ing] the grant" to it. 22 U.S.C. § 6208(g). And none of those provisions applies to MBN. Defendants' actions thus cannot be justified based on provisions that the agency neither invoked nor followed. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

What is more, those provisions confirm that *Congress*'s priorities—not USAGM's— govern the Networks' funding. The provisions may be triggered if, and only if, RFA is not following the requirements *in the statute Congress enacted*. They require RFA to use funds for "activities consistent with" the statute, and to "carry[] out the functions described" in the statute in an "effective and economical manner." 22 U.S.C. § 6208(c)(5), (g). Absent from this statutory scheme is any indication that USAGM itself may supplant Congress's priorities with its own, and then invoke those priorities to choke off mandatory funds.

Defendants' sole defense of its "agency priorities" rationale is to point to an Office of Management and Budget (OMB) regulation providing that a "[f]ederal award may be terminated . . . *to the extent authorized by law*, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (emphasis added); Opp. 7, 18. But USAGM's termination for "agency priorities" is not "authorized by law," for the reasons already described. Congress has directed that USAGM "shall" allocate specified sums of money to the Networks, and it has provided USAGM with supervisory and termination authorities that come nowhere close to justifying termination because the agency wants to pursue a course different from the one Congress set. The OMB regulation is thus of no moment.

12

4.  Tacitly recognizing the legal infirmity in their termination decisions, Defendants at the last minute are trying a belt-and-suspenders approach.  On the morning that Defendants filed their opposition brief, USAGM sent to each Network a new master grant agreement tailor-made to force the Networks to agree to unlawful and impossible-to-satisfy conditions that will enable Defendants to refuse to disburse the Networks' funding on spurious grounds.  Remarkably, Defendants' opposition does not inform the Court of that development, aside from an oblique passing reference to an attempt "to improve the terms" of the grant agreements.  Opp. 4.

Defendants ignore that USAGM entered into master grant agreements for FY2025 with each Network *earlier this year*.[5]  And they ignore that they are barred by a temporary restraining order (TRO) from implementing their termination of those grant agreements.  *See Widakuswara v. Lake*, 2025 WL 945869, at *11 (S.D.N.Y. Mar. 28, 2025).  Despite all that, Defendants seek to pressure the Networks to "provide a signed version of [the new] Grant Agreement and [their] April 2025 funding, in alignment with the new requirements, in order to expedite the payment process."  Ex. A at 2; Ex. C at 2.  Put plainly, Defendants have placed a gun to the Networks' heads:  they must agree to onerous new terms or else shut down because USAGM will continue to withhold their congressionally mandated funds unless they knuckle under.

And not just any terms—a set of conditions that range from the blatantly unlawful to the impossible-to-follow.  For example, the new agreements would require that "all members of the Board of Directors must be approved by the USAGM CEO," including "current board members" who "must obtain approval" or else their appointments become "null and void."  Ex. B at 5; Ex. D at 5.  That requirement directly contradicts Congress's statutory withdrawal, just three years

---

[5] Defendants falsely assert that the Networks' grant agreements are "now-expired."  In fact, RFA and MBN signed master grant agreements effective for all of fiscal year 2025—"for the grant period October 1, 2024, through September 30, 2025."  Opp. Ex. B. at 3; Opp. Ex. C. at 3.

ago, of USAGM's authority to "condition" the Networks' grants "on [USAGM's] authority to determine membership of [their] boards."  National Defense Authorization Act for Fiscal Year 2023, Pub. L. 117-263, 136 Stat 2395, 3915 (2022) ("striking" 22 U.S.C. 6204(a)(20) (2017)).[6]

In addition, the new agreements would provide that, in the event of any "duplicative programming" with other USAGM grantees, the Networks "shall immediately reduce and delete language services upon notice by USAGM within 24 hours of such notice," on pain of termination.  Ex. B at 3-4; Ex. D at 3-4.  That requirement not only violates the statutory firewall and imposes a technologically-infeasible 24-hour limit; its evident objective is to end the Networks because Voice of America shares many language services with them.  The same is true of the requirement concerning contracts and leases, as it deems any "default or late payment" to be a "material breach," despite the fact that the ongoing impoundment is *already* forcing those very problems.  Ex. B at 3; Ex. D at 3.  Other examples abound.  *See* Mem. in Support at 7-9, *RFE/RL, Inc. v. Lake*, No. 25-cv-799-RCL (Apr. 9, 2025), ECF 28-1.

The import of these new conditions is plain for all to see:  they are just impoundment by another name.  They are holding the Networks' appropriated funding hostage as the Networks veer ever closer to bankruptcy unless the Networks submit to draconian and unlawful terms that would inevitably and almost immediately lead to their own demise.  The Spending Clause does not permit this blatant effort to impose conditions beyond what Congress permitted.  *See* RFA

---

[6] This condition also violates the statutory firewall that requires USAGM to "respect the professional independence and integrity" of its grantees.  22 U.S.C. § 6204(b); *Pack*, 470 F. Supp. 3d at 14.  The Networks were structured as private, independent non-profit organizations, rather than as government agencies, by design.  "It was deemed important by Congress that institutional arrangements be such that the stations not lose their 'non-official status'; to transform [them] from independent broadcasters into house organs for the United States Government was seen as inimical to [their] fundamental mission."  *Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1125 (D.C. Cir. 1985).  Congress empowered USAGM to supervise the grantees— not to operate them, and not to destroy them.

Br. 24-25; MBN Br. 27-28; *W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023) ("Allowing an executive agency to impose a condition that is not otherwise ascertainable in the law Congress enacted 'would be inconsistent with the Constitution's meticulous separation of powers.'" (citation omitted)).  And the conditions blatantly violate the statutory scheme, which necessarily contemplates that grant agreements entered to implement the statute will enable the Networks to carry out their statutorily authorized functions using their congressionally appropriated, mandatory funding.  USAGM cannot seek through the grant agreements to destroy the grantees that Congress has decided to fund.

Defendants' gamesmanship threatens core tenets of our separation of powers.  If the Executive can unilaterally withhold appropriated funds merely by subjecting Congress's selected recipient to unlawful and impossible conditions, then it will be the Executive and not the Congress that possesses the power of the purse.  The Networks believe that, if the Court were to enter their proposed order, which would enjoin Defendants from "impounding, blocking, or otherwise interfering with payment of funds appropriated" to the Networks, that order would have the effect of prohibiting Defendants' conduct—including this new attempt to impound funds through impossible-to-accept conditions.[7]  But if the Court considers it appropriate, the Networks would welcome an even more specific order targeted to prevent Defendants' gamesmanship.  The Networks' dire financial condition leaves them with little time to litigate successive motions to enforce compliance.

C.    **The Networks Are Likely to Succeed on Their APA Claims.**

1.  For the reasons just explained, Defendants' impoundment of the Networks' funds contravenes statutory directives and the Constitution.  Accordingly, it must be set aside as

_____

[7] The Networks attach to this pleading a new proposed order with materially indistinguishable terms so that the Court may consider entering one single order covering both cases.

contrary to law and in excess of Defendants' statutory authority under 5 U.S.C. § 706(2).  *See* RFA Br. 15-16; MBN Br. 18-19.  For the same reason, the Court should "compel agency action unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1).

Defendants' withholding of their funds is also arbitrary and capricious.  This Court previously held that a substantively identical termination letter was arbitrary and capricious. *RFE/RL, Inc. v. Lake*, 2025 WL 900481, at *3 (D.D.C. Mar. 25, 2025).  Defendants do not acknowledge that decision; but ignoring this Court's ruling in an analogous case does not make USAGM's actions any less arbitrary and capricious.  Opp. 18.  It is no answer that the termination letters "explained . . . that RFA's and MBN's grants no longer effectuate agency priorities."  *Id.*  As this Court has already said, that "explanation" "can scarcely be characterized as an explanation" as it is "unsupported by any facts or reasoning" and offers no "rational connection between the facts found and the choices made."  *RFE/RL, Inc.*, 2025 WL 900481, at *3.  And contrary to Defendants' argument, Opp. 18, OMB regulations permitting termination based on "agency priorities" do not help Defendants because they permit only those terminations that are "authorized by law."  *See supra* p. 12.

2.  Defendants cannot escape judicial review by characterizing their impoundment as "committed to agency discretion by law."  Opp. 17.  The exact opposite is true.  Far from providing "absolutely no guidance as to how" USAGM's "discretion is to be exercised," *Make the Road, New York v. Wolf*, 962 F.3d 612, 632 (D.C. Cir. 2020) (citation omitted), Congress provided express instructions:  USAGM "shall" allocate specific sums of money to specific grantees, plain and simple.  *Train* reinforces that point.  This case is reviewable.

Defendants invoke *Lincoln v. Vigil*, 508 U.S. 182 (1993), but that case supports the Networks.  *Lincoln* recognized that, although an agency's spending priorities and programming decisions with respect to a lump-sum appropriation are "traditionally regarded as committed to

agency discretion," an agency is "not free simply to disregard statutory responsibilities" when Congress has chosen to "circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* at 192-93. That is precisely what has happened here. Defendants say that courts cannot adjudicate whether a given grant is within USAGM's "priorities" (Opp. 17), but that is not the question. It is instead whether the governing law allows USAGM to deny the Networks the funds that Congress has directed they receive based on the bare invocation of those priorities (whatever they may be). It does not.

**D.    The Networks Are Likely to Succeed on Their Mandamus and *Ultra Vires* Claims.**

Defendants do not contest that the Networks would prevail on their *ultra vires* claim by demonstrating that the impoundment "disregard[s] a specific and unambiguous statutory directive" from Congress. *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 762 (D.C. Cir. 2022) (citation omitted). The Networks have made that showing. So USAGM must allocate the specified funds to the Networks. For the same reasons, the Networks are likely to succeed on their mandamus claim. The Networks have demonstrated the need to "correct transparent violations of a clear duty to act." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004) (citation omitted); 28 U.S.C. § 1361.

**E.    The Networks' Are Likely to Succeed on Their Constitutional Claims.**

The Court should reject Defendants' attempt to sidestep the Networks' constitutional claims by dismissing them as "purely statutory." Opp. 20.

Defendants rely on *Dalton v. Specter*, 511 U.S. 462, 473 (1994). Opp. 21. But *Dalton* held only that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." 511 U.S. at 472. The Networks do not contend that *every* statutory violation by the Executive Branch gives rise to a

constitutional claim—but an impoundment of funds *does*, in multiple ways.  *See* RFA Br. 22-29; MBN Br. 22-29.  In cases spanning almost two hundred years, courts, and the Executive Branch itself, in an Office of Legal Counsel opinion authored by William Rehnquist, have repeatedly understood Executive Branch refusals to pay appropriated sums—i.e., sums allocated *by statute* to be paid—as constitutional violations.  *See, e.g.*, *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 610 (1838); *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021); William H. Rehnquist, *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, Office of Legal Counsel, 1 Op. O.L.C. Supp. 303, 309-10 (1969).  It could not be otherwise:  When a president disregards mandatory appropriations, he does not merely exceed his statutory authority, he affirmatively usurps Congress's exclusive authority.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); RFA Br. 22-29; MBN Br. 22-29.

Defendants offer only a drive-by response on the merits, arguing that the Networks are "not funded through direct congressional appropriations," but are instead funded by grant agreements.  Opp. 21.  That is not responsive.  Congress has specifically directed that the Networks "shall" be paid a specific amount via an appropriation.  *See supra* pp. 8-15.  The mechanism by which the Executive is to effectuate that appropriation is not relevant to the question of whether the Executive has the authority to refuse to pay the appropriated funds at all.

## II.    RFA and MBN Respectively Have Demonstrated Irreparable Injury.

Defendants' unlawful impoundment threatens various devastating harms, each of which is independently sufficient to warrant preliminary injunctive relief, and all of which flow directly from Defendants' ongoing refusal to release congressionally appropriated funds.

### A.    The Networks Have Established Irreparable Harm to Their Very Existence.

As Defendants acknowledge, economic harms that "threaten[] the very existence of the movant's business" constitute irreparable harm.  Opp. 22.[8]  That harm is unquestionably present.  Every cent of both Networks' funding comes from their annual appropriations.  Without those funds, both Networks face imminent shutdown.  Fleming Decl. ¶¶ 10, 26; Kline Decl. ¶¶ 15, 42.

Defendants' contention that the Networks have not adequately substantiated the threat to their continued existence is frivolous—and more than a little ironic given that it is the stated aim of USAGM's de facto head to shut the Networks down.  RFA has furloughed 75% of its U.S.-based staff and terminated over 90% of its freelance reporters.  Fleming Decl. ¶ 26.  Without immediate relief, it will shut down virtually all operations in a matter of weeks.  *Id.*  MBN furloughed 95% of its domestic staff, sent Worker Adjustment and Retraining Notification ("WARN") Act notices to its workforce, and—just earlier today—was forced to lay off about 500 staff members (90% of its organization) to stay alive past April.  Kline Decl. ¶ 39; Tim Balk, *Trump Cutbacks Force Layoffs at U.S.-Backed Broadcaster in the Middle East*, N.Y. Times (Apr. 12, 2025).[9]  Only a skeleton staff of about 30 employees remains at MBN.  Balk*, Trump Cutbacks Force Layoffs*.  Its flagship news channel, Alhurra TV, will soon go dark.  Kline Decl. ¶ 42.  These are not theoretical harms—they are documented collapses of operations that threaten the Networks' continued existence.

Defendants make the remarkable assertion that the Networks are required to make "detailed projections" to support their case that the harms they face are existential.  Opp. 23-24.

---

[8] Even if the harm faced by the Networks here was not "existential," the financial losses they are suffering are "certain, imminent, and unrecoverable"—enough to establish irreparable harm.  *Texas Child. Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242 (D.D.C. 2014).  That is particularly true given that money damages are not available for the Networks' APA claims—a point that Defendants entirely ignore.  *See* RFA Br. 38; MBN Br. 41.
[9] https://www.nytimes.com/live/2025/04/12/us/trump-administration-news/trump-cutbacks-force-layoffs-at-us-backed-broadcaster-in-the-middle-east.

The Networks have *already* been forced to furlough or fire the overwhelming majority of their workforces—as confirmed by declarations submitted by the Networks' chief operating officers, which show that RFA will run out of funds "at the end of [April]" and that—even with MBN's anticipated mass layoffs—it will be able to "stay afloat [only] a few weeks past April."  Fleming Decl. ¶ 26; Kline Decl. ¶ 42.  Moreover, the single case Defendants cite for this absurd argument is inapposite—there, a declarant made "conclusory" projections that certain permitting delays would force the declarant to be "out of business in eighteen months."  *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011).  Where, as here, Defendants' actions cut off a grantee's *sole* source of funding, no projection is needed to know what harms will ensue.

### B.   The Networks Have Established Irreparable Harms to Their Reputation, Credibility, and Mission.

Injuries to reputation, trust, and institutional credibility are paradigmatic forms of irreparable harm—particularly where, as here, they flow directly from government action that undercuts an organization's ability to fulfill its core mission.  *See* RFA Br. 37-38; MBN Br. 40-41.  Both RFA and MBN operate in some of the most dangerous and sensitive media environments in the world.  Their credibility with local journalists, sources, and audiences has been built through years of sustained reliability and consistent editorial independence.  That credibility is now collapsing due to USAGM's unlawful impoundment.

RFA has been forced to terminate the vast majority of its freelance contracts across Asia, including in China, North Korea, and Myanmar.  Fleming Decl. ¶ 26; Bralo Decl. ¶ 3.  These terminations send a signal that RFA is no longer a reliable employer or partner; once severed, these relationships may never be rebuilt.  Fleming Decl. ¶ 28; Bralo Decl. ¶¶ 3, 15.  The reputational harm is not merely theoretical; freelance journalists have already withdrawn from RFA work for fear of retaliation in the absence of institutional protection.  Bralo Decl. ¶¶ 9-10.

MBN faces similar harm.  Already it has been forced to terminate the employment of nearly all its overseas staff and to break contracts.  If forced to cease operations altogether, its reputation will suffer irreparable harm across the region.  *See* Kline Decl. ¶¶ 39, 47.  MBN broadcasts into 22 countries in the Middle East and North Africa, where consistent, credible service is essential to maintaining audience trust.  A shutdown—especially one stemming from perceived political interference—will irreversibly damage its brand as an independent voice.  *Id.* ¶¶ 43, 48.

Defendants do not dispute that both Networks' reputations have already been damaged by the forced programming shutdown, mass furloughs, and the termination of freelance reporters. They suggest only that such results do not flow "directly" from their actions.  Opp. 24 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Nonsense.  The Networks' forced shutdown is the direct result of Defendants' impoundment—and it is obvious that the inevitably resulting termination of contracts and operations directly harms the Networks' reputations.

### C.    The Networks Have Established Irreparable Harms to the Safety and Wellbeing of Their Journalists and Staff.

The Networks also face irreparable harm in the form of threats to their journalists and staff.  Without access to appropriated funds, the Networks will no longer be able to protect their journalists operating in countries where they routinely face threats and danger.  Bralo Decl. ¶ 9; Kline Decl. ¶ 50.  Both Networks also employ staff (or, in the case of MBN, employ*ed* until earlier today, when it was forced to lay off more than 90% of its organization) on work-based visas in the U.S. and abroad who will face deportation and persecution—and, in some cases, imprisonment—upon their forced repatriation.  Bralo Decl. ¶ 11; Kline Decl. ¶¶ 44-45.

Defendants argue only that these harms are not cognizable because they affect "third parties."  Opp. 25  That is wrong.  The Networks *themselves* are harmed by the harms to their employees.  Harm to the Networks' employees constitutes harm to the Networks' mission and

operations—the Networks cannot provide reliable news coverage without their journalists.  The Networks' reputation will further suffer if they cannot protect their employees from persecution. *See* RFA Br. 35-37; MBN Br. 39-40.  Notably, none of the authorities Defendants cite (Opp. 25) involve harms to a plaintiff's employees.  *New Mexico v. Musk*, 2025 WL 520583, at *4 (D.D.C. Feb. 18, 2025) (*states* challenging the termination of *federal* employees); *Church v. Biden*, 573 F. Supp. 3d 118, 145-46 (D.D.C. 2021) (harms to unrelated individuals).  The Networks, in their capacity as employers, have a strong interest in preventing harm to their employees.  *See Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *13 (D.D.C. Feb. 3, 2025) (organizations whose "workers may be unable to pay for housing or food" demonstrated irreparable harm).

## III.    The Balance of the Equities and Public Interest Favor Relief.

Finally, the balance of equities and the public interest favor granting the preliminary injunction.  "There is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  *Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation omitted).  A preliminary injunction would merely require defendants to act consistently with the law.  Congress has declared that "[i]t is the policy of the United States to promote the right of freedom of opinion and expression" and that "[i]t is in the interest of the United States to support broadcasting to other nations."  22 U.S.C. § 6201(1), (3).  For decades, Congress has chosen to advance that mission through continued funding of RFA and MBN.  Restoration of that funding is therefore indisputably in the public interest, as declared by Congress.  *Accord RFE/RL, Inc.*, 2025 WL 900481, at *4 (Radio Free Europe/Radio Liberty); *Widakuswara*, 2025 WL 945869, at *10 (Voice of America; "granting this TRO merely requires what is already statutorily mandated").

Further, unlike in the inapposite caselaw cited by Defendants, RFA and MBN face significant, irreparable harm due to Defendants' withholding of their congressionally

appropriated funds—harm that is far more serious than any faced by Defendants.  USAGM's

refusal to provide congressionally appropriated funds "threatens the very existence" of these

organizations.  *See supra* pp. 20-21; *Wis. Gas*, 758 F.2d at 674.  That contrasts starkly with the

only two cases on which Defendants rely.  *See Open Tech. Fund*, 470 F. Supp. 3d at 30 (no

irreparable harm where USAGM CEO's replacement of senior officials "*enhance*[*d*] OTF's

programs" and plaintiffs could later "be restored to the Networks' board of directors" (emphasis

in original)); *Dep't of Educ.*, 2025 WL 1008354, at *1 (U.S. Apr. 4, 2025) (no irreparable harm

where respondents had "financial wherewithal to keep their programs running").

## IV.    The Proposed Injunction Is Proper.

Defendants claim that the Networks seek a mandatory injunction, and assert such relief is

disfavored.  Opp. 9.  But the D.C. Circuit has rejected any distinction between a mandatory and

prohibitory injunction and declined to apply any higher standard to the former, observing that

"the 'mandatory' injunction has not yet been devised that could not be stated in 'prohibitory'

terms."  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016); *see also*

*United States v. W. Elec. Co., Inc.*, 46 F.3d 1198, 1206 (D.C. Cir. 1995); *Mathis v. U.S. Parole*

*Comm'n*, 749 F. Supp. 3d 8, 14 (D.D.C. 2024).

In any event, the Networks seek a prohibitory injunction here.  A prohibitory injunction

restores the status quo:  "the last uncontested status which preceded the pending controversy."

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022).  In a case challenging agency

action, the status quo is the point before the agency took the challenged action.  *See, e.g.*, *Nat'l*

*Council of Nonprofits v. OMB*, -- F. Supp. 3d --, 2025 WL 314433, at *2 (D.D.C. 2025)

(concluding that an administrative stay prohibiting implementation of the OMB funding freeze

memo would "maintain the status quo"); *Endo Par Innovation Co. v. Becerra*, 2024 WL

2988904, at *9 (D.D.C. 2024).  The status quo here preceded the Defendants' unprecedented

impoundment of the Networks' funds.  For decades, Defendants provided the Networks their appropriated funds in the ordinary course.  Enjoining Defendants' impoundment or interference with disbursement of the Networks' appropriated funds restores that status quo.

And regardless of which standard the Court applies, the Networks easily clear it.  The Networks have established a crystal-clear violation of Defendants' statutory and constitutional obligations, devastating irreparable harm, and a lopsided balance of the equities.  This Court should enjoin Defendants' unlawful impoundment.

**V.    The Court Should Not Require a Bond Under Rule 65(c).**

The Court should exercise its discretion to deny Plaintiffs' requested bond.  That request—a payment "each month, equal to the size of any payment" made under the preliminary injunction, Opp. 27—would effectively nullify the relief Plaintiffs seek here.

Federal Rule of Civil Procedure 65(c) "vest[s] broad discretion in the district court," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), including "to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020).  A court may consider the hardship to the plaintiff, and deny the requested security if it "would have the effect of denying the plaintiffs their right to judicial review of administrative action."  *NRDC v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971); *see* Wright & Miller, Federal Practice and Procedure § 2954 (3d ed. 2025).

In enjoining government interference with congressional appropriations, courts in this district and across the country have declined to require plaintiffs to post bond.  *See, e.g.*, Order Granting Motion for Temporary Restraining Order, *RFE/RL, Inc. v. Lake*, No. 25-cv-00799 (D.D.C. Mar. 25, 2025), ECF No. 14; *Nat'l Council of Nonprofits v. OMB*, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025); *Colorado v. HHS*, 2025 WL 1017775, at *6 (D.R.I. Apr. 5, 2025); *Cmty. Legal Servs. in East Palo Alto v. HHS*, 2025 WL 973318, at *4 (N.D. Cal. Apr. 1, 2025).

Other courts have required only nominal bond. *See, e.g., Maryland v. U.S. Dep't of Agriculture*, 2025 WL 800216, at *26 (D. Md. Mar. 13, 2025) (setting nominal bond of $100, an "approach" that "has long been followed in public-interest litigation cases").

Defendants' requested bond would effectively deprive the Networks of judicial review. Posting a bond equal to all appropriated funding received under the preliminary injunction would in effect require Plaintiffs to forgo all of their mandatory appropriations until the conclusion of this litigation—thus inflicting the very irreparable harm that prompted the Networks to seek preliminary relief. Such a bond would "defy logic—and contravene the very basis" of the preliminary injunction order, *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19, and "would ensure that very few individuals could afford to sue the federal government" for withholding mandatory appropriations, *Widakuswara*, 2025 WL 945869, at *11. It is also impossible here, when Defendants themselves have ensured that the Networks' funding runs dry. The Court should deny bond and find that no security is required.[10]

## VI.    The Court Should Not Grant a Stay.

Defendants ask this Court to stay any order for at least seven days. The Court should decline that request. Defendants cannot meet the standards for a stay; they do not even attempt to show otherwise. For the reasons explained above, the Networks are experiencing dire, ongoing, and irreparable harm. A stay would needlessly and unlawfully prolong it. And nothing prevents Defendants from prosecuting an appeal while they comply with Congress's direction.

## CONCLUSION

The Court should grant preliminary injunctions in favor of the Networks.

---

[10] Defendants likewise fail to explain what "costs and damages" they would incur if "found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). While Defendants gesture at "funds lost to United States taxpayers," Opp. 27, Congress has *already* mandated that appropriated funds be allocated to the Networks. *See Widakuswara*, 2025 WL 945869, at *11; *Pacito v. Trump*, 2025 WL 893530, at *15 (W.D. Wash. Mar. 24, 2025).

April 12, 2025

/s/ Kristin Bateman
Kristin Bateman*^
Jennifer Fountain Connolly (D.C. Bar No. 1019148)
Robin F. Thurston (D.C. Bar No. 1531399)
Skye L. Perryman (D.C. Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org
jconnolly@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

Respectfully submitted,

/s/ Donald B. Verrilli, Jr.
Donald B. Verrilli, Jr. (D.C. Bar. No. 420434)
Ginger D. Anders (D.C. Bar. No. 494471)
Jeremy S. Kreisberg (D.C. Bar No. 1048346)
Helen E. White (D.C. Bar No. 1741368)*
Esthena L. Barlow (D.C. Bar No. 90000252)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Donald.Verilli@mto.com
Ginger.Anders@mto.com
Jeremy.Kreisberg@mto.com
Helen.White@mto.com
Esthena.Barlow@mto.com

Hailyn J. Chen**
Adeel Mohammadi**
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Hailyn.Chen@mto.com
Adeel.Mohammadi@mto.com

Gabriel M. Bronshteyn**
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
(415) 512-4000
Gabriel.Bronshteyn@mto.com

*Admission pending
**Pro hac vice application pending
^ Admitted only in California; practice supervised by members of the D.C. bar

Attorneys for Radio Free Asia and Middle East Broadcasting Networks, Inc.